**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**


| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **Criminal Case No. 1:13-cr-00142-PB** |
| **v.** | ) | |
| | ) | |
| **JOHNATHON IRISH** | ) | |
| _____ | ) | |

**UNITED STATES' OBJECTION TO DEFENDANT'S**
**MOTION TO DISMISS COUNT V OF THE INDICTMENT**


I.    Introduction.

       Arguing that the government lacks a compelling interest, under a strict scrutiny analysis,

to prohibit the possession of firearms by unlawful users of controlled substances – specifically

marijuana, as applied in this case – the defendant contends that Count V of the instant

indictment, which charges him with unlawfully possessing a firearm under 18 U.S.C. §

922(g)(3), violates his Second Amendment right to keep and bear arms as construed in District of

Columbia v. Heller, 554 U.S. 570 (2008).[1]

       Although yet to be squarely addressed by the First Circuit, this issue is by no means

novel.  In fact, numerous courts of appeals and various district courts have entertained, and

ultimately rejected, both facial and as-applied Second Amendment challenges to the

constitutionality of § 922(g)(3) post-Heller, including cases in which the underlying drug was

marijuana.   See, e.g., United States v. May, 538 Fed. App'x 465, 466 (5th Cir. 2013) (rejecting

facial Second Amendment challenge to § 922(g)(3) where the underlying drug was marijuana);

United States v. Dugan, 657 F.3d 998, 999 (9th Cir. 2011) (same); United States v. Yancey, 621

_____

[1] The defendant also obliquely refers to a due process argument, which the government will attempt to
unpack independently.

F.3d 681, 683 (7th Cir. 2010) (same); United States v. Seay, 620 F.3d 919, 925 (8th Cir. 2010) (same); United States v. Richard, 350 Fed. App'x 252, 260 (10th Cir. 2009) (similar).[2]  For the reasons that follow – and which have already been thoroughly explicated in the above-referenced litany of unsuccessful challenges – the defendant's constitutional claim should be similarly rejected by this Court.

II.        18 U.S.C. § 922(g)(3) is not facially invalid.

The defendant first contends that § 922(g)(3) impermissibly infringes on an individual's Second Amendment right to bear arms, and is therefore facially unconstitutional.  To succeed on this challenge, he "must establish that no set of circumstances exists under which [§ 922(g)(3)] would be valid,"  United States v. Salerno, 481 U.S. 739, 745 (1987) – or, pursuant to the First Circuit's more recently "refin[ed]" framework for assessing Second Amendment challenges, that "the statute lacks any 'plainly legitimate sweep[,]'" Hightower v. City of Boston, 693 F.3d 61, 77-78 (1st Cir. 2012) (quoting Washington v. Glucksberg, 521 U.S. 702, 740 n. 7 (1997)).[3]  The defendant fails to meet this substantial burden.

---

[2] See also United States v. Roberge, 2013 WL 4052926, at *18 (E.D. Tenn. 2013) (rejecting facial and as-applied Second Amendment challenges to § 922(g)(3)); United States v. Conrad, 923 F.Supp.2d 843, 851 (W.D. Va. 2013) (same); Tyler v. Holder, 2013 WL 356851, at *4 (W.D. Mich. 2013) (similar); United States v. Emond, 2012 WL 4964506, at *4-5 (D. Me. 2012) (similar where one of the underlying drugs was marijuana); United States v. Korbe, 2010 WL 2404394, at *3-4 (W.D. Pa. 2010) (similar); United States v. Lacy, 2009 WL 3756987, at *1 (E.D. Wis. 2009) (similar); United States v. Carter, 669 F.3d 411, 417 (4th Cir. 2012) (vacating and remanding for further development, but strongly suggesting that it would reject such a constitutional attack on § 922(g)(3), even where the underlying drug was marijuana).

[3] In Hightower, the Court recognized that its test was a "refinement" of the Salerno formulation, but declined to decide which was controlling in cases involving Second Amendment challenges.  Hightower v. City of Boston, 693 F.3d 61, 78 n. 13 (1st Cir. 2012) ("We have also noted that the 'plainly legitimate sweep' language is a 'refinement' of the Salerno formulation.  We do not resolve this issue here . . . . [Although] [o]ther circuits have applied the Salerno formulation in cases raising facial challenges under the Second Amendment.").

A.      § 922(g)(3) is "presumptively lawful" under *Heller*.

As a preliminary matter, 18 U.S.C. § 922(g)(3), which prohibits the possession of

firearms by unlawful drug users,[4] regulates conduct of a criminal nature that calls into question

the capacity of a possessor to safely and responsibly operate a firearm.  Accordingly, this

provision, as explained in greater detail below, is akin to the "longstanding prohibitions" on

firearms that the Supreme Court has recognized to be "presumptively lawful."  See Heller, 554

U.S. at 626-27.

The Second Amendment provides that "[a] well regulated militia being necessary to the

security of a free State, the right of the people to keep and bear arms shall not be infringed."

United States Const. Amend II.  In Heller, the Supreme Court held, *inter alia*, that the Second

Amendment safeguards the individual "right to keep and bear arms for the purpose of self-

defense."  554 U.S. at 626-29, 634-36.  In so doing, the Court deemed unconstitutional two

District of Columbia statutes that wholly banned handgun possession in the home, and required

all other firearms within the home to be kept inoperable, thus rendering them unavailable for

their lawful purpose.  Id. at 634-36.

