UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


```
* * * * * * * * * * * * * * * * *
                                  *
UNITED STATES OF AMERICA          *
                                  *   13-cr-142-01-PB
            v.                    *   March 27, 2014
                                  *   11:15 a.m.
JOHNATHON IRISH                   *
                                  *
* * * * * * * * * * * * * * * * *
```


TRANSCRIPT OF RECORDED BAIL HEARING
BEFORE THE HONORABLE STEVEN J. MCAULIFFE




Appearances:

For the Government:   Nick Abramson, AUSA
                      U.S. Attorney's Office
                      53 Pleasant Street
                      Concord, NH 03301


For the Defendant:    Jonathan Saxe, Esq.
                      Federal Defender Office
                      22 Bridge Street
                      Concord, NH  03301


Probation Officer:    Sean Buckley

```
 1                      BEFORE THE COURT
 2           THE CLERK:  The Court has before it for
 3   consideration a bail hearing in the matter of United
 4   States of America versus Jonathon Irish, Criminal No.
 5   13-cr-142-01-PB.
 6           THE COURT:  All right.  Mr. Saxe, I was a
 7   little confused.  There was a stipulation to detention.
 8   Now you're moving for bail?
 9           MR. SAXE:  Yes, because at the time he
10   stipulated to detention, your Honor, he was being held
11   on state charges in Rockingham County.  Those charges
12   were dismissed.  So now the only thing that's holding
13   him up was the stipulation of detention in this case.
14   So that's the deal.
15           THE COURT:  All right.  Whenever you're ready.
16   It's the government's burden.  Go ahead, Mr. Abramson?
17           MR. ABRAMSON:  Yes, your Honor, it is our
18   burden in this case.  There is no presumption under
19   3142.  So we carry the burden of showing by clear and
20   convincing evidence that he poses a danger to the
21   community and by preponderance that he's a risk of
22   flight.
23           While I think we meet the threshold in full
24   here, I'm going to focus on the risk to the community
25   because I think that is real and substantial in this
```

1    case.

2              I did file a lengthy memorandum in support of

3    detention so I won't belabor the point here, but I will

4    walk through some of the highlights for you.

5              THE COURT:  I've read it.

6              MR. ABRAMSON:  The first of which is that the

7    nature of these crimes are quite serious.  The defendant

8    is charged primarily with engaging in the business of

9    dealing in firearms without the requisite federal

10   firearms license, but it wasn't just any firearms.  It

11   was assault rifles, which, as we all know, are

12   notoriously dangerous weapons.

13             THE COURT:  Why are they so notoriously more

14   dangerous than any other firearm?  They look more

15   dangerous, but it's just a firearm, isn't it?

16             MR. ABRAMSON:  Well, your Honor, I would

17   submit that they are more dangerous.

18             THE COURT:  In what sense?

19             MR. ABRAMSON:  I think that they are typically

20   considered by people in the field to be more of a

21   military grade weapon that is inherently more dangerous.

22             THE COURT:  Kills you just as dead as another

23   firearm; right?

24             MR. ABRAMSON:  That's true, and that's not

25   something I'm going to focus on.  But I do think they're

1    quite dangerous, and he was placing them in the stream

2    of commerce with no paperwork, no way to track them, no

3    records.

4           As part of that scheme, he was using his

5    girlfriend to go into gun stores and purchase the

6    assault rifle or receivers so that no background check

7    was conducted on him.  There would be no delay, and he

8    could quickly obtain the firearms to build and sell.

9           And I would note that as you can see in

10   Section 3142(g)(1), Congress has called particular

11   attention in making this calculation to crimes involving

12   firearms.

13          THE COURT:  They were sort of talking about

14   use.

15          MR. ABRAMSON:  I think that certainly

16   heightens it, but they do identify crimes involving

17   firearms, explosives, or destructive devices as the type

18   or kind that we should be paying particular attention to

19   in these calculations.

20          As far as the detention determination as a

21   whole, we obviously take a more holistic approach.  So

22   we then -- in the event that the Court looks at these

23   types of crimes as, for example, not the typical armed

24   bank robbery, hands-on child exploitation case, the type

25   of case that might clearly warrant detention, we do look

1    at a number of other factors under 3142, and I think

2    that each of those factors when you walk through them

3    militates strongly in favor of detention in this case.

4    First of all, with respect to the weight of the

5    evidence, as I said, I've walked through that in the

6    memorandum.  I won't walk through that at length here.

7    More concerning is the defendant's criminal history and

8    the nature of the danger that he poses to the public.

9            With regard to his criminal history he's I

10   believe 27 years of age.  His criminal history is

11   already two pages long.  I understand that none of those

12   are technically felony offenses, but it is a quite

13   extensive criminal history, and I can tell you that

14   there's a banker's box full of police reports from

15   perhaps a dozen New Hampshire police departments sitting

16   in my office that are not reflected in his criminal

17   history.  He does have extensive experience with law

18   enforcement at a very young age.

19           He also, as we've seen in a lot of these

20   police reports which is not reflected in this criminal

21   history, does have a personal history of violent and

22   aggressive behavior and of use of firearms in support of

23   that violence and aggressive behavior, and I've listed a

24   few of those in the government's memorandum.

25           For example, in August of 2012 a police report

1   from Brentwood, New Hampshire, details an incident in

2   which Mr. Irish confronted two teenage girls in his

3   neighborhood who were playing a prank on a friend and

4   brandished a firearm during that confrontation.

5          On February 23rd, 2013, there's a recorded

6   conversation in which the defendant mentions that he was

7   glad he didn't bring his daughter to a firearms rally in

8   front of the Concord State House because he was afraid

9   there might be a fire fight with law enforcement.

10          In September of 2013, even more recently, he

11   brandished a firearm yet again, according to a police

12   report, when a neighbor was driving through his

13   neighborhood and he confronted that neighbor claiming

14   that he was driving too fast.

15          In late October of 2013, the defendant asked

16   the local police for permission to fire blank rounds at

17   children to scare them at Halloween.

18          These are just a few examples of his history

19   of behavior where he uses firearms.  He's essentially a

20   bully with an affinity for firearms, and I think that

21   poses a real and substantial threat to the community.

22          More specifically in this case, we have

23   specific threats, recorded threats, that the defendant

24   has made with regard to multiple potential witnesses in

25   this case.  We've obtained recordings of his jail calls.

1  In one of his jail calls he refers to his girlfriend,

2  who I will refer to here as ST, and he states that if

3  anything happens to his daughter, he will, quote, put

4  her in a hole.

5         He refers to another friend in a separate call

6  and states essentially that if that friend cooperates

7  and testifies, he will, quote -- and I have to say the

8  word is a little unclear.  It's either slit or cut his

9  throat.  And later on in the call says that he will bury

10  him.

11         And, finally, there is a third potential

12  witness in this case, the lead case agent, Philip

13  Christiana of the FBI, whom the defendant has given

14  particular attention and blames for his current legal

15  troubles, and in multiple calls he boasts about having

16  Googled Agent Christiana's address and knowing where he

17  lives, and he states that he knows where Agent

18  Christiana's family goes to church.

19         So I would argue that even beyond the general

20  threats and the specific threats, putting a finer point

21  on that is the fact that we have received information

22  that the defendant reached out to a former associate to

23  find out about the possibility of obtaining a firearm if

24  he was released pending trial.

25         So I think we need to take all of those into

1  account, his history of violent and aggressive behavior

2  with firearms, his specific threats in this case, his

3  criminal history, and his possible attempt to obtain a

4  firearm if he's released make a very strong case for

5  detention here.

6           The final point I will make, which I know we

7  are looking at primarily the danger to the community and

8  the risk of flight, but I think there is a very real

9  risk of tampering in this case.  We do have evidence

10  that -- I should step back for a moment.  As Attorney

11  Saxe just explained to you, when he first -- when the

12  defendant first stipulated to detention, there was an

13  ongoing state case involving the defendant and his

14  girlfriend.  During that time period his girlfriend was

15  cooperating with the government.  She was providing

16  information to the government about the defendant's

17  criminal activities.  In some of the defendant's

18  recorded jail calls, he reaches out to a friend and asks

19  that friend to pass a message on to the girlfriend

20  stating essentially either we both go down for this or

21  she's going down for this.

22           Very shortly thereafter, the girlfriend

23  decides to stop cooperating with the government,

24  reconciles with the defendant, and we've seen

25  communications from the girlfriend to other potential

1    witnesses in this case stating that she's going to do

2    everything she can to help him get off of his federal

3    charges.

4            So I think given the threats he's made, the

5    actions that he's taken with respect to his girlfriend,

6    there is a very real risk of witness tampering in this

7    case if he's released, and given that trial is only a

8    month away, that is something that concerns me.

9            So that's the detention issue, and I don't

10   think we should get to the second issue here because I

11   think he should be detained.  But the second issue is if

12   you do release this defendant, who is the appropriate

13   custodian?  Who is the appropriate person to whom he

14   should be released?  And the defense has suggested that

15   an individual named Tony Costello would be the person

16   with whom the defendant would reside if he was released

17   pending trial.

18           I have several concerns about that.  The first

19   which was -- which I was alerted to by Mr. Buckley just

20   before this hearing is that in a conversation last night

21   Mr. Costello represented that he does not have a

22   criminal history, and we are still in the process of

23   developing this, but it seems like there is some

24   potential that he does in fact have a criminal history.

25           My second concern is that Mr. Costello was the

1    individual through whom the defendant reached out to his

2    girlfriend while he was in prison to essentially try to

3    get her to change her position.  So we are talking about

4    taking this defendant with all his baggage and his

5    background and placing him with an individual who has

6    previously -- and he's admitted this to an FBI agent --

7    passed along messages from the defendant to witnesses.

8            So for all of those reasons I would strongly

9    recommend that we detain this defendant pending trial.

10            THE COURT:  Thank you, Mr. Abramson.  Mr.

11   Saxe?

12            MR. SAXE:  Thank you, your Honor.  With

13   respect to Mr. Costello, the reason why he needs

14   someplace to stay is that he survives on SSI,

15   disabilities that he has, physical and mental

16   disability, and that's cut off while he's in jail.  So

17   he needs to stay at a place for a period of time until

18   his payments get back on and then he can get his own

19   place.

20            So I contacted Mr. Costello.  Mr. Costello's

21   name was given to me and I contacted him and I was under

22   the impression that he had no criminal record.  If he

23   does have one, I would agree that's not an appropriate

24   place.  We could find another place.  So I think that

25   issue can be addressed separately from the issue of

1   whether my client's a flight risk or a danger to the

2   community.  So if you make a finding that he's not a

3   flight risk or a danger to the community, we could find

4   another place.  So I don't think that that's an issue.

5           As far as his -- he has no ties anywhere else

6   as I put in my motion.  I contacted his mother, who

7   couldn't be here today because she's watching the

8   couple's child.  The child's mother, Stephanie Taylor,

9   is here today, and she was referenced in part of the

10  government's argument.  And so his whole family lives

11  here, his grandmother, his grandfather, his mother, his

12  sisters, everything is here, his child is here.  And he

13  has Social Security Disability.  He can't run.  He

14  doesn't have any money to run, and he doesn't have

15  anywhere to run to.  So I don't think that's the issue.

16  I think -- I don't accept this argument, but obviously

17  the better argument from the government's perspective is

18  whether he's a danger to the community because the case

19  involved guns.  That's potentially an issue.

20          So I would call the Court's attention to page

21  eight of the government's objection to my motion and it

22  was referred to by the government in their presentation.

23  It says:  Jonathon has made -- this is an email -- or

24  it's not an email.  It's a chat from Stephanie Taylor,

25  who's in the courtroom right now, using a different

1   email address, and she says:  And we agree that this is

2   what she said.  Jonathon has me using his Facebook to

3   get in touch with people as I had to delete my account

4   for many reasons.  His message to you is do not trust

5   his sister Leslie and he -- it's probably mistyped --

6   and be nice cause more than likely everything that she

7   may have to say to your or anybody is not true.  I'm

8   working with those that I can get him off of his state

9   charges and his federal charges.

10          Now, first of all, I don't think that that's

11  really evidence of anybody obstructing justice in any

12  way.

13          More importantly, I would call your attention

14  to Exhibit B because that implies that he's going to use

15  this conversation -- that this conversation is evidence

16  of him trying to use Stephanie Taylor to get him off his

17  federal charges; right?  But if you read the rest of

18  that email -- or the chat, it says -- and I will read

19  the whole thing.  I'm working with those that I can to

20  get him off of the state charge, and his federal

21  charges, well, he says he's just going to take a plea

22  hoping that he can get out in six or eighteen months.

23          That doesn't sound like that's evidence that

24  he's trying to use her to tamper with witnesses in this

25  case.  He's telling her I'm going to plead guilty.  So I

1  suggest that that's not evidence of witness tampering at

2  all, and it is a little bit misleading.

3          THE COURT:  It's probably hearsay, but is it

4  evidence of knowledge of guilt?

5          MR. SAXE:  He's saying -- my point is this.

6  My understanding of the reason why that was offered by

7  the government is to show --

8          THE COURT:  Whatever it was offered by the

9  government for, what's its character and nature?  You're

10 citing language that one person attributes to your

11 client that suggests knowledge of guilt or acceptance of

12 guilt.

13         MR. SAXE:  Well, they are offering that to

14 show that he's trying to tamper with a witness in this

15 case, and my position is --

16         THE COURT:  He wasn't trying to tamper with a

17 witness.  He's going to try to plead guilty.

18         MR. SAXE:  Right.  So that's not evidence he's

19 tampering with a witness.  That was one of the main

20 arguments.

21         THE COURT:  Let's accept that.  Is it evidence

22 of knowledge of guilt?

23         MR. SAXE:  You could argue that.  But it's

24 definitely not evidence of witness tampering.  I mean he

25 could have confessed to the police, and that's not a

1   reason why he shouldn't be out on bail I would suggest.

2           THE COURT:  Well, it might be because it could

3   show the evidence is overwhelming -- of his guilt is

4   overwhelming.

5           MR. SAXE:  It could go into the reasoning.  My

6   point is I think the government is concerned about

7   witness tampering here, and I don't really think that

8   that's an issue and I think that that was not evidence

9   of witness tampering at all.

10          I would also suggest that my client has made

11  numerous completely wildly inaccurate claims about a lot

12  of things, okay, and if you look through the reports by

13  the FBI agents that investigated this case, their

14  reports are replete with examples of that, and I would

15  take -- call the Court's attention to Exhibit C,

16  Defendant's Exhibit C.  In the second paragraph,

17  WatchDogIrishIII -- that's my client's moniker.  At the

18  end of the second paragraph he says:  Then I went to the

19  sandbox.  These kids don't get it.

20          That means he went to Iraq.

21          If you look at the fourth paragraph down,

22  it's, again, another statement by WatchDogIrishIII,

23  which is my client.  He's telling this person on the

24  line:  When I worked with the contractors and got home,

25  it wasn't much for me.  Combat experience, shooting

1   people and blowing shit up, not much of a call for that
2   here back home.  So I build AR-15s.  It pays the bills
3   usually.
4           Okay.  So that is an utterly fanciful
5   statement.  He never went to Iraq.  He was never in the
6   military.  He never built AR-15s for people in Iraq.
7   And this discovery contains tons of statements like
8   that.
9           Also on the issue of guilt, your Honor, I
10  would call the Court's attention to Exhibit D, which is
11  again received in discovery.  The undercover in this
12  case is an individual who runs this place called Charlie
13  Company.  He is a key player in this case.  There's
14  probably 50 CDs worth of recordings.  Many of them are
15  in his store recording not just my client, but they have
16  recordings of militia meetings and meetings of people
17  that are in groups that don't appreciate, most
18  specifically, the Obama administration or the federal
19  government.
20          So if you look at Exhibit D, what this is,
21  your Honor, is my client is in a phone conversation with
22  this guy Milton who's -- he's not undercover.  He's the
23  CI and he's the guy that runs -- the federally-licensed
24  firearms dealer.  He has a license.  And the history
25  there is that my client worked for Milton at his

1    Army/Navy store.  He was there when Milton got his

2    license as a firearms dealer.  They're very close, and

3    he's kind of a like a father figure to my client.  At

4    least he was before this case happened.

5           So this is the conversation.  They're charging

6    my client with running a firearm business without a

7    license.  And what this conversation is -- and I will

8    bring you through it afterward, but essentially this is

9    a situation where my client is contacting Milton because

10   he wants to sell -- Milton wanted his guns.  And Milton

11   is a licensed firearms dealer.

12          So he brings the gun and he says I want to

13   sell this to you for $900.  And at this point in time

14   Milton is working for the FBI, and Milton says, oh, no,

15   I don't have any money.  I can't buy the firearm.  You

16   need to sell it to Mike.

17          Well, Mike is the FBI.  So my client says,

18   well, I want $900 for it.  It cost him $976 to build.

19   And he's going to sell to Milton for $900.  Milton says,

20   no, you need to sell it to Mike.  And then my client

21   says, I will sell it to you for $700.  And then Milton

22   says, I don't have $700.  You need to sell it to Mike.

23   And then Milton calls Mike.

24          So that sounds somewhat like entrapment to me.

25   I mean, that's like the federally-licensed dealer -- my

1    client trying to sell a firearm in a legal way to a

2    licensed dealer and the licensed dealer pushing him off

3    to sell it illegally to the federal agent who's acting

4    undercover.

5            Now, I will just walk you through this.  If

6    you look at page three, CHS, that's the informant.  JI,

7    that's my client.  And in the middle of the page my

8    client says:  You can sell -- you can register this as a

9    sure valid weapon and sell it for three grand, but I'm

10   not doing that.  And then my client says:  Because I

11   don't have my Class 3.  In other words, because it would

12   be illegal.

13           Then if you skip forward to page five, CHS

14   four lines down, says:  Boy, you really put some coinage

15   in this.  Meaning, this must have cost you some money.

16   My client says:  Actually not much, more than what I'm

17   selling it to you for.  Like I said, I have a total of

18   967 into it.  And then Milton says:  And you want to

19   sell it to me for how much?  And my client says:  Nine.

20   It's losing money.

21           That's not really in the business of selling

22   firearms.

23           And then the undercover -- Milton says

24   essentially:  I don't have the money right now.  There's

25   the little sentence there where he says I need to put my

1    two grand into an escrow account.

2          Then if you skip down four, five paragraphs up

3    from the bottom of the page:  I'm going to be tied up

4    with money for at least a couple weeks, but if you want

5    I can reach out to Mike.  It's up to you.  And so my

6    client says, yeah.  And then Milton says, okay, I will

7    give him a call.  He will give Mike a call.  And my

8    client says:  Okay, a sale is a sale.  And then Milton

9    says:  It's up to you, brother.  And then Milton says:

10   I will reach out to him, meaning Mike.

11         So then he calls Mike.  But before that my

12   client says:  I figured out where it's going to go

13   anyway, or from you I will take seven.

14         So he's going to lose $200.  He's offering to

15   sell it to the licensed dealer for 200 bucks less than

16   he made it for, 260 bucks less than he made it for.  And

17   Milton says, no, I'm not going to take it.  You've got

18   to sell it to Mike.

19         Then he makes a phone call, at the bottom of

20   the page, to Mike, and he says, hey, Mike, -- Mike, the

21   undercover agent -- it's Milt over at Charlie Company.

22   Want to do me a favor and call me as soon as you get

23   this, okay?  I want to talk business.  I want to talk

24   business.

25         So as far as running an unlicensed firearm

business, that's not what this sounds like.  And there's

more of this.  I don't have it all, but there's more of

this, okay?  So as far as the charge of running an

unlicensed firearm business, there's a problem with

their case there.  There's a big problem with their case

on that.  And everything goes through Milton.  Every

transaction occurred in Milton's store, and I'm

99 percent sure while Milton was in the store every time

and I think in most, if not every one, Milton's in the

room while the transaction is going on.  So I would

suggest to you that there's a very strong entrapment

defense in this case which goes to the strength of the

government's case.

          And then there's a lot of recordings where my

client says things, like I'm doing this for -- look

here, he says that.  He says yeah.  At one point in one

of the recordings he says I made 30 of these, 40 of

these.  Ridiculous.  He never made 30 or 40 of these.

He's a disabled person because he has one eye and mental

disabilities, living this close to the poverty level,

and he's willing to sell a gun for less than he made it

for to his father figure Milton, the guy that runs the

store.

          Just some other things that he said, and these

come from Agent Christiana's reports.  Agent Christiana

interviewed a lot of people.  He interviews someone
named Crystal Marie Rogers.  Irish did tell Rogers on
Facebook he was building guns and that was how he,
Irish, made his living.  Irish told Rogers he's spent
time in Iraq during the Iraq War and he was building
guns while in Iraq.

       Total fabrication.

       They then -- Mr. Christiana interviewed James
Brown.  In part of his report he says:  Irish told Brown
he worked for Blackwater overseas and suffers from PTSD.
Brown does not believe Irish.  A ridiculous story, it's
just not true.

       He is is a gun nut.  He wants people to think
he's a military guy.  He's got mental illness.  He wants
people to think he's this huge figure in the American
militia movement, which is nonsense.

       And then Mr. Christiana interviewed a Paige
Watterson.  Irish told Waterson he was honorably
discharged from the military.  He had many guns because
of his CIA job.  Irish told Waterson he has guns to
protect Cheyenne from being taken by the state.
That's -- Cheyenne, that's his daughter.

       Mr. Christiana interviewed a Joseph Sutkas
(ph).  Irish told Sutkas he and his friends have a line
on an H1 Hummer that's fully armored.  On his Social

1    Security Disability I guess.  Irish said to Sutkas he

2    was -- on numerous occasions he worked for Uncle Sam and

3    he served overseas in the sandbox.  He has told people

4    that I'm an armorer for the police.  And on and on and

5    on, these crazy, crazy statements that you can't take

6    out of context.  They want you to believe the part where

7    he says I'm making my living selling AK-47s, but they

8    want you to take out the part where he says I did it in

9    Iraq, I learned how to do this in Iraq.

10            So I think if a jury hears all the evidence

11   and is aware of what he's like and the things that he

12   says, that their case is not necessarily as strong as

13   the government says it is.  And also I think that goes

14   to whether or not he's a risk.

15            Now, the government has in their pleading

16   talked about a number of events that occurred which

17   sound disturbing.  It's on page six, okay?  He made a

18   YouTube video in which he stated that any perceived

19   threats to his family will be met with deadly force.

20            Well, I mean, given the nature of all the

21   things that he says and the fact that he doesn't have

22   any record for ever using force or deadly force, I don't

23   think he has any assault convictions on his record.

24   And, by the way, his record may be several pages long,

25   but a lot of those things didn't even result in

1  convictions.  The ones that did were either violations

2  or misdemeanors and he never went to jail.

3          Regarding the Brentwood Police Department, on

4  August 12th reports filed by the Brentwood, New

5  Hampshire, Police Department detailed an incident in

6  which the defendant confronted with firearms two teenage

7  girls who parked in the neighborhood.

8          What happened is he sees a car -- there had

9  been a lot of break-ins with burglaries.  He sees a car

10  parked out in the middle of the road with no lights on

11  and nobody in it.  So because he's a gun nut, he goes

12  out there with a gun.  And there's no one in the car.

13  And so he calls the police.  He calls the police, not

14  the girls, and says there's something going on here.

15  The girls come.  He has a gun.  I'm sure they were

16  scared to death because there was a guy there with a

17  gun.

18          He was never charged with anything on that.

19  There was no charges at all.  He was never charged or

20  convicted of anything regarding that incident.

21          Then the firearms rally, I don't know if you

22  remember that, your Honor, but I'm a liberal, you know,

23  so I consider people like my client to be gun nuts.  And

24  at that rally there was a ton of them and there was a

25  lot of them that were armed.  If you look at the

1    pictures, my guy's -- my client's standing there with a

2    rifle, a gun, and there's a guy next to him with a gun,

3    and there was a whole bunch of those people there.  But

4    that's not illegal.  You can have a gun inside the

5    legislature.  So that's not illegal for him to do.

6           Again, there's another incident where someone

7    was driving -- this is on page seven of their report.

8    An individual was driving through and there was a

9    confrontation with my client.  My client called the

10   police.  There were no charges.  He wasn't charged with

11   anything.

12          And as far as my client asking the police for

13   permission to fire blank rounds at children, there was a

14   discussion about him requesting permission to fire

15   blanks as part of a scary thing, but I don't think he

16   ever requested that he fire blanks at children.  Plus he

17   called the police.

18          All right.  So I would suggest, your Honor,

19   that my client's dangerousness is being somewhat

20   overblown by the government here.  I understand that

21   there's a concern because it's a firearm charge, okay,

22   but there's also a concern because he is a Second

23   Amendment, right-wing libertarian guy who stands up for

24   his rights, all right?  He doesn't have much of a

25   criminal record, never -- I think he might have been in

1    jail for a very short period of time for something, but

2    I'm not even sure about that.  These are all minor

3    violations, either misdemeanors or just  violations or

4    they were dismissed.  He's definitely not a flight risk

5    because there's nowhere he could go.

6              There would be a requirement that he not have

7    a firearm.  I realize today we don't have a residence

8    for him, but I think if you make a finding that he

9    should be released, I could find a place.  I thought

10   this one was okay, but I had some other places where

11   they want him to stay.  A lot of his friends have a ton

12   of firearms.  So I had found a good place for him to

13   stay, but the guy had 125 firearms and he said I'm not

14   going to get rid of.  So I would assume he had no

15   record.

16             THE COURT:  What about these implicit threats

17   to the FBI agent and his family?

18             MR. SAXE:  Oh, thank you very much.  It just

19   so happened when my client -- at least this was my

20   information.  That the agent lived about a mile from his

21   house and went to church at the end of my client's

22   street.  So that's how my client knew where he lived.

23   He lives right next to him.  So it's not I don't think

24   an issue of him finding out that my client lived

25   somewhere and casing him out and claiming to do

1   something.  I don't think that's the case.  If I'm wrong

2   I'm sure I will be corrected, but my client lived very

3   close to him.  He knew where he lived and knew where he

4   went to church because the church is right there.

5            THE COURT:  Yes.  Source of knowledge isn't

6   the issue.  It's the intent or the comment is the issue.

7            MR. SAXE:  I'm sorry, your Honor?

8            THE COURT:  It's not the source of the

9   knowledge that's at issue.  It's the intent of the

10  comment.  Why does one say I know where his children go

11  to church?  Why would you say that if you're not

12  threatening?

13           MR. SAXE:  I think, your Honor, that -- well,

14  I know that my client was in regular contact with Mr.

15  Christiana all the time, not thinking there was going to

16  be --

17           THE COURT:  I'm sure they talked every day,

18  but still the question remains.

19           MR. SAXE:  I don't think he's a threat to Mr.

20  Christiana.

21           THE COURT:  I'm sure you don't, but the

22  question remains, what's the intent of the comment?

23           MR. SAXE:  Which comment was that?

24           THE COURT:  The effect of I know where your

25  family and children go to church.  I may not understand.

1          MR. SAXE:  He's making comments about

2    everything all over the place.  I think that you need --

3    you can't really evaluate whether he should be released

4    without evaluating the fact that he just makes all kind

5    of wild claims about guns and military and Blackwater

6    ops.  Oh, one of the other claims was I was in the

7    border patrol down in Texas.  Just nonsense, not true,

8    and I think they know that.

9          So I will just ask that you consider that, and

10   I don't think that given all these facts that they meet

11   their burden.

12          THE COURT:  Thanks, Mr. Saxe.  Mr. Abramson?

13          MR. ABRAMSON:  Your Honor, I just have two

14   quick points.  The first is -- I'm not going to get into

15   the weight of the evidence.  I understand the entrapment

16   argument.  I think that's an argument that's better

17   suited for trial.  There's multiple other charges here

18   where the evidence is overwhelming involving guns.

19          With respect to these fanciful stories, one of

20   the charges here is that the defendant lied to a federal

21   agent about the whereabouts of his firearms during the

22   course of this investigation.  We are talking about

23   releasing a defendant who would presumably be reporting

24   to probation and giving accurate information about his

25   whereabouts about whether he had firearms.  I think his

1  nature of lying, if we accept that as true, is

2  problematic in that sense.

3          And finally a point that I meant to make in

4  the beginning, which is also very concerning, is the

5  defendant's ability to build firearms.  I won't call him

6  an expert, but he knows how to build firearms.  He knows

7  how to build assault rifles from component parts.  So

8  even in the event that we are able to prevent him from

9  purchasing a firearm or acquiring a firearm from a

10  friend, if he's able to find the basic parts, he could

11  easily build a firearm wherever he's residing.

12          So I will rest on those points.

13          THE COURT:  All right.  Thank you.

14          MR. SAXE:  Briefly, your Honor.  The only

15  place he can buy the parts to build a firearm is from a

16  firearms dealer.  So it's not like he has parts lying

17  around at home.  It's just like buying a gun when he

18  buys the parts to build a gun.  It's just like buying a

19  gun.  As a matter of fact, that's one of the charges,

20  that he bought the parts.

21          THE COURT:  Thank you, Mr. Saxe, I appreciate

22  it.  I've considered the nature of the evidence, the

23  weight of the evidence, the defendant's criminal

24  history, likelihood of recidivism as indicated by that

25  criminal history, the fact that the defendant definitely

1    poses in my judgment a danger to the community and

2    persons within the community, and given those findings I

3    find that there's no condition or combination of

4    conditions that will reasonably assure the safety of the

5    community and persons within the community, and

6    therefore the defendant shall be detained pending trial.

7              And I will issue a detention order shortly.

8    Court's adjourned.

9              (Adjourned at 11:50 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               C E R T I F I C A T E

2

3          I, Diane M. Churas, do hereby certify that the

4   foregoing transcript is a true and accurate

5   transcription of the recorded proceedings, to the best

6   ability and belief.

7

8                                   **DIANE M. CHURAS, LCR, RPR, CRR**
    Submitted:  11/21/14           LICENSED COURT REPORTER, NO. 16

9                                   STATE OF NEW HAMPSHIRE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25