```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW HAMPSHIRE


* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *   13-cr-142-01-PB
            v.                  *   July 30, 2014
                                *   2:30 p.m.
JOHNATHON IRISH                 *
                                *
* * * * * * * * * * * * * * * * *




                  TRANSCRIPT OF MOTION HEARING
             BEFORE THE HONORABLE PAUL J. BARBADORO




Appearances:

For the Government:    Nick Abramson, AUSA
                       Office of U.S. Attorney
                       53 Pleasant Street
                       Concord, NH 03301


For the Defendant:     Lawrence A. Vogelman, Esq.
                       Nixon, Raiche, Vogelman, Barry &
                       Slawsky, P.A.
                       77 Central Street
                       Manchester, NH  03101


Court Reporter:        Sandra L. Bailey, LCR, CM, CRR
                       Official Court Reporter
                       United States District Court
                       55 Pleasant Street
                       Concord, NH  03301
                       (603)225-1454
```

BEFORE THE COURT

1

2          THE CLERK:  Court is now in session and has

3   for consideration today a hearing on a motion for status

4   of counsel in Criminal Case No. 13-cr-142-01-PB, United

5   States of America versus Johnathon Irish.

6          THE COURT:  Mr. Abramson, can you refresh my

7   memory as to what the charges are and what the

8   government's case is against the defendant?

9          MR. ABRAMSON:  Yes, your Honor.  There are

10  five counts presently charged in this case.

11          There are two 1001 counts based on statements

12  that Mr. Irish made to a federal agent.

13          There's a one count of aiding and abetting the

14  straw purchase of a firearm under 18 USC 922(a)(6).

15          There's one count of engaging in the business

16  of dealing in firearms without a federal firearms

17  license.

18          And there's one count of being a regular user

19  of a controlled substance, that is marijuana, as a

20  possessor of a firearm that has traveled in interstate

21  commerce.

22          With respect to the -- I will start with one

23  of the false statement counts.  The evidentiary basis

24  for that count is that Mr. Irish told a federal agent

25  that firearms that were owned by him had been sold to a

1   friend of his, and we have Mr. Irish on a tape-recording

2   a short time later admitting that that was a lie.  And

3   during an interview in November of 2013 with Mr. Irish

4   he again admitted to multiple law enforcement agents

5   that he had lied to the agent on that occasion.

6               THE COURT:  What was the lie?

7               MR. ABRAMSON:  The lie was that he had sold

8   all of his personal firearms to a friend when in fact he

9   had had them placed in another location so that he could

10  retrieve them.  There were ongoing state proceedings

11  pursuant to which he was not allowed to possess any

12  firearms.

13              THE COURT:  Okay.

14              MR. ABRAMSON:  So he told the federal agent as

15  part of the agent's investigation that he no longer

16  possessed them when in fact they had just been placed

17  somewhere else.

18              THE COURT:  Okay.

19              MR. ABRAMSON:  The second 1001 charge involves

20  a statement to a federal agent that he had asked a

21  federal firearms licensee about the legality of having

22  his wife or then girlfriend straw purchase firearms for

23  him, and the testimony of that individual will be that

24  no such inquiry was ever made.

25              THE COURT:  Why would he ask somebody about

1    that?  What was the context in which he allegedly made

2    that statement?

3              MR. ABRAMSON:  The alleged context is that Mr.

4    Irish was a friend of this individual who owns his own

5    firearms business, and he and his girlfriend had

6    purchased some firearms.  His girlfriend came in to sign

7    for the firearms that were in fact for Mr. Irish, and

8    after the fact Mr. Irish told the federal agent that he

9    had spoken at length with the owner of that business

10   before conducting the transactions to insure that it was

11   okay that his girlfriend signed.

12             THE COURT:  Oh, okay.  So your evidence will

13   be that the girlfriend signed for purchases of firearms

14   which were intended for the defendant and to try to, in

15   your theory, avoid criminal responsibility for a straw

16   purchase he made a statement that, look, before we did

17   this I talked to the owner and it was clear that, and I

18   was told that this was okay, is that --

19             MR. ABRAMSON:  That's correct.

20             THE COURT:  Okay.  So you're saying the owner

21   will come and testify he never had that conversation?

22             MR. ABRAMSON:  That's correct.  As far as the

23   aiding and abetting the straw purchase count, that

24   involves a separate transaction in September of 2013 at

25   Riley's in Hooksett, New Hampshire.

1      On that date in September his girlfriend again

2   signed for and paid for a firearm that was intended for

3   Mr. Irish in which he, within a few weeks, subsequently

4   sold to a federal law enforcement officer who was

5   operating in an undercover capacity.  So --

6            THE COURT:  Has the girlfriend been charged

7   with any of these things?

8            MR. ABRAMSON:  No, she has not, your Honor.

9   She did testify in grand jury at length as to the

10  details of that purchase and implicated the defendant.

11           THE COURT:  So she admitted she did, she

12  admitted she committed a crime of being a straw

13  purchaser for someone else?

14           MR. ABRAMSON:  Yes, that is correct, your

15  Honor.

16           THE COURT:  So she must be cooperating

17  otherwise you wouldn't -- you would have charged her I

18  assume?

19           MR. ABRAMSON:  Yes.

20           MR. VOGELMAN:  Just so you know, judge, while

21  we're talking about it, she's in court.  I'm just

22  telling you that.

23           MR. ABRAMSON:  Right, and to be clear, she was

24  cooperating in the initial stages of the investigation,

25  but her posture has since changed.

1          THE COURT:  Okay, so at that time she was

2    cooperating, but she's no longer cooperating, but you

3    haven't charged her to this point?

4          MR. ABRAMSON:  Right.  We have not charged her

5    at this point.

6          THE COURT:  Okay.

7          MR. ABRAMSON:  But there is a substantial

8    amount of additional evidence aside from the testimony

9    of the girlfriend, including an admission by the

10   defendant during that November interview with multiple

11   law enforcement agents that he had the girlfriend

12   purchase the firearm for him because he wanted to avoid

13   any potentially lengthy background checks associated

14   with his name being on the 4473.

15         THE COURT:  Okay.

16         MR. ABRAMSON:  As to the regular user in

17   possession of firearms charge, we have approximately six

18   or seven witnesses who will come in and testify about

19   the defendant's regular marijuana use.  Two of them are

20   individuals from whom the defendant regularly purchased

21   marijuana on a weekly basis, and those witnesses will

22   establish that the defendant was a weekly if not daily

23   user of marijuana throughout the course of 2013 when he

24   possessed multiple firearms that had traveled in

25   interstate commerce.

1          And finally the count involving engaging in

2    the business of selling firearms without a federal

3    firearms license, we have several witnesses who will

4    come in and testify that Mr. Irish pitched them to sell

5    them self-built assault rifles.  We have approximately

6    60 hours of videotape, obviously not all of which would

7    be presented, but it's a substantial amount of video

8    tape from an undercover operation in which an FBI agent

9    makes three purchases of assault rifles from the

10   defendant for cash.  And we have multiple posts on the

11   defendant's Facebook page and text messages in which the

12   defendant essentially brags to friends that he builds

13   and sells assault rifles for a living.

14          And I know that in the previous hearing in

15   this case the U.S. Attorney, John Kacavas, mentioned

16   that it is a complex evidentiary basis for that charge,

17   and I think that's a fair characterization, so I don't

18   know if we need to go into all the tangential evidence,

19   but I think that's a fair summary of the evidence at

20   this point.

21          THE COURT:  Okay.  Now, just refresh my

22   memory.  The defendant originally had another lawyer

23   representing him, and I allowed the defendant to have

24   new counsel appointed because he was dissatisfied with

25   the way his lawyer was representing him.

1          MR. ABRAMSON:  That's correct, your Honor.

2          THE COURT:  All right.  Mr. Vogelman, you have

3   raised some concerns about your client's competency.

4   What do you want to say about that?

5          MR. VOGELMAN:  In my conversations with him,

6   discussing this case, discussing his alternatives, his

7   responses, both his emotional responses and the words of

8   responses have given me grave doubts of whether he's

9   competent to really understand what's going on, in the

10  truest sense competent to make a decision as to what he

11  wants to do with the case and competence to assist me in

12  the case.

13         I've been doing this a long time, judge, and

14  I'm pretty good, as you know, with difficult clients,

15  but it's really reached the point where I had serious

16  enough doubts that I thought I had to bring them to the

17  Court's attention.

18         THE COURT:  So, do your concerns have anything

19  to do with this defendant's philosophical or idealogical

20  views about firearms or anything like that?

21         MR. VOGELMAN:  Absolutely not, judge.

22         THE COURT:  Okay.  So, if he had views about

23  the Second Amendment or firearms rights that were

24  inconsistent with your own views, would that in any way

25  affect your assessment of his competency?

1      MR. VOGELMAN:  Absolutely not, judge.

2      THE COURT:  Okay.  So, let me hear from the

3  defendant about -- normally a proffer from an

4  experienced defense lawyer is sufficient to have an

5  evaluation for competency, and I am -- and that's on the

6  basis of your proffer I have granted that request.  Now,

7  I guess the defendant hasn't moved to force you to

8  withdraw.  You've just asked for what, a hearing to

9  determine whether you should still represent him?

10      MR. VOGELMAN:  His exact words to me over the

11  phone were today file a motion for the status of

12  counsel.  I asked if he wanted to get rid of me.  He

13  says file a motion for the status of counsel.  I guess

14  that's the way the last, when Mr. Saxe was relieved, it

15  was pursuant to that motion.

16      So, I did -- I'm perfectly willing to stay on

17  if he's willing and the Court is willing, but I filed

18  that motion because he was obviously very upset with the

19  fact that I had made a motion to have him examined.

20      THE COURT:  All right.  All right, thank you.

21  Lot me ask the defendant, you asked for this motion to

22  be filed.  It was filed at your request.  What do you

23  want to say?

24      THE DEFENDANT:  Yes, your Honor.  First of

25  all, thank you for hearing it, hearing me at this

1    hearing and thank you for, thank you for giving me

2    Attorney Vogelman after the last status of counsel

3    hearing.

4              I apologize, however, that we have to have

5    this hearing regarding this matter.  The problem is,

6    your Honor, is Attorney Vogelman seems to think the only

7    reason I wish to not be represented by him at this point

8    in time and further on in this case is only because of

9    his recommendation and request of the competency

10   evaluation.  Your Honor, that is only the most recent

11   issue regarding what has been going on.

12             When Mr. Vogelman first met with me, he asked

13   me what it was, what the issues were with Attorney Saxe,

14   and why I was requesting Attorney Saxe be relieved as my

15   defense counsel.  And I told him, because Attorney

16   Vogelman told me he did not want to make the same

17   mistakes, I told him do not sit there and attempt to

18   tell me that this case is not connected with that of my

19   daughter's 2010 case.  Do not sit there and attempt to

20   tell me that it did not originate from the 2010 case.

21   Do not attempt to call me a liar.  Do not allow the

22   prosecution to attempt to continue to threaten me and my

23   daughter and my family in order to get me to take a plea

24   bargain, and do not call me crazy.

25             He has done every single last one of those,

1    your Honor, to the point where in the last meeting about

2    three, three and a half weeks ago Attorney Vogelman

3    looked at me and said there's no connection between this

4    federal case and the case of your daughter in 2010.

5    Your Honor, not only is there a connection admitted by

6    the government in and through their own discovery and

7    through their own summary of the investigation

8    background, they clearly admit that that is the origin

9    for this investigation and why this investigation began.

10           Now, this hearing started out when you asked

11   Attorney Abramson to brief you on and remind you of the

12   current counts and charges that are in front of this

13   Court.  Your Honor, what I heard there was more than

14   just a brief description of the counts and charges, but

15   almost Attorney Abramson attempting to try those cases

16   and plead the government's case in front of you --

17           THE COURT:  That's what I asked him to do.  I

18   asked him to tell me what his evidence would be so that

19   I could understand what you're likely to face in terms

20   of the charge.

21           THE DEFENDANT:  Yes, yes, your Honor, I

22   understand, and what I was getting at, I apologize for

23   not getting directly to the point, however, the

24   situation was was that Attorney Abramson more than

25   convoluted and twisted the wording and context of every

1  single last count and their supposed alleged evidence in

2  the matters.

3          Your Honor, I have in front of -- the

4  documentation that my wife provided because I was unable

5  to do so because when I was transferred from Strafford

6  County Department of Corrections to Essex County

7  Department of Corrections, I was not allowed to have any

8  of my legal documentation.  I was not allowed to have my

9  discovery.  I was not allowed to have any of the

10  documents.

11          I've expressly asked Attorney Vogelman, since

12  he has represented me in this case, to bring me a

13  notebook with almost 80 different pages, front and back,

14  of notated page numbers and briefings of what is on

15  those page numbers specific to each count and specific

16  to outlining and highlighting the facts of the case of

17  the connection and the origin of this case connecting it

18  and originating from my daughter's 2010 case, that of

19  which was immediately dismissed and sealed with a gag

20  order placed by the family court out of Rochester Family

21  Court.

22          Those of which, those court documents that

23  were dismissed and sealed are also involved in this

24  discovery, which they should not be.

25          THE COURT:  I'm not -- I'm confused.  What's

1    the notebook you're talking about?

2              THE DEFENDANT:  The notebook, sir, it's a

3    notebook that I had had the Strafford County that I sat

4    for many hours going through each page of discovery on

5    my thumb drive in the law library, page by page,

6    notating what was on each page that I thought may or was

7    definitely pertinent to the case --

8              THE COURT:  And what happened to the notebook

9    or what do you want to have happen to the notebook?

10             THE DEFENDANT:  It was subsequently given to

11   Attorney Saxe so he could review it so that I could

12   point out specific cases, specific situations within the

13   case and the discovery to him.  Subsequently when

14   counsel switched from Attorney Saxe to Attorney

15   Vogelman, Attorney Vogelman gained custody of the

16   notebook with the rest of the evidence and discovery.

17             THE COURT:  And what are you asking?

18             THE DEFENDANT:  I have been asking Attorney

19   Vogelman to bring it to me at both the facilities of

20   Strafford County and Essex County so that I can show him

21   specific page numbers because I can --

22             THE COURT:  All right, wait.  Stop.

23             THE DEFENDANT:  Yes, sir.

24             THE COURT:  Mr. Vogelman, do you know what the

25   notebook is that he's talking about?

1     MR. VOGELMAN:  I know what the notebook is.  I

2  don't want to get into a swearing match here, but I will

3  get to him.

4     THE COURT:  Will you bring it to him?

5     MR. VOGELMAN:  I will.

6     THE COURT:  Okay.  All right, thank you.  Go

7  ahead, what's the next thing?

8     THE DEFENDANT:  Thank you, your Honor.

9  However, the situation is that since, due to my transfer

10 to Essex County and myself not being allowed to have my

11 legal documents, they were subsequently mailed and

12 FedEx'd to my family, my mother and my wife.  My wife

13 has since, along with my mother, been gracious enough to

14 go through all 2,754 pages I believe or more of

15 documents in discovery and print me out some of, not

16 all, but some of what I've requested of, that of the

17 connection and origin of my daughter's 2010 case, that

18 of the different issues and situations we have with the

19 Special Agent Philip Christiana from the FBI submitting

20 fraudulent information for prosecution to a state

21 agency, that being Chichester Police Department, that

22 Philip Christiana knew was fraudulent, knowing that

23 there was no protection order in place when he forwarded

24 this information to the police department for

25 prosecution of a violation of a protection order, when

1   again, Agent Christiana had full knowledge that there

2   was no order in place, because when the order was

3   dismissed, your Honor, I had contacted Agent Christiana.

4          THE COURT:  What does this have to do with Mr.

5   Vogelman?

6          THE DEFENDANT:  I apologize for getting off

7   track, your Honor.  What this -- this has to do with Mr.

8   Vogelman is because he refuses to see that not only is

9   there a malicious attack against me throughout the

10  investigation and through this entire prosecution, your

11  Honor, he refuses to admit the connection and origin of

12  the case where it is clearly outlined and specified by

13  the government in their discovery.

14         THE COURT:  Okay, now, here's where I think

15  you've gotten off track.

16         THE DEFENDANT:  I apologize.

17         THE COURT:  No, that's fine.  And you may not

18  understand the way lawyers have to work with clients.

19         There are certain things that the client, you

20  get to completely decide, your lawyer can't decide for

21  you.  One of those things is plead guilty or plead not

22  guilty.  That's your decision.  He can never make it for

23  you.  He can't stop you from doing what you want to do.

24  He can advise you.

25         Another thing that you have complete control

 1    over is do I testify or do I not when it comes time for

 2    trial.

 3           Other than those two things, when you have a

 4    lawyer it is -- and there may be a few other minor

 5    things, but the things that I want to focus on now, for

 6    the most part, is what your defense strategy is going to

 7    be isn't up to you.  It's up to your lawyer.  He decides

 8    on your defense strategy and you don't get to decide

 9    that.  He has an obligation to consult with you about

10    it.  He has an obligation to hear you out on what you

11    think the strategy should be, but ultimately he's got to

12    pursue that, so, and I don't want to get into the

13    details between you because I don't want to have him

14    disclose privileged communication, but if he has told

15    you that whether there's a connection or not it's not

16    going to lead to a viable defense for you, that's a

17    decision he has to make.

18           Now, if you don't like that and you want to

19    represent yourself, after I have you evaluated, if

20    you're found to be competent and you want to present

21    whatever kind of theory you want to present, there is a

22    way to do it, and that's to represent yourself.

23           I would strongly advise you against that.  It

24    doesn't work out well in practice for the vast majority

25    of people that do it.  But you need to understand, your

1   lawyer is not a simple mouthpiece who you can manipulate

2   like a puppet master.  He doesn't just say whatever you

3   want to say and do whatever you want to do.  He's a

4   professional.  You happen to have one of the most

5   experienced criminal defense lawyers we have in the

6   entire state of New Hampshire.  You have a defense

7   lawyer who is one of the most committed to protecting

8   civil rights of any of the lawyers we have in the entire

9   state.  He's a lawyer who I know by his past experience

10  doesn't care what your political beliefs are, your

11  beliefs about the Second Amendment, what your personal

12  views are.  He would defend you if you were a Nazi, a

13  communist, an Arian Nation member, a Black Power, he

14  wouldn't -- none of that I know because of his prior

15  background plays any role in any decision he makes.

16          So, if he has made a judgment that in my

17  review of the case this is the strategy that you need to

18  pursue, you can't tell him no, that's wrong.

19          So, I understand your concern, and I think the

20  way we need to take this is a step at a time.  Let's get

21  the evaluation done.  And if the experts -- after

22  hearing I'm satisfied that you're competent, then I'm

23  going to come back and ask you do you want to represent

24  yourself or do you want to have Mr. Vogelman continue to

25  represent you.  I'm not going to assign another lawyer

1  to you because if you can't work with Mr. Vogelman,

2  you're not going to be able to work with anybody in the

3  United States.  So, that will not work.

4  THE DEFENDANT:  Yes, sir, your Honor.

5  THE COURT:  We will not be able to find you a

6  lawyer who will do everything you say, and that just

7  isn't the way it will work.

8  THE DEFENDANT:  Yes, your Honor, I understand,

9  and I was not just speaking -- if I may be allowed to

10  finish what I was speaking on --

11  THE COURT:  Well, I'm not going to let you

12  just continue to rant on about your theories.

13  THE DEFENDANT:  No, it's not about that, your

14  Honor, at all, and excuse me for interrupting.

15  THE COURT:  Okay, go ahead.

16  THE DEFENDANT:  I was about to get to the

17  regarding the defense strategies and whatnot.

18  Attorney Vogelman has continuously asked me

19  what I would like to use for a defense for this, what I

20  would like to use for a defense for that.  I'm not going

21  to go into it because as far as I'm concerned it's

22  specific attorney/client privilege.

23  There was one specific charge that has been

24  the most largest of concerns.  When I would attempt to

25  discuss it with him or ask him questions about it, there

1   was one specific question which would be a definition to

2   it, I guess you could say, or a definition to one of the

3   elements, and he did not give me an answer as to what

4   the definition was.  All he would keep telling me is

5   that, no, that's not a defense, that's not a defense.

6   And I said, well, Larry, you tell me what's a defense

7   because there's got to be a defense here somewhere.  You

8   can't just tell me there's no defense at all.  That was

9   our last conversation we had.

10          Now, in and throughout that last conversation

11  which is where I believe Attorney Vogelman has come up

12  with the opinion that he feels I need the competency

13  evaluation, and what he's speaking to is he continues to

14  see, and I believe that the reason he requested the

15  competency evaluation, is because again, he does not

16  believe the connection between the 2010 case and the

17  origin of the federal case from the 2010 case, which

18  yes, I do consistently and without failure insist on

19  pointing out.

20          THE COURT:  Okay.  I understand that.  And

21  you're entitled to believe anything that you want to

22  believe and no one is going to try to change your mind

23  with respect to any of that.  It's a question of whether

24  the proof of that or that defense will be pursued at

25  your trial.  And what I'm saying to you is Mr. Vogelman

1    has a duty to listen to you about that.  But as your

2    lawyer, he ultimately decides on that after listening to

3    you.  You don't decide that.  So, and, it sounds like

4    this is very similar to the problem you were having with

5    your last lawyer and it will be the problem you will

6    have with your next lawyer and the one after that and

7    the one after that.

8            So, if you're competent and you want to pursue

9    some argument like that, you'll have to do it on your

10   own.  No lawyer will do it for you.

11           THE DEFENDANT:  Your Honor, I understand what

12   you're saying.  The thing is is that it's not a

13   personal, an arbitrary personal opinion of mine.

14           THE COURT:  It's fact, I understand.  It's

15   fact in your mind, it's fact.

16           THE DEFENDANT:  No, there's no fact in my

17   mind, your Honor, it's fact throughout the discovery

18   that I have paperwork right here from the --

19           THE COURT:  Let me ask you this.  What is --

20   how does that lead to a defense and a not guilty verdict

21   against you?

22           THE DEFENDANT:  It was not meant solely as a

23   defense or a not guilty verdict, your Honor.  It was

24   simply meant, because I truly feel that, and as I do to

25   this very second, that the jury and anyone else who is

1    hearing this matter needs to be fully aware of and fully

2    informed of the origin of this case.

3              THE COURT:  Okay.  Well, as I said, we will do

4    this a step at a time.  In listening to you, I mean, I

5    know because I've had prior interactions with you,

6    you're a smart man, you're respectful to the Court which

7    I greatly appreciate, but you are obviously, and I don't

8    fault you for this, deeply, deeply emotionally committed

9    to the belief that this is a retaliatory action by the

10   government stemming from some problem with a case

11   involving your daughter; right?  You deeply believe

12   that.  I don't think you're making that up in any way.

13             Now, I don't know whether it is or it isn't

14   connected.  But what I know is the way you're talking

15   about it, the vehemence with which you're describing it,

16   the insistence on talking about it over and over and

17   over again, is a concern for me about your competence.

18   And that's why I too want to see a psychologist evaluate

19   you just to make sure because, because what you're

20   facing right now is your entire future will depend upon

21   what happens in this proceeding, and if you are not

22   competent, I don't want this proceeding to move ahead

23   against you, because it doesn't get undone.

24             If you are competent, then I want, I will then

25   turn to you and say, look, I don't think it's in your

1    interest to do this, but if you can't go along with

2    whatever the defense is that Mr. Vogelman wants to put

3    up for you, I understand that, the only way you can

4    avoid that is by representing yourself.  And even though

5    I will advise you not to do that, that is the only

6    option I can see for you that will allow you to pursue a

7    defense strategy that your lawyer deems as being

8    manifestly against your interests.

9             So, you may have a strong feeling about this

10   and how important it is to bring this out to the public,

11   but if his conclusion is it's not going to help your

12   defense, because his job isn't to help you disclose this

13   to the public, okay, even if it's true, his job is to

14   get a not guilty verdict against, entered in your case

15   so you can walk as a free man, or if he can't do that,

16   get the lowest possible sentence for you that he can.

17   And that's his single-minded focus.  And you may have a

18   different agenda, but he can't pursue that agenda to the

19   extent it's against your interests.

20             THE DEFENDANT:  Yes --

21             THE COURT:  He has to pursue your interests in

22   getting a not guilty verdict.  So, I understand your

23   point.

24             THE DEFENDANT:  I just -- I don't mean to

25   interrupt, I just want to make it clear, your Honor.  In

1  no way, shape or form at all am I wanting to bring this

2  information regarding my daughter's 2010 case out in any

3  way to bring to the public, only to those involved in

4  the case, to show and to prove the retaliatory actions.

5  That is it.  It's not like I'm trying to make a

6  spectacle of this, your Honor.  To be completely honest

7  --

8          THE COURT:  Okay, but let's -- so when we try

9  to figure out, and I can't be your lawyer and --

10         THE DEFENDANT:  Yes, sir.

11         THE COURT:  -- Mr. Vogelman may have further

12 thoughts about this, but sometimes people in your

13 position say the government prosecution is part of a

14 vendetta.  I want to present to the jury as a defense

15 that the government is engaged in some kind of

16 overreaching misconduct.

17         I can tell you that that is a very, very

18 narrow area in which there's ever any viable defense on

19 that ground.

20         Another -- sometimes people will raise things

21 like you're raising to say I want you to attack the

22 government's witnesses for bias, to show they're biased

23 against me so the jury will doubt their credibility.

24 That is a strategy to undermine the credibility of

25 government witnesses to help create doubt, and Mr.

1    Vogelman might or might not determine that pursuing that

2    line of defense is useful.

3            But in the end, it doesn't result in a not

4    guilty verdict by itself.  There has to be an

5    overarching defense strategy, which might be as simple

6    as the government can't prove my guilt beyond a

7    reasonable doubt; to the extent you have to depend on

8    witnesses they're not credible either because the

9    government is biased against me or because the witnesses

10   the government has are interested in their own interests

11   over others.

12           There may be ways to work some of this in.

13   But the way you keep going over and over this, this

14   hearing and the last hearing, again, it suggests

15   single-mindedness of thought that to an unbiased

16   observer raises questions about your ability to assist

17   in your defense.  And when one person gets so

18   preoccupied and fixated with one part of the case to the

19   point that they can't look at the rest of the case, that

20   raises questions about whether there is something going

21   on with them that calls into question their competency.

22           So, again, I understand your point, and I'm

23   not going to dismiss Mr. Vogelman today, but I'm not

24   going to hold out, I'm going to reserve until I get

25   through the next step of this process, which is to get a

 1   competency evaluation of you so I can have an unbiased

 2   set of experts look at you -- look you over, look at

 3   your prior history and tell me is this a guy who just

 4   strongly believes what he believes and is perfectly

 5   competent and able to do what he needs to do, or is this

 6   a guy who's got something else going on with him.

 7            THE DEFENDANT:  May I say two more things,

 8   your Honor, I apologize.

 9            THE COURT:  Yes.

10            THE DEFENDANT:  One, the other reason that has

11   been a longstanding issue as to a dispute or

12   disagreement I guess can you say between Attorney

13   Vogelman and I, he refuses to -- he asked me if, you

14   know, if I felt there was anything that needed to be

15   suppressed by a motion.  And I told him the first thing

16   which, that of which I did not even have access to the

17   grand jury testimony of my wife until, what, roughly

18   three months ago, Larry, Attorney Vogelman?

19            MR. VOGELMAN:  Less.

20            THE DEFENDANT:  Roughly two or three months

21   ago or so, that of which there are two pages missing out

22   of it which I still have not gotten, I believe 19 and

23   21.  Regardless, your Honor, in both the interviews and

24   grand jury testimonies, to this date it has been said to

25   everyone who has spoken to her, she does not remember

1  anything because of her levels of intoxication.  And

2  Attorney Vogelman refuses to file motions for

3  suppression on that.

4       THE COURT:  Well, okay, I'm confused.  What

5  are you suggesting should be suppressed, her testimony?

6       THE DEFENDANT:  How could -- well, what I

7  don't understand, your Honor, is how could any interview

8  or grand jury testimony be admissible or even be allowed

9  into evidence if the individual was under the influence,

10 that of which all controlled questions were, by

11 controlled questions I mean questions such as your name,

12 date of birth, where you were born, background, so forth

13 so on, all those types of questions were asked

14 throughout the interviews and throughout the grand jury

15 testimonies except the questions of are you under the

16 influence of any controlled substance or alcohol.

17      THE COURT:  Okay.  Here is what I, again, I'm

18 trying to think this through.  So you're assuming that

19 your wife won't in fact be called to testify.

20      THE DEFENDANT:  Oh, I know she -- they're

21 threatening to subpoena her.  And the government --

22      THE COURT:  And are you trying to keep her

23 from being allowed to testify in court or are you saying

24 I think if she is called she will take the Fifth

25 Amendment, and then the government will try to introduce

1    the grand jury transcript, and if they try to introduce

2    that, we should keep it out?

3            THE DEFENDANT:  Your Honor, all I can tell

4    you, I refuse to speculate on that, all I can tell you

5    is what I have been informed of, that of which is that

6    consistently my wife has continuously and consistently

7    and repetitively said she does not remember to the point

8    where she breaks out in tears because she can't remember

9    and feels so bad for it.

10           THE COURT:  Okay --

11           THE DEFENDANT:  And, excuse me, your Honor, in

12   the last meeting three and a half weeks ago in which

13   Attorney Abramson was present with myself, Attorney

14   Vogelman and two other individuals, he informed me, this

15   is the first time they did not threaten to press charges

16   on Stephanie and indict her federally for the same

17   charges I'm on if I did not take the plea bargain, this

18   time he simply says that we will, Attorney Abramson says

19   we will compel her, compel Stephanie to testify at

20   trial, and if she claims she does not remember or

21   changes her story, we will charge her with perjury and

22   we will read the grand jury testimony to the jury, as

23   well as Attorney Abramson attempted to say that she

24   would not be allowed to take the Fifth Amendment.

25           THE COURT:  Okay.  I can't think of -- you

1    appear to be complaining that Attorney Vogelman will not

2    file a motion to suppress.  It's not clear to me whether

3    you want her live testimony to be what you call

4    suppressed or whether you want the --

5              THE DEFENDANT:  I apologize if there's a

6    different word for it, your Honor.

7              THE COURT:  Well, it matters in this way

8    because there are, you don't -- in my experience here

9    people have never filed motions to suppress something

10   like this.  Suppression motions are in almost all cases

11   filed based on a claim that physical evidence was

12   obtained in violation of the Fourth Amendment or

13   confessions of the defendant were obtained in violation

14   of Miranda rights or were coerced in violation of the

15   Fifth Amendment or were obtained in violation of a right

16   to counsel.  Occasionally you find motions to suppress

17   out-of-court identifications based on Sixth Amendment

18   rights.  What you're talking about is ordinarily handled

19   more in the nature of an objection to testimony when

20   it's offered or a motion in limine to bar the testimony.

21   But I can't -- I don't -- I'm not aware that there's any

22   grounds to prevent your wife from being required to

23   testify based on the grounds that she gave a prior

24   statement while intoxicated.  Nor am I aware of any

25   basis to keep out the prior statement on the grounds

1    that you say that she was intoxicated.

2            But we're so far away from that now, I can't

3    even begin to speculate about whether there's some way

4    to attack that or not, but you need not fear that you're

5    going to lose the right to challenge that.  If there is

6    a right to challenge it, it can be done when the

7    testimony is offered at trial.

8            THE DEFENDANT:  Your Honor, I don't mean to

9    interrupt.  My biggest fear, and I apologize after 2010

10   when it comes to any threat against my family, that's

11   the only thing that scares me.  That's my Achilles heel

12   and everyone knows it.  Simply by threatening or being

13   able to prosecute for perjury for not remembering one's

14   testimony, which completely contradicts, for the record,

15   completely contradicts that of those individuals at the

16   gun stores and that of the owner and things he has told

17   other employees of the store, but that's something for

18   trial and it's been on its own.

19           The fact that what -- I'm afraid that if this

20   -- if her grand jury testimony is allowed to be brought

21   in and she's put on the stand, because she does not

22   remember.  As far as I can tell, from what I hear in her

23   voice when she tells me, I truly not believe she does.

24   And the only way she will is if she reads her grand jury

25   testimony, and seeing that, what is in her grand jury

1   testimony is again a complete contradiction to what

2   other facts and other testimony by individuals in the

3   case.  And that in itself would be -- could be

4   considered perjury, your Honor.  So it honestly feels

5   like a catch 22 or a double-edged sword for her if she

6   gets on.

7           THE COURT:  I understand, and listen, this is

8   a very difficult thing for you.  I understand you're

9   emotional about it.  It's not surprising that you would

10  care for your family.  I think we need to take this a

11  step at a time, okay?  Let's just do it a step at a

12  time.

13          Let's get the evaluation done.  And I am

14  concerned based on, and I'm not in any way being

15  critical because as I say, you are being very good at

16  being respectful to the Court which I very much

17  appreciate.

18          THE DEFENDANT:  I'm not some common street

19  punk, your Honor.

20          THE COURT:  And I appreciate the way that

21  you're being respectful to the Court, but this is -- I

22  can tell by the way you're describing things, the

23  cadence that you're using, the intonation that you're

24  using, the emotionality, the fixation on the particular

25  matters that are so concerning to you, that they are

1   potentially overwhelming you and overwhelming your

2   ability to work with not just Mr. Vogelman, work with

3   anybody, because it's so got you right now.

4          So let's get that evaluation done and figure

5   out if anything is going on that I need to get you some

6   help on, and after I do that then we will come back and

7   we will do the status of counsel hearing again, and if

8   you want it, and if you want another lawyer, we will

9   explore what your options are.

10          THE DEFENDANT:  May I explain my only concern

11   about the competency evaluation, your Honor?

12          THE COURT:  Just briefly because we've been at

13   it --

14          THE DEFENDANT:  I apologize.  You know, if

15   they for whatever reason do not find competency, which I

16   highly doubt that will be an issue, you know, there's no

17   reason for them not to find competency; however, if they

18   do, and correct me if I'm wrong, my understanding is at

19   that point they will then, the evaluator or this Court

20   will then find a, well, make a finding and decision

21   whether or not I am restorable for trial; correct?

22          THE COURT:  Correct.

23          THE DEFENDANT:  As far as I know, the only way

24   to restore one for trial especially with alleged mental

25   disease or defects would be through that of medication.

1       THE COURT:  It could also be non-medication

2   therapeutic intervention, but generally speaking, that's

3   right, you would probably -- I would probably commit you

4   to a facility for a period of time to be, undergo

5   therapy and perhaps medication and, say, for example, if

6   there was a diagnosis of bipolar disorder, something

7   like that, that there are medications that can help

8   people with those disorders --

9       THE DEFENDANT:  Your Honor, I don't mean to

10  cut you off.  I cannot take medication.  Because of my

11  traumatic brain injury, all medications have what's

12  known as an adverse effect meaning they do the opposite.

13  Mainly antidepressants make me severely depressed.

14      THE COURT:  Well, I had forgotten.  You may

15  have mentioned this before.  But you had a traumatic

16  brain injury in the past which is another reason for

17  concern here.  Medication may not be the answer.  If --

18      THE DEFENDANT:  Doctors and therapists have

19  clearly stated that my form of therapy, because I

20  physically cannot open up or speak to somebody who I do

21  not personally know and trust, so therefore multiple

22  doctors, including my own personal physician, and my

23  wife and I even have letters to this effect stating that

24  we have therapy dogs because of this, and the biggest,

25  the biggest issue and the absolute biggest reason of my

 1    emotional state now is I've been eight months without my

 2    daughter.

 3              THE COURT:  Okay.

 4              THE DEFENDANT:  Which is what caused this in

 5    the beginning.

 6              THE COURT:  All right, let's -- here's the way

 7    we're going to get through this, okay?  I've heard you

 8    at length, I understand your views, and I'm sympathetic

 9    to the pain that you're suffering, but the only way I

10    can do this is one step at a time.  Let's not get ahead

11    of ourselves, okay?  We don't have to worry about what

12    happens if I find you incompetent until I get there.

13    And if I do, then we will look at the next steps in the

14    process.

15              THE DEFENDANT:  My view, your Honor, is what's

16    going to happen if somebody tries to force me to take

17    medication and I refuse to take medication --

18              THE COURT:  Nobody can force you to take

19    medication unless I were to order it, and I would never

20    do that without holding a hearing and giving you an

21    opportunity to be represented on that if you didn't want

22    to take medication.  That's a last resort that I would

23    hardly not view lightly.  So no one can make you take

24    medication during this evaluation process especially if

25    you say that it has adverse effects on you according to

1    your own treating physician.  They will get all the

2    medical records in your background.  They will do an

3    evaluation.

4            THE DEFENDANT:  Can I ask that we do it

5    through an independent source, not through the

6    government, or is that too much to ask?

7            THE COURT:  I -- well, we may need to do

8    another evaluation depending upon what the government --

9    we start with the government, and if you and your lawyer

10   are dissatisfied with that evaluation, then I might

11   consider appointing an independent evaluator outside of

12   the government.  But the routine way to do this is an

13   evaluation with the government.  So, one step at a time,

14   okay?  You hear me --

15           THE DEFENDANT:  Yes, sir.

16           THE COURT:  I am not going to let you be

17   railroaded.  As long as you work with me the way you

18   have been, I will work with you.  You may not like the

19   things I do, but I will hear you at each step of the

20   process, and I'm not out to get you --

21           THE DEFENDANT:  I never said you were, your

22   Honor, I never meant to insinuate that.

23           THE COURT:  No, I know don't.  No, I don't

24   think you, I just want to emphasize to you that you work

25   with me, I will work with you, we will take it a step at

1    a time.  First step is to get this evaluation done.

2    Nobody is going to force you to take medication.  If

3    somebody were to do that, refuse the medication, call

4    Mr. Vogelman, he will schedule a hearing, I'll make sure

5    that nobody will force you to take medication --

6                   THE DEFENDANT:  Excuse me, but when I

7    attempted to refuse medication in Rockingham County,

8    your Honor, they attempted to -- they threatened to lock

9    me in what they call the hole, solitary confinement.

10                  THE COURT:  Well, again, Mr. Vogelman, if he

11   reports to you that someone is trying to force him to

12   take medication, you will immediately call up the United

13   States Attorney's office, remind them of the

14   conversation that I've just had with them.  If they

15   insist that he needs to be medicated, you will file a

16   request for an immediate hearing, and I will address the

17   issue directly.  I'm not saying -- I mean, I can't say

18   how I would rule.

19                  THE DEFENDANT:  I understand, your Honor.

20                  THE COURT:  But I will give you a hearing and

21   they can't force you to take medication.  It's not my

22   experience that they do that.  They may try to persuade

23   you to do it.

24                  THE DEFENDANT:  I did see it happen in

25   Strafford County and Rockingham County, your Honor.

1          THE COURT:  Well, there are some limited

2    occasions where people have been forcibly medicated but

3    it's pursuant to a court order.

4          So, in any event, again, let's just focus on

5    this.  Go through this evaluation.  Try to be as honest

6    with people as you can be.  And if you're right, that

7    you don't have a mental illness that's preventing you

8    from being able to assist counsel, then we will come

9    back and I will ask you what you want to do next.

10          THE DEFENDANT:  I have posttraumatic stress

11    syndrome -- I have posttraumatic stress disorder, and

12    antisocial personality that stems from my posttraumatic

13    stress disorder, and attention hyperactivity disorder.

14          THE COURT:  I understand.  And that's why we

15    have to have an evaluation done, and I think we've

16    covered it.  So, hang in there.  Do it a step at a time.

17    I will be back with you again after we've done this

18    evaluation, and then we'll revisit the issue of Mr.

19    Vogelman's representation of you if you want to.

20          And in the meantime, Mr. Vogelman, stay in

21    touch with him during the evaluation process.  If you

22    should feel at any point that his constitutional rights

23    are in any way being endangered, you'll of course

24    contact the government immediately and notify the Court

25    if necessary to hold some kind of emergency hearing.

1      We'll take it a step at a time and let's see

2   where we are --

3           MR. VOGELMAN:  One more thing, judge.

4           THE COURT:  Yes.

5           MR. VOGELMAN:  Some of the issues that were

6   raised by Mr. Irish that the government and I were

7   sensitive to, the government has been good enough to

8   expedite the service of the trial subpoena on Stephanie

9   so that she could come to the Court and get assigned

10  counsel.

11          THE COURT:  Oh, so she can get counsel to

12  represent her?

13          MR. VOGELMAN:  Right.  So, he had to first

14  serve her with a respect in expedited -- usually he

15  wouldn't be serving trial subpoenas today, but I think

16  --

17          THE COURT:  Okay, I think that's a good idea.

18  Let's get a court-appointed attorney for her so she can

19  have her own attorney to protect her interests.

20          MR. VOGELMAN:  We have started that process,

21  sir.

22          THE COURT:  All right.  Anything else?

23          MR. ABRAMSON:  Just two quick issues, your

24  Honor, and I'll keep it brief.

25          The first is just with respect to the

 1   discovery, I know there was a reference to some

 2   confusion about the discovery being transferred to the

 3   new facility.  I just wanted to assure the Court that

 4   Attorney Vogelman and I have taken care of that and he

 5   should have access to his discovery material as soon as

 6   he's back at the Essex facility.

 7              THE COURT:  Okay.

 8              MR. ABRAMSON:  The second issue is just

 9   whether the Court feels that an explanation is warranted

10   with regard to the allegations of threats being made to

11   the defendant.  I won't get into that if you don't feel

12   it's necessary.

13              THE COURT:  At this point I think it's pre-

14   mature.  I think we need to get this evaluation done,

15   and then after that, if he wants, if he's making

16   allegations about you that should require some kind of

17   action, you can respond to them, but I think it's

18   premature.  I think it's a step -- a step at a time

19   here.  I'm satisfied based on my own observations today

20   that we do need to do an evaluation.  Beyond that I'm

21   completely open to anything the defendant wants to

22   propose, but I need to first determine his competency

23   because that strongly affects the extent to which he has

24   the option of representing himself and how I evaluate

25   the various arguments he wants to pursue.

1    And so I think we just ought to take it a step

2  at a time, okay?

3    MR. VOGELMAN:  There's one further thing.  In

4  your order you indicated that the speedy trial act was

5  tolled in the interest of justice, but you also asked

6  for a speedy trial waiver signed by the defendant which

7  I don't think he is --

8    THE COURT:  Well, given the questions about

9  his competency that's a standard practice, but I don't

10  think it is -- I'm not going to ask him to waive any

11  rights that he has under the current circumstances

12  because if there's a question of competency, the waiver

13  wouldn't be valid in any event.

14    MR. VOGELMAN:  That's why I raised it.

15    THE COURT:  And I appreciate you making that

16  point.  I don't want to compel him to waive any right

17  that he has.  But I stand by my ends of justice finding

18  here that when I do an evaluation, it takes time.  We

19  need to continue the trial so we can assess the

20  defendant's competency, but I think that's a good point

21  to protect his interests.

22    THE DEFENDANT:  Does anybody know when I will

23  be transferred for the evaluation?

24    THE COURT:  It probably would be in the next

25  week or two, but I don't know how quickly that's going

1  to happen.

2          THE DEFENDANT:  Does anyone know how long that

3  will take?

4          THE COURT:  It takes a long time.  I'm

5  thinking 20 days, something like that.

6          MR. VOGELMAN:  The statute says they should do

7  it in 30, but oftentimes they do come in --

8          THE COURT:  Takes longer.  Sometimes longer,

9  sometimes shorter, but it's around that period of time.

10          THE DEFENDANT:  Would it be too much to ask

11  that the Court put it at 30 days and no more, whereas

12  this trial is putting a severe strain on my --

13          THE COURT:  No, I understand, and I think what

14  we will do is you will be in communication with him and

15  with the government, and the government will inquire

16  after 20 days and tell the -- here's what I think we

17  will do.  You'll contact the referring facility and say

18  that the Court has expressed concern that this matter be

19  expedited if at all possible, and it should be completed

20  if possible within 20 days.  And if it's not, you'll

21  inquire the status of it and inform Mr. Vogelman.  And

22  if the parties believe some further action needs to be

23  taken, you will file it, Mr. Vogelman can file the

24  appropriate motion for a further hearing.

25          So, we will do what we can to expedite it,

1    okay?

2              THE DEFENDANT:  Thank you, your Honor.

3              THE COURT:  All right.  Thank you.

4              MR. ABRAMSON:  Your Honor.

5              (Hearing adjourned at 3:20 p.m.)

6

7

8

9

10

11                    C E R T I F I C A T E

12

13             I, Sandra L. Bailey, do hereby certify that

14    the foregoing transcript is a true and accurate

15    transcription of the within proceedings, to the best of

16    my knowledge, skill, ability and belief.

17

18

19    Submitted: 5/13/2015

20                              **SANDRA L. BAILEY, LCR, CM, CRR**

21                              LICENSED COURT REPORTER, NO. 15

22                              STATE OF NEW HAMPSHIRE

23

24

25