At the same time, the Court cautioned that, "[l]ike most rights, the right secured by the

Second Amendment is not unlimited[,]" expounding in dicta that "nothing in [the] opinion

should be taken to cast doubt on longstanding prohibitions on the possession of firearms by

felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as

---

[4] Title 18, United States Code, Section 922(g)(3) provides, in pertinent part:

> It shall be unlawful for any person . . . who is an unlawful user of or
> addicted to any controlled substances (as defined in section 102 of the
> Controlled Substances Act (21 U.S.C. 802) . . . to ship or transport in
> interstate or foreign commerce, or possess in or affecting commerce, any
> firearm or ammunition . . . or to receive any firearm or ammunition
> which has been shipped or transported in interstate or foreign commerce.

schools and government buildings, or laws imposing conditions and qualifications on the

commercial sale of firearms." Id. at 626-27.  The Court intended its identification of such

"presumptively lawful regulatory measures only as examples," noting that "the list does not

purport to be exhaustive." Id. at 627 n. 26.  In short, like other constitutional rights, Heller

recognized that the individual right protected by the Second Amendment is not absolute, but

rather is subject to certain reasonable categorical restrictions.

       While the Court declined to explain the analytical framework employed to determine the

presumptive constitutionality of these (or similar) regulatory measures, it did make one concept

quite clear: the fundamental right to use arms in the defense of hearth and home was intended to

extend only to "*law-abiding, responsible citizens*." Id. at 635.  This notion, supported by

significant historical scholarship, is consistent with the view that in "classical republican

philosophy, the concept of a right to arms was inextricably and multifariously tied to that of the

'virtuous citizen,'" such that "the right to arms does not preclude laws disarming the unvirtuous

(i.e. criminals [or those engaged in criminal conduct]) or those who, like children or the mentally

unbalanced, are deemed incapable of virtue."  Don B. Kates, Jr., The Second Amendment: A

Dialogue, Law & Contemp. Probs., Winter 1986, at 146 (1986); see also Don B. Kates &

Clayton E. Kramer, Second Amendment Limitations and Criminological Considerations, 60

Hastings L.J. 1339, 1359 & n. 120 (2009).

       Indeed, as early as 1760, William Blackstone explained that English subjects enjoyed a

right to possess arms for their defense, "suitable to their condition and degree" and "under due

restrictions."  I William Blackstone, Commentaries, at *139.  This right and others, according to

Blackstone, were subject to "necessary restraints," viewed as "gentle and moderate," and

designed to prevent "what would be pernicious either to ourselves or our fellow citizens." Id. at

*140.  Proposals from the American founding period reflect a similar perception of the pre-existing right to bear arms.  For example, at the Massachusetts Ratifying Convention, a proposition by Samuel Adams would have forbidden Congress to prevent "the people of the United States *who are peaceable citizens*, from keeping their own arms."  Journal of Convention: Wednesday, February 6, 1788 (emphasis added).  This historical understanding of the inherent limitations on the right to bear arms is reflected in the Supreme Court's review of the legislative intent behind the Gun Control Act of 1968, which in turn codified the predecessor of § 922(g)(3):

> [Congress enacted the Gun Control Act of 1968] broadly to keep firearms away from the persons [it] classified as potentially irresponsible and dangerous . . . .
>
> The history of the 1968 [Gun Control] Act reflects a similar concern with keeping firearms out of the hands of *categories of potentially irresponsible persons*, including convicted felons.

Barrett v. United States, 423 U.S. 212, 218, 220 (1976) (emphasis added); see also Huddleston v. United States, 415 U.S. 814, 824 (1974) ("The principal purpose of the federal gun control legislation . . . was to [curb] crime by keeping 'firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'") (quoting S. Rep. No. 1501, 90th Cong., 2d Sess., 22 (1968), and citing 114 Cong. Rec. 13219 (1968) (remarks by Sen. Tydings)).

Those historically accepted limitations on the right to bear arms are, as Heller confirmed, just as applicable now, and the defendant in this case is neither law-abiding nor a responsible citizen within the contemplation of the Second Amendment.  At the time he is alleged to have violated § 922(g)(3), the defendant was a previously convicted drug offender,[5] and his current

---

[5] The defendant was convicted of a misdemeanor marijuana offense under the laws of New Hampshire in 2009.

offense involved the possession of firearms while engaged in the recurring use of a controlled substance, to wit, marijuana.  Much as the Court in <u>Heller</u> recognized that the prohibitions on firearms possession by felons and the mentally ill were regarded as "presumptively lawful" and therefore unaffected by <u>Heller's</u> mandate, § 922(g)(3) regulates conduct that is likewise illicit in nature and impairs the ability of a person to utilize firearms in a responsible manner. Consequently, like the other "well-rooted, public-safety-based exceptions to the Second Amendment" contained in § 922(g)'s sister subsections, § 922(g)(3) represents a sound congressional "determination that those unlawfully using or addicted to controlled substances should not have firearms at the ready."  <u>United States v. Chafin</u>, 2008 WL 4951028, at *2 (S.D. W. Va. 2008);[6] <u>see also</u> <u>Yancey</u>, 621 F.3d  at 684-85 (equating firearm restrictions for habitual drug users with similar restrictions under § 922(g) for felons and the mentally ill, explaining that "[k]eeping guns away from habitual drug abusers is analogous to disarming felons," and that "[h]abitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control.").

Following <u>Heller</u>, courts have universally rejected Second Amendment challenges to 18 U.S.C. § 922(g)(1)'s preclusion of firearm possession by convicted felons, often citing <u>Heller's</u> "presumptive[ ] lawful[ness]" language.  <u>See, e.g.</u>, <u>United States v. Schrag</u>, 542 Fed. App'x 583, 585 (9th Cir. 2013); <u>United States v. Barton</u>, 633 F.3d 168, 172 (3d Cir. 2011); <u>United States v.

---

[6] The legislative history of § 922 also makes clear that Congress considered firearms-related dangers posed by unlawful drug users and adjudicated mental defectives to be comparable, as they were considered together as part of Congress' effort to place "prohibitions against the sale or other disposition to unlawful users of narcotic drugs and adjudicated mental defectives[.]"  1968 U.S.C.C.A.N. 4410, 4413. The history notes that, while the subsection "originally made it unlawful for a felon, fugitive, or one under indictment to receive a firearm or ammunition which has been shipped or transported in interstate or foreign commerce[,]" a committee amendment was later added to include both unlawful drug users and adjudicated mental defectives in the list of persons categorically prohibited from receiving firearms.  <u>Id.</u> at 4421.

Rozier, 598 F.3d 768, 771 (11th Cir. 2010).  Moreover, citing the same language, at least one court has also presumptively validated the firearms prohibition encompassed by § 922(g)(9), for those committing misdemeanor domestic violence crimes.  See, e.g., United States v. White, 593 F.3d 1199, 1205-06 (11th Cir. 2010); but cf. United States v. Booker, 644 F.3d 12, 25 (1st Cir. 2011) (noting that while § 922(g)(9) "appears consistent with Heller's reference to certain presumptively lawful regulatory measures," any "categorical ban on gun ownership by a class of individuals must be supported by some form of 'strong showing,' necessitating a substantial relationship between the restriction and an important governmental objective").

In sustaining the constitutionality of § 922(g)(3) against Second Amendment assaults, several courts have similarly invoked Heller's keystone presumption.  See, e.g., Seay, 620 F.3d at 925 ("[W]e find that § 922(g)(3) is the type of 'longstanding prohibition[ ] on the possession of firearms' that Heller declared presumptively lawful."); Richard, 350 Fed. App'x at 260 (holding, without significant discussion, that § 922(g)(3) is the kind of "longstanding prohibition[ ] on the possession of firearms" preserved in Heller); Dugan, 657 F.3d at 999 (interpreting Heller to mean that §922(g)(3) embodies a long-standing prohibition of conduct); Korbe, 2010 WL at *3-4 (holding that § 922(g)(3) is a "regulatory measure [ ] that Heller held to be presumptively lawful"); Lacy, 2009 WL at *1 (similar).

At bottom, like felons and those convicted of misdemeanor crimes of domestic violence, unlawful users of controlled substances pose a risk to society if permitted to bear arms – the very type of individual instability historically excluded from the Second Amendment's inherently limited scope – and prohibiting such possession does not contravene the protections guaranteed by the Second Amendment.  It is, therefore, appropriate that the "longstanding prohibition" against drug users possessing firearms be excepted by Heller from those statutes requiring

7

review.  Section 922(g)(3) is far from the broad ban on firearm possession at issue in <u>Heller</u>, and
its validity should be sustained presumptively.  <u>See</u> <u>Booker</u>, 644 F.3d at 25 n. 17 (1st Cir. 2011)
("While we do not attempt to discern the 'core' Second Amendment right vindicated in <u>Heller</u>,
we note that <u>Heller</u> stated that the Second Amendment 'elevates above all other interests the
right of law-abiding, responsible citizens to use arms in defense of hearth and home . . . .  We
would question whether appellants, who manifestly are not 'law-abiding, responsible citizens,'
fall within this zone of interest.").

      B.      <u>If further review is necessary, intermediate scrutiny is the applicable standard</u>.

Assuming, *arguendo*, that the defendant's constitutional claim is subject to further
review, the appropriate standard of enquiry is something far closer to intermediate, rather than
strict, scrutiny.  <u>See</u> <u>id.</u> (holding that a categorical ban on gun ownership by a class of individuals
must be supported by "some form of 'strong showing,' necessitating a substantial relationship
between the restriction and an important governmental objective").  The defendant's claim to the
contrary – that strict scrutiny should be applied – is flawed in several respects.

In <u>Heller</u>, and subsequently in <u>McDonald v. City of Chicago</u>, 130 S. Ct. 3020, 3050
(2010), the Supreme Court expressly declined to adopt any specific standard for resolving
Second Amendment challenges.  Rather, the Court held that the District of Columbia's
comprehensive ban precluding law-abiding citizens from possessing handguns "fail[ed]
constitutional muster . . . [u]nder any of the standards of scrutiny that we have applied to
enumerated constitutional rights."  554 U.S. at 628.  Thus, while the Court eschewed rational
basis scrutiny, it neither adopted a strict scrutiny analysis nor precluded intermediate scrutiny for
Second Amendment claims.  <u>Id.</u> at 628 n. 27, and 634.  Moreover, by recognizing the presumed
validity of a wide range of firearms restrictions, including restrictions of the kind found in

§ 922(g), the Court in <u>Heller</u> implicitly suggested that a standard less exacting than strict scrutiny would be appropriate for resolving Second Amendment claims implicating those areas.  <u>See id.</u> at 687-88 (Breyer, J., dissenting).

In light of the Supreme Court's refusal to identify a single standard for resolving Second Amendment claims (much less the most exacting standard), and its statement that nothing in its decision undercuts the presumed validity of various "longstanding [firearms] prohibitions," it is unsurprising that every court to address the issue after <u>Heller</u> has rejected the argument that strict scrutiny applies, instead employing – at least where the level of scrutiny is explicitly identified – the less exacting standard of intermediate scrutiny.  <u>See, e.g.</u>, <u>United States v. Carter</u>, 669 F.3d 411, 417 (4th Cir. 2012) (applying intermediate scrutiny to assess a Second Amendment challenge to § 922(g)(3)); <u>Yancey</u>, 621 F.3d at 683 (same); <u>Seay</u>, 620 F.3d at 925 (same); <u>Dugan</u>, 657 F.3d at 999 (same); <u>Roberge</u>, 2013 WL  at *18 (same); <u>Holder</u>, 2013 WL at *4 (same); <u>Emond</u>, 2012 WL 4964506 at *4-5 (same); <u>cf.</u> <u>Richard</u>, 350 Fed. App'x at *2 (summarily upholding § 922(g)(3) without specifying a level of scrutiny).  Additionally, while the First Circuit has yet to directly address a Second Amendment challenge to § 922(g)(3), it applied what appeared to be the functional equivalent of intermediate scrutiny in reviewing the constitutionality, under the Second Amendment, of a different provision of § 922(g).  <u>Booker</u>, 644 F.3d at 25 (applying a standard similar to intermediate scrutiny to a Second Amendment challenge of 18 U.S.C. § 922(g)(9)).

Nor does the application of strict scrutiny turn, as the defendant suggests, on the mere characterization of a right as "core" or "fundamental."  To the contrary, even with respect to rights denominated as "fundamental" in nature, the Supreme Court often does not apply strict scrutiny.  <u>See, e.g.</u>, <u>Burdwick v. Takushi</u>, 504 U.S. 428, 432-34 (1992) (Although "[i]t is beyond

9

cavil that voting is of the most fundamental significance under our constitutional structure," it is erroneous to assume that "a law that imposes any burden on the right to vote must be subject to strict scrutiny. [. . . ]  [Rather,] a more flexible standard applies.") (internal quotations omitted); see generally, Adam Winkler, Fundamentally Wrong About Fundamental Rights, 23 Const. Comment. 227, 227-28 (Summer 2006) ("In fact, only a small subset of fundamental rights triggers strict scrutiny – and even among those strict scrutiny is applied only occasionally.") (citing numerous cases); Richard H. Fallon, Jr., Some Confusions About Due Process, Judicial Review, and Constitutional Remedies, 93 Colum. L. Rev. 309, 315 (1993) ("Not every restriction of a right classified as fundamental incurs 'strict' scrutiny.").  Most notably, strict scrutiny is frequently not applied even in the First Amendment context.  See, e.g., United States v. O'Brien, 391 U.S. 367 (1968) (applying intermediate scrutiny to content-neutral laws burdening expressive conduct).  Thus, despite the Court's pronouncement in Heller and McDonald that the Second Amendment encompasses a "fundamental" right, it does not necessarily follow that § 922(g)(3) should be subjected to strict scrutiny review, and in fact, applying such a standard would be entirely inconsistent with the prevailing post-Heller jurisprudence.

> C.    Under intermediate scrutiny, § 922(g)(3) is substantially related to an important government objective.

Applying the intermediate scrutiny test requires the Court to consider whether § 922(g)(3) is "substantially related to an important government objective."  Clark v. Jeter, 486 U.S. 456, 461 (1988); Kittery Motorcycle, Inc. v. Rowe, 320 F.3d 42, 47 (1st Cir. 2003).  The government objective is clear: Congress enacted the exclusions in § 922(g) to keep guns out of the hands of presumptively risky people, like drug addicts and chronic users, in order to suppress armed violence.  See Dickerson v. New Banner Inst., Inc., 460 U.S. 103, 112 n. 6; see also S.

Rep. No. 90-1501, at 22 (1968) ("The ready availability, that is, the ease with which any person can anonymously acquire firearms (including criminals . . . narcotic addicts, mental defectives . . . and others whose possession of firearms is similarly contrary to the public interest) is a matter of serious national concern."). This objective is, without a doubt, an important one. <u>Salerno</u>, 481 U.S. 747 ("There is no doubt that preventing danger to the community is a legitimate regulatory goal."); <u>Yancey</u>, 621 F.3d at 684; <u>Carter</u>, 669 F.3d at 413 ("[W]e conclude, applying the intermediate scrutiny standard, that Congress had an important objective for enacting § 922(g)(3) to reduce gun violence."); <u>Emond</u>, 2012 WL at *5 ("Preventing gun violence is an important government objective[.]").

The defendant concedes as much, but argues that § 922(g)(3), both facially and as-applied to him, does not substantially further that interest without excessively intruding on Second Amendment rights. In other words, the defendant challenges the link between marijuana usage and gun violence. The question, then, is whether categorically prohibiting unlawful users of drugs (including marijuana) from possessing firearms reasonably fits this important governmental interest. Myriad sources strongly suggest that it does, including *every court to consider the issue*, among them the Courts of Appeals for the Fourth, Fifth, Eighth, Ninth, and Tenth Circuits; volumes of empirical data, several examples of which have been attached to this memorandum as substantive exhibits; and last, but certainly not least, plausible notions of common sense.

In using those sources to make its determination, the Court should consider two important foundational aspects of the decisional framework: first, intermediate scrutiny does not require a seamless fit between § 922(g)(3) and the goals that Congress aspired to achieve – rather, the fit need only be a reasonable one, <u>United States v. Mahin</u>, 668 F.3d 119, 127-128 (4th Cir. 2012)

(intermediate scrutiny "has never been held to require a perfect end-means fit"); and second, the text and reach of § 922(g)(3) are more than relevant – they are critical.  In fact, the "reasonable fit" inquiry should begin by reviewing the precise contours of the challenged statute, which, here, are especially narrow.  The point was most recently, and succinctly, made by the Court of Appeals for the Fourth Circuit in considering an identical Second Amendment challenge to § 922(g)(3):

> [Section] 922(g)(3) does not permanently disarm all persons who, at any point in their lives, were unlawful drug users or addicts. Instead, it only applies to persons who are currently unlawful users or addicts.  This feature of § 922(g)(3) contributes to its proportionality for two reasons.
>
> First, . . . it is less intrusive than other statutes that impose a permanent prohibition on the possession of firearms . . . . Congress tailored the prohibition to cover only the time period during which it deemed such persons to be dangerous.
>
> Second[,] § 922(g)(3) tracks the ongoing choices of individuals either to remain drug users or to quit drug abuse . . . . [Section] 922(g)(3) enables a drug user who places a high value on the right to bear arms to regain that right by parting ways with illicit drug use.  Given that the Supreme Court has already signaled that the permanent and virtually irreversible prohibition on firearm possession by convicted felons is "presumptively lawful," we might finding it challenging to conclude that the narrower classification set forth in § 922(g)(3) is unlawful.

United States v. Carter, 669 F.3d 411, 417 (4th Cir. 2012).  Mindful of the challenged statute's exceedingly narrow prohibitory sweep, and the requirement that such sweep need only "reasonably fit" the important governmental interest of keeping guns away from potentially dangerous individuals, the Court should consider the following in support of the government's position.

(i)    <u>Empirical data establishes a connection between the abuse of drugs – including marijuana – and (often violent) criminal behavior</u>.

There is undoubtedly a robust association between drug abuse (or addiction) and criminal conduct, as described in several of the exhibits attached to this memorandum.  <u>See, e.g.</u>, Lana Harrison & Joseph Gfroerer, <u>The Intersection of Drug Use and Criminal Behavior: Results from the National Household Survey on Drug Abuse</u>, 38 Crime & Delinquency 422, 423 (1992) ("Research has consistently demonstrated a high degree of correlation between drug use and criminal behaviors[,]" and also observing that "rates of criminal behavior are higher for populations more heavily involved in drug use") (referencing five different studies respecting the first quoted observation)[7]; Dixie J. Koo <u>et al.</u>, <u>Violent Victimization and the Routine Activities/Lifestyle of Active Drug Users</u>, 38 J. Drug. Iss. 1105, 1106 (2008) (hereafter "<u>Violent Victimization</u>") ("A substantial portion of the violence today is attributed to drug-trafficking and substance abuse, and criminal victimization associated with substance use is a serious concern.") (referencing four additional studies)[8].

A similar correlation has been established between drug use and *violent* crime in particular.  For example, the Harrison and Gfroerer article noted a 1989 study indicating "that violence is peripherally related to drug abuse."  Harrison & Gfroerer, at 424; <u>see also</u> <u>id.</u> at 438 ("Drug users are . . . more likely to engage in property and violent crime . . . .").  Other sources suggest an even tighter link.  Bureau of Justice Statistics, U.S. Dep't of Justice, <u>Substance Abuse and Treatment, State and Federal Prisoners</u>, 1997, at 2 (1999) ("1999 BJS Report") ("Among Federal prisoners the reported use of alcohol or drugs at the time of offense showed greater

---

[7] Attached hereto as Government Exhibit 1.

[8] Attached hereto as Government Exhibit 2.

variation by offense type.  Violent offenders reported the highest levels . . . .").[9]  The 1999 BJS

Report also observed that "[a] third of State prisoners said they had committed their current

offense while under the influence of drugs . . . . [a]nd robbery (40%) [along with drug possession

and trafficking] . . . were the most closely tied to drug influence."  Id. at 3.  The 1999 BJS

Report's findings on marijuana usage were particularly noteworthy, given that marijuana is the

present defendant's drug of choice: "Fifty-seven percent of State prisoners said they had used

drugs in the month before their current offense, up from 50% in 1991 . . . . [a]nd [t]he use of

marijuana in the month before the offense (39%) had increased since 1991 (32%)."  Id. at 4.  A

similar growth rate was seen on the federal side, with the percentage of federal inmates using

marijuana *while committing their offense* growing from 6% to 11% since 1991.  Id.

　　　　A more recent report from the Bureau of Justice Statistics is of perhaps even greater

concern.  It provides that "half . . . of Federal inmates reported drug use in the month before their

offense, up from 45% in 1997."  Bureau of Justice Statistics, U.S. Dep't of Justice, Drug Use and

Dependence, State and Federal Prisoners, 2004, at 1 (2007) ("2007 BJS Report").[10]  The 2007

BJS Report also noted that "[p]risoners who met the criteria for recent drug dependence or abuse

had extensive criminal records."  Id.  Importantly, the 2007 BJS Report observed that *"forty*

*percent of [state inmates] . . . reported using marijuana in the month before their offense, and*

*15% said they had used marijuana at the time of the offense*," and similarly found that 36.2% of

federal prisoners reported using marijuana in the month before their offense, while 14% said they

had used marijuana at the time of the offense.  Id. at 2 (emphasis added); see also id. ("Marijuana

remain[s] the most common drug used by . . . prisoners.").  Given the limited legalization of

---

[9] Attached hereto as Government Exhibit 3.

[10] Attached hereto as Government Exhibit 4.

marijuana (albeit in a very small number of states), and the growing movement to approve its use for certain limited medicinal purposes, those troubling statistics are only likely to worsen.

A few among the many similar sources are additionally worth mentioning.  One article finds that for violent offenses such as murder, rape, robbery, and aggravated assault, the adults who were arrested for such crimes in the preceding year were more likely to have used an illicit drug during that period than those who were not arrested (63.1% versus 13.7%).  Office of applied Studies, Substance Abuse and Mental Health Services Administration, Illicit Drug Use Among Persons Arrested for Serious Crimes, (2005).[11]  Another study found that "[c]riminals who use illegal drugs commit robberies and assaults more frequently than do nonuser criminals, and they commit them especially frequently during periods of heavy drug use."  H. Virginia McCoy, et al., Perpetrators, Victims, and Observers of Violence: Chronic and Non-Chronic Drug Users, 16 J. Interpersonal Violence 890, 906 (2001).[12]  The McCoy study further observed that "more than one half of all homicides in New York were drug related . . . . [and] more than half of arrestees booked for violent crimes were confirmed by laboratory tests to have used at least one illegal drug in the hours before their arrest."  Id. at 891.

The defendant, both in his facial and as-applied constitutional challenges to § 922(g)(3), seeks to isolate and differentiate marijuana from its illicit brethren, but the proposed differentiation finds little traction in the empirical evidence.  Harrison and Gfroerer, for instance, observed that, as of 1991, "[t]he most prevalent of the illicit drugs [used by inmates] was cannabis, with 33.4% prevalence, 9.6% past-year prevalence, and 4.8% past-month prevalence."  Harrison & Gfroerer, at 429.  Moreover, as noted above, even more recent data suggest that a significant percentage of individuals convicted of felony criminal conduct admitted to using

---

[11] Attached hereto as Government Exhibit 5.

[12] Attached hereto as Government Exhibit 6.

marijuana shortly before, or even during, their criminal acts.  2007 BJS Report, at 2.  Studies

such as these persuaded the United States Court of Appeals for the Seventh Circuit to conclude,

in a similar marijuana-related Second Amendment challenge to § 922(g)(3), that "[a]mple

academic research confirms the connection between drug use and violent crime," United States

v. Yancey, 621 F.3d 681, 686 (7th Cir. 2010) – a position credited by the Court of Appeals for

the Fourth Circuit in United States v. Carter, 669 F.3d 411, 417 (4th Cir. 2012) (noting that while

"the government . . . chose[ ] not to rely on academic research or other empirical data to

demonstrate the connection between drug use and gun violence, . . . such evidence is abundantly

available.").

      The defendant could, if he so chose, attempt to nip at the edges of these studies.  For

example, at least one article attempts to debunk the belief that marijuana use is causally related

to violent behavior.  See Evelyn H. Wei et al., Teasing Apart the Developmental Associations

Between Alcohol and Marijuana Use and Violence, 20 J. of Contemp. Crim. Just. (2004).[13]  As

is apparent from the earlier-referenced collection of authorities, however, the weight of the

literature is decidedly against such findings.[14]

      While the many studies concerning drug usage and violence may not, with absolute

certainty, define a strict causal nexus, such is not the standard; Congress is not precluded from

legislating in a certain manner simply because it cannot conclusively exclude every possible

contributing variable when it nevertheless has strong evidence of a link between the regulated

---

[13] Attached hereto as Government Exhibit 7.

[14] Congress itself explicitly recognized the link between marijuana and the potential for gun violence.  It effected the precursor of what is now § 922(g)(3), in part, by prohibiting several classes of persons from receiving firearms shipped in interstate commerce, including drug users.  While the statute swept in users of several different categories of drugs, marijuana was the only drug specifically listed by name.  See Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, 1220-21 (prohibiting receipt of firearms by any person who is "an unlawful user of or addicted to marihuana or any depressant or stimulant drug . . . or narcotic drug").

variable and the problem sought to be remedied.  The empirical data strongly suggest that drug use – including marijuana use – is rampant among criminal offenders, and often plays a role in the actual offense conduct.  Even if that link is not entirely indisputable, it is strong enough to render Congress's regulatory fit under § 922(g)(3) a reasonable one in achieving the important goal of reducing violent crime.

(ii)    The courts have endorsed the government's position without fail.

Often in reliance on the empirical evidence, every court to consider a Second Amendment challenge to § 922(g)(3), whether facial or as-applied, has found the statute to pass constitutional muster.  See, e.g., United States v. May, 538 Fed. App'x 465, 466 (5th Cir. 2013) (rejecting facial Second Amendment challenge to § 922(g)(3) where the underlying drug was marijuana); United States v. Dugan, 657 F.3d 998, 999 (9th Cir. 2011) (same); United States v. Yancey, 621 F.3d 681, 683 (7th Cir. 2010) (same); United States v. Seay, 620 F.3d 919, 925 (8th Cir. 2010) (same); United States v. Richard, 350 Fed. App'x 252, 260 (10th Cir. 2009) (similar); United States v. Roberge, 2013 WL 4052926, at *18 (E.D. Tenn. 2013) (rejecting facial and as-applied Second Amendment challenges to § 922(g)(3)); United States v. Conrad, 923 F.Supp.2d 843, 851 (W.D. Va. 2013) (same); Tyler v. Holder, 2013 WL 356851, at *4 (W.D. Mich. 2013) (similar); United States v. Emond, 2012 WL 4964506, at *4-5 (D. Me. 2012) (similar where one of the underlying drugs was marijuana); United States v. Korbe, 2010 WL 2404394, at *3-4 (W.D. Pa. 2010) (similar); United States v. Lacy, 2009 WL 3756987, at *1 (E.D. Wis. 2009) (unpublished) (similar); United States v. Carter, 669 F.3d 411, 417 (4th Cir. 2012) (vacating and remanding for further development, but strongly suggesting that it would reject such a constitutional attack on § 922(g)(3), even where the underlying drug was marijuana).

In Yancey, for example, the Seventh Circuit, applying intermediate scrutiny, held that § 922(g)(3) is substantially related to an important government objective, recognizing that the statute's broad objective of "suppressing armed violence" is "without a doubt an important one." 621 F.3d at 684.  The Court elaborated that "habitual drug users, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms," noting further that "studies amply demonstrate the connection between chronic drug abuse and violent crime, and illuminate the nexus between Congress's attempt to keep firearms away from habitual drug abusers and its goal of reducing violent crime."  Id. at 685-86.

In Seay, the Eighth Circuit agreed, holding that "[n]othing in [the defendant's] argument convinces us that we should depart company from every other court to examine § 922(g)(3) following Heller.  Further, § 922(g)(3) has the same historical pedigree as other portions of § 922(g)(3) which are repeatedly upheld by numerous courts since Heller."  620 F.3d at 925. And in Dugan, the Ninth Circuit similarly explained that

> [W]e see the same amount of danger in allowing habitual drug users to traffic in firearms as we see in allowing felons and mentally ill people to do so.  Habitual drug users, like career criminals and the mentally ill, more likely will have difficulty exercising self-control, particularly when they are under the influence of controlled substances.

657 F.3d at 999.  Of particular note is that, in each of these cases (and others cited above), as here, the defendants' underlying drug of choice was marijuana.

The defendant fails to counter this overwhelming authority with even a single case in which a court has implicitly suggested, much less held, that § 922(g)(3) is violative of the Second Amendment.

(iii)    <u>Common sense suggests that Congress's regulatory scheme reasonably fits</u>.

Putting aside, for the moment, the case law and empirical data, there are also plausible common-sense notions that support the constitutionality of § 922(g)(3).  For example, due to the illegal nature of their activities, drug users and addicts are reasonably more likely than other individuals to have hostile encounters with law enforcement, and adding firearms to those engagements could significantly increase their dangerousness.  In a similar vein, because drug users and addicts necessarily interact with a criminal element when obtaining the illicit drugs, their transactions in the black market would present far greater risks of violence (including gun violence) than lawful commerce; and the inflated price of illegal drugs in that market could drive users into financial desperation, with the possible result that the user would be forced to turn to crime to finance his habits.  <u>See, e.g.</u>, Koo, <u>Violent Victimization</u>, at 1105-1138 (22% of 900 active drug users surveyed in Miami, Florida reported being victimized by a violent act).  The resulting crimes, potentially violent in nature, are far more ominous from a public safety standpoint when firearms are involved.  Finally, the impaired mental function that often coincides with controlled substance usage, including marijuana usage, might lead to irrational or unpredictable behavior that would only be compounded by a handy firearm.  <u>Cf.</u> Bernard Laumon, <u>et al.</u>, <u>Cannabis intoxication and fatal road crashes in France: population based case-control study</u>, BMJ, (Dec. 2, 2005) (noting the impaired cognitive effects of marijuana on operators of motor vehicles).[15]

The defendant suggests that few of these risks would apply to him because he is only a user, rather than a trafficker, and his drug of choice is marijuana, rather than stereotypically violence-inducing drugs like PCP or cocaine.  But users such as the defendant, regardless of the type of drug, would "not be immune from the deleterious effects of using illicit drugs, such as

---

[15] Attached hereto as Government Exhibit 8.

the loss of self-control, which threaten the safety of others[, . . . ] [n]or would users and addicts

be freed from the need to deal with sellers of drugs and to enter black markets in doing so."

Carter, 669 F.3d at 420.  In its case-in-chief, the government intends to elicit testimony from

individuals who not only used marijuana with the defendant regularly, but who sold him

marijuana dozens of times.  The anticipated testimony will establish that, on each and every

occasion, the defendant's personal firearm was on his hip, at the ready.  This injection of

firearms into the sphere of illicit drug transactions and usage presents exactly the type of danger

that Congress may lawfully address through reasonably limited legislation like § 922(g)(3).

> (iv)    § 922(g)(3) is neither overbroad nor underinclusive.

The defendant also contends that § 922(g)(3) is simultaneously overbroad and

underinclusive because it generally disarms "even those drug users that do not pose a realistic

threat of gun violence, and requires no individualized determination that a particular person

poses . . . a threat[,]"  while targeting "only those who use a particular brand of intoxicants, while

excluding users of other intoxicants, such as alcohol, who present a comparable or greater risk of

gun violence."  Def. Br. at 5.

As to the overbreadth argument, the Supreme Court made clear, when it signaled that

prohibiting the possession of firearms by felons and the mentally disabled was presumptively

constitutional, that "some categorical disqualifications are permissible: Congress is not limited to

case-by-case exclusions of persons who have been shown to be untrustworthy with weapons."

United States v. Skoien, 614 F.3d 638, 641 (7th Cir. 2010) (en banc).  Thus, while § 922(g)(3)

does, in fact, extend to all "unlawful users" of controlled substances, not just distributors,

Congress could be just as apprehensive about gun ownership by users and addicts of illegal drugs

as a class.

The latter claim, that §922(g)(3) is underinclusive because it targets irresponsible users of some mind-altering substances, such as marijuana, but not users of other substances, such as alcohol, "simply amounts to a disagreement with Congress' policy decision to link the firearms prohibition in § 922(g)(3) to the Controlled Substances Act, 21 U.S.C. §802." Carter, 669 F.3d at 420. As the Supreme Court has explained, the Controlled Substances Act is a "comprehensive framework for regulating the production, distribution, and possession of five classes of 'controlled substances.'" Gonzales v. Raich, 545 U.S. 1, 24 (2005). Congress could easily have chosen, in enacting § 922(g)(3), to conduct a fulsome reexamination of the nation's drug policy in order to identify precisely what types of drug users ought to be prohibited from possessing firearms. Instead, "it opted, quite reasonably, to connect § 922(g)(3)'s prohibition to the carefully studied and regularly updated list of substances contained in the Controlled Substances Act." Carter, 669 F.3d at 420. Consequently, § 922(g)(3) is neither unconstitutionally overbroad nor underinclusive.

III.     18 U.S.C. § 922(g)(3) is not invalid as-applied in this case.

The gravamen of the defendant's as-applied challenge is simply a more pointed thrust at his facial differentiation attempt: that his characterization as merely a *marijuana user* is somehow distinguishable from users or distributors of other illicit substances, and therefore the Congressional fit – outlawing firearm possession by *all* unlawful drug users – is not a reasonable one. Because a version of this argument was essentially made – and herein addressed – with regard to the facial Second Amendment challenge, there is little left to add; his remaining dispute – that marijuana use has been "legalized" by the laws of some jurisdictions (though it remains subject to federal criminal penalties), and therefore creates an "absurd[ ]" interaction between state and federal marijuana laws – merely invites the Court to evaluate the comparative wisdom

of policy choices made by the respective state and federal legislative bodies. That evaluation is unnecessary, as this byproduct of our dual-sovereignty system is, at most, a potential indicator that the fit between Congress's important objectives and its chosen regulation is perhaps not perfect or seamless. But it need not be. The fit is reasonable, and that it all that the Constitution requires.

To conclude with respect to the defendant's Second Amendment challenges, the Constitution does not mandate a specific method by which the government must satisfy its burden under heightened judicial scrutiny. See, e.g., Satellite Broadcasting & Commc'ns Ass'n v. FCC, 275 F.3d 337, 355, 360 (4th Cir. 2001) (requiring minimal empirical evidence where intermediate scrutiny applied and Congress' justifications were "both familiar and plausible"). Indeed, in carrying its burden to establish the fit between a regulation and a governmental interest, the government "may resort to a wide range of sources, such as legislative text and history, empirical evidence, case law, and common sense, as circumstances and context require." Carter, 669 F.3d at 418. It has done so here, demonstrating through empirical evidence, case law, common sense, and the legislative record, that § 922(g)(3)'s limited imposition on Second Amendment rights has a plainly legitimate sweep, and proportionately advances the important goal of preventing gun violence.

IV.     The defendant's due process rights have not been violated.

Finally, the defendant purports to wield the Second Amendment in support of what seems to be a hybrid due process argument, which the government, admittedly, cannot clearly discern. As understood by the government, the defendant asserts that because a person is subject to conviction under § 922(g)(3) without any prior act or finding notifying him of that restriction – unlike restrictions based on prior felony or misdemeanor convictions or whether or not someone

has been adjudicated as mentally defective – the statute thereby violates his due process rights. This argument lacks merit.

As the defendant readily concedes, the First Circuit has added gloss to § 922(g)(3)'s definition of "unlawful user," effectively precluding due process challenges on the basis of vagueness, U.S. v. Marceau, 554 F.3d 24, 30 (1st Cir. 2009); see also United States v. Caparotta, 676 F.3d 213, 216 (1st Cir. 2012) (further defining "unlawful user").  With that avenue foreclosed by Circuit precedent, his due process argument is tantamount to the oft-rejected notion that ignorance of the law excuses otherwise illegal conduct – but the general rule precluding such an argument is deeply rooted in the American legal system.  Cheek v. United States, 498 U.S. 192 (1991); United States v. Smith, 18 U.S. 153 (1820) (Livingston, J., dissenting).  Based on the conception that the law is definite and knowable, the common law presumed that every person knew the law.  That rule has been applied by the Supreme Court in numerous cases construing criminal statutes.  Id.; see, e.g., United States v. Int'l Minerals & Chem. Corp., 402 U.S. 558, 583 (1971).

Importantly, despite the defendant's claim to the contrary, § 922(g)(3) does not strip a defendant of his Second Amendment right to possess a firearm *prior* to his judicial designation as an unlawful drug user.  Unlike the other statutes of prohibited persons that the defendant references in his brief – to wit, 18 U.S.C. §§ 922(g)(1) and § 922(g)(4) – a defendant's status as an unlawful user of drugs is far from categorical at the time of his arrest.   Rather, a defendant has a constitutional prerogative to exercise his full panoply of trial rights, and to require the government to prove beyond a reasonable doubt that his unlawful drug use was sufficiently consistent, prolonged, and close in time to his gun possession to put him on notice that he qualified as an unlawful user of drugs.  A defendant's relinquishment of his Second Amendment

right to possess a firearm under § 922(g)(3) is therefore conditioned on the government convincing the district court and a jury of his prohibited status.

The instant defendant has been notified of his charges by formal indictment; he has appeared at all of the accompanying preliminary proceedings; he has apparently engaged his counsel regarding the nature and substance of the charges (based on the government's attempted negotiations with defense counsel); and he retains the right at trial to challenge whether he was, in fact, an unlawful user of drugs.  He will therefore receive all the accoutrements of the due process clause before any interference with his Second Amendment right under §922(g)(3).[16]

V.     Conclusion.

For the foregoing reasons, the government requests that the Court deny the defendant's Motion to Dismiss Count V of the Indictment without a hearing, given the unanimous support of the courts and the substantial empirical data provided herein.

Respectfully submitted,

JOHN P. KACAVAS
United States Attorney

By:        /s/ John P. Kacavas
           John P. Kacavas
           NH Bar No. 8177
           United States Attorney
           53 Pleasant Street, 4th Floor
           Concord, NH 03301
           (603) 225-1552

---

[16] The defendant, in making his due process argument, relies heavily on the First Circuit's decision in United States v. Rehlander, 666 F.3d 45 (1st Cir. 2012).  There, the Court invalidated the adequacy of Maine's *ex parte* emergency involuntary admission procedure to a mental health facility as a basis for a permanent firearm prohibition under 18 U.S.C. § 922(g)(4).  Id.  The Rehlander decision, however, is readily distinguishable: unlike Rehlander, the defendant here will have a full trial, and all the accompanying rights (and burdens on the government) before any restriction is imposed on his Second Amendment rights.

/s/ Nick Abramson
Nick Abramson
Assistant United States Attorney
MA Bar No. 672267
53 Pleasant Street, 4th Floor
Concord, NH 03301
(603) 225-1552
Date: April 8, 2014                    Nick.Abramson@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served via ECF to Jonathan Saxe, Esq., Assistant Federal Public Defender, counsel for defendant.

/s/ Nick Abramson
Nick Abramson
Assistant United States Attorney