```
              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF NEW HAMPSHIRE


*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                            *
UNITED STATES OF AMERICA                    *
                                            *   13-cr-142-01-PB
              v.                            *   November 3, 2014
                                            *   11:30 a.m.
JONATHON IRISH                              *
                                            *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE PAUL J. BARBADORO


<u>Appearances:</u>

<u>For the Government:</u>    Nick Abramson, AUSA
                        U.S. Attorney's Office
                        53 Pleasant Street
                        Concord, NH 03301


<u>For the Defendant:</u>     Lawrence A. Vogelman, Esq.
                        Nixon Raiche Vogelman &
                            Slawsky, P.A.
                        77 Central Street
                        Manchester, NH 03101


<u>Court Reporter:</u>       Diane M. Churas, LCR, CRR
                        Official Court Reporter
                        U.S. District Court
                        55 Pleasant Street
                        Concord, NH   03301
                        (603) 225-1442

```
                            I N D E X


WITNESS:             DIRECT     CROSS     REDIRECT     RECROSS

WENDY E. IRISH

By Mr. Irish        8

NANCY E. HASKELL

By Mr. Irish        15
```

```
 1                      BEFORE THE COURT

 2            THE CLERK:  Court has before it for

 3  consideration a motion hearing in Criminal Case

 4  13-cr-142-01-PB, United States of America versus

 5  Jonathon Irish.

 6            THE COURT:  Mr. Irish, what did you want to

 7  say?

 8            THE DEFENDANT:  Well, your Honor, I didn't

 9  know which motion you wanted to address first.

10            THE COURT:  Whatever you want.  We'll take

11  them up in whatever order you choose.

12            THE DEFENDANT:  Well, I think it's just the

13  bail motion.  I would appreciate addressing that first

14  because my aunt is actually up here from Georgia and she

15  has to leave rather quickly to get back.

16            THE COURT:  So do you still want your lawyer

17  to represent you on the bail hearing?

18            THE DEFENDANT:  No, your Honor.  I'll speak

19  for myself on the bail matter, your Honor.

20            THE COURT:  Wait a second.  I have to decide

21  whether I can let you do that because ordinarily -- you

22  have a lawyer.  Your lawyer should speak for you.  If

23  you want to fire your lawyer, then you either have to

24  get a new lawyer or you represent yourself.

25            THE DEFENDANT:  Well, your Honor, I don't mean
```

1    to interrupt, however, I did inform Attorney Kirk

2    Simoneau, one of Attorney Vogelman's partners, roughly

3    about -- actually on 14 October that Attorney Vogelman

4    needed to file a motion to withdraw from the case

5    because of multiple issues, which we'll address after

6    this.

7              However, your Honor, I was informed that he

8    did not have to do that until this hearing.  Attorney

9    Vogelman lied to myself as well as my family, told us

10   that he would file motions for bail, which he refused

11   and failed to do.

12             THE COURT:  Wait a second.

13             THE DEFENDANT:  I'm sorry, your Honor.

14             THE COURT:  You have a witness who needs to

15   leave.  Would the government object if I allowed him to

16   represent himself on the bail matter before taking up

17   whether to discharge Mr. Vogelman to try to accommodate

18   his request?

19             MR. ABRAMSON:  Your Honor, I'm not familiar

20   with the legal ramifications of that, but as a practical

21   matter I do not have an objection to that.

22             THE COURT:  Well, I try to think about -- if I

23   granted his request, I don't see how he can complain

24   that you never should have let me represent myself on

25   this matter even though I asked you as a convenience to

1    my witness to let me do it before determining counsel.

2              But, Mr. Vogelman, did you want to say

3    anything about that?

4              MR. VOGELMAN:  No.  There is authority for,

5    you know -- it doesn't happen often in this building for

6    hybrid representation.  I've actually been involved in

7    cases where, for whatever reason, the federal judge let

8    both the defendant go pro se with standby counsel.  This

9    is similar to that so I don't think there's any problem.

10             THE COURT:  I don't believe in hybrid

11   representation.  I believe in standby so -- but to

12   accommodate the defendant, I think we ought to just try

13   to let him do what he wants to do on the bail first

14   because he has a witness who may have to leave.

15             So that's fine.  I will let you go ahead and

16   do that one first, and then we'll deal with the counsel

17   issue after you've done that.

18             So did you want to call a witness or did you

19   want to say something before you called a witness?  What

20   did you want to do.

21             THE DEFENDANT:  Well, I just wanted to inform

22   the Court what it's in regards to.  My aunt has

23   extensive knowledge of my -- there have been claims

24   by -- I don't know if they're going to be called as

25   witnesses at trial, but persons who -- Agent Christiana

1  has interviewed specifically my biological abusive

2  father, John Charles Irish, where John Charles Irish

3  made the allegations that I'm, quote, unquote, a ticking

4  time bomb, that I'm a danger to the family, I'm a danger

5  to the community, and that nobody in my family wants

6  anything to do with me, your Honor.

7          THE COURT:  Let's stop.  Are you going to rely

8  on that testimony in opposition to bail?

9          MR. ABRAMSON:  No, your Honor, we do not rely

10  on that with respect to the initial bail determination.

11          THE COURT:  All right.  So they're not going

12  to rely on anything that your father said.  So we can

13  ignore that.

14          THE DEFENDANT:  Yes, your Honor.  Well, I

15  understand, your Honor, however, I feel that that very

16  well may come up at trial because of the credibility of

17  the individuals who they have interviewed.

18          THE COURT:  I doubt I would let anybody

19  testify that you're a ticking time bomb at your trial.

20  I can't foresee how that would come up.  Do you?

21          MR. ABRAMSON:  No, your Honor, we certainly

22  would not elicit any testimony of that nature.

23          THE COURT:  I don't think you need to worry

24  about that.

25          THE DEFENDANT:  The concern, your Honor, is

1   they're making concerns of my dangerousness and so forth

2   and so on.

3          THE COURT:  Do you want to call your aunt to

4   talk about that issue?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Do you have an objection?

7          MR. ABRAMSON:  No, your Honor.

8          THE COURT:  Why don't we call her and you can

9   ask her whatever questions you want.

10          THE DEFENDANT:  Wendy.

11          THE COURT:  Could you come up, ma'am, and

12   stand by the witness stand and the clerk will place you

13   under oath.

14                    WENDY ELIZABETH IRISH

15       having been duly sworn, testified as follows:

16          THE CLERK:  Thank you.  Would you please state

17   your name and spell your last name for the record.

18          THE WITNESS:  Wendy Elizabeth Irish,

19   I-R-I-S-H.

20          THE COURT:  Have a seat, ma'am.  Let me

21   just -- to guide you here, focus on things that she can

22   say that will help me determine that you should be

23   released on bail.  Don't go into a lot of bad things

24   that you want to try to refute because nobody is putting

25   on that evidence now.  She can say things that will help

1    me decide you're not a bail risk, you can be released

2    without a danger that you will harm others, or that you

3    will flee.  That's what I want to hear.  Okay?  So focus

4    on that.  Go ahead.

5              THE DEFENDANT:  Yes, your Honor.

6                        DIRECT EXAMINATION

7    BY MR. IRISH:

8        Q.    Aunt Wendy, you've known me my entire life;

9    correct?

10       A.    Yes, I have.

11       Q.    There's obviously multiple issues throughout

12   the family.  Have I ever been a threat or a danger to

13   anyone in the community, anyone in the family or

14   anything of the nature?

15       A.    No, you have not.

16       Q.    Have I ever -- everyone -- it's no secret I

17   have had issues when I was younger which turned out to

18   be misdemeanors, violations, and whatnot.  Have I ever

19   failed to appear for court?

20       A.    No.

21       Q.    Have I ever attempted to harm anyone?  Have I

22   attempted to make an act of aggression or an act of

23   violence with another individual?

24       A.    Not that I know of, no.  And definitely nobody

25   in the family because you have actually had no contact

1  with my side of the family for years because of

2  incidents with your father.  So there's no way you have

3  threatened my parents, my sister, my brother, my son, or

4  anybody because you have basically been cut off from the

5  family because of your father.

6      Q.    Now, the knowledge you have of myself and the

7  family, could you please explain why I would be one of

8  if not the last person to actually be aggressive or

9  violent towards another individual because --

10  specifically towards violence I have been involved in in

11  the past that you know of?

12      A.    I have never known you to hurt another human

13  being.  I have never known you to -- other than maybe

14  yell, like we all lose our temper.  I've never known you

15  to act out against anybody.  I have never heard -- I've

16  been in contact -- we've reestablished contact about

17  two, two and a half years ago, and I have a son who has

18  Down's syndrome, and whenever you have seen him, you

19  have always shown a soft side to him.  You have never

20  ever shown any signs of hostility or anything to me or

21  my elderly parents.

22      Q.    Specifically, are you aware of any situations

23  or any events that have happened to myself or throughout

24  the family in our past as to why I would not -- why I

25  would refuse to be violent towards another individual?

1          THE COURT:  You can ask -- is there a leading
2    question?  Were you, like, abused?  Do you want to talk
3    about how you were abused?
4         Q.    Would you please explain to the Court the
5    violence that was acted against myself and my mother and
6    my sisters to explain to the Court why I refuse to be
7    like that person.
8         A.    I know you're talking about your father who
9    has a very violent temper, who has abused you, your
10   sister, and has abused me.  He's held a gun to my head,
11   he's held a knife to my throat, and you have always said
12   you would never ever be like your dad.  He's the one
13   with the violence.  He's the one who has pulled guns.
14   He's the one who has pulled knives.  He's the one that
15   my family is afraid of, not you.
16        Q.    Now, you're aware of situations that -- the
17   government is going to say it was a custody issue.
18   Everyone who knows the details of the case and is
19   intimate with the case knows that it was an illegal
20   custody issue and in essence an abduction with what
21   happened with my daughter.
22        A.    Yes.
23        Q.    You are also aware of the continued assaults
24   from my father during my adult life?
25        A.    Yes.  Your father had told me about those.

1      Q.   Would you agree that there have been instances

2   in the past where people were more than surprised and

3   have even said that they would have acted and handled it

4   differently and possibly more aggressively?

5      A.   Yes.   There have been many times where your

6   dad has said he would kick your butt if you came near my

7   parents.   He has said he would beat you if you came near

8   my parents, and that is the reason why you have not been

9   able to have a relationship with my side of the family.

10      Q.   Well, specifically, Auntie, what I meant was

11   certain situations that I have dealt with with myself

12   and my family between John, the situation with our

13   daughter -- and I could be wrong, but I believe you even

14   said that, you know, somebody had spoken to you

15   regarding the fact that I could have -- I personally

16   could have handled several situations a lot differently

17   and I guess you can say violently?

18      A.   I did tell you that you act very maturely when

19   it came to your dad standing on court steps telling the

20   news reporter that you were an unfit father, and you

21   were less than ten feet away.

22      Q.   When it came to specifically the situation

23   with my daughter, weren't a lot of people surprised that

24   -- we'll be blunt about this.   Were or were not a lot of

25   people surprised that I did not take my daughter back by

1    force and that I did allow the Court to go through the

2    motions?

3         A.   Yes.

4         Q.   Has there been anyone else in the family at

5    all, aside from my father, who has ever showed any form

6    of concern for myself or my actions or my violentness?

7         A.   No.

8              THE DEFENDANT:   Thank you, Auntie.

9              THE COURT:   All right.   Did you have any

10   questions?

11             MR. ABRAMSON:   No, your Honor, I have no

12   questions for this witness.

13             THE COURT:   I'm a little confused.   Where do

14   you live?

15             THE WITNESS:   Georgia.

16             THE COURT:   And how frequently have you been

17   in contact with Mr. Irish, say, in the last year?

18             THE WITNESS:   Which Mr. Irish?

19             THE COURT:   I'm sorry, this one here in the

20   courtroom.

21             THE WITNESS:   Before his incarceration, we

22   talked weekly on the phone, and I come up here -- I try

23   to come up every six months, and I saw Jonathon probably

24   two years ago for the first time in years.

25             THE COURT:   So there were a number of years

1    where you didn't see him, and did you keep talking to

2    him on the phone during those years?

3            THE WITNESS:  Yes.  I've been in contact with

4    him on the phone off and on for years.

5            THE COURT:  And then about two years ago you

6    saw him for the first time in a number of years?

7            THE WITNESS:  Yes.

8            THE COURT:  And then you would periodically

9    come back up and see him when you would visit again?

10           THE WITNESS:  I mean 99 percent when I come

11   up, because my parents are elderly, I spend my time with

12   my parents.  If I get the chance to see Jonathon, I do,

13   but I don't always get to see him.

14           THE COURT:  I'm trying to figure out how much

15   contact where you're actually present with him over the

16   last, say, 12 months before he was incarcerated.  How

17   many days were you actually with him, staying at his

18   house --

19           THE WITNESS:  Oh, never.  I've never stayed at

20   his house.

21           THE COURT:  So you would see him during

22   meetings.

23           THE WITNESS:  Brief meetings.  We visited, but

24   we stayed in contact by the phone numerous times, text

25   numerous times, and I have a lot more contact with my

1   brother, with John.

2           THE COURT:  He's the father?

3           THE WITNESS:  Yes.  I would see him on visits

4   and he would have conversations with me about Jonathon.

5           THE COURT:  When you say John, he's the one

6   that abused Mr. Irish and said the bad things about him

7   on the courthouse steps?

8           THE WITNESS:  Yes.

9           THE COURT:  I don't know anything about this

10  custody courthouse thing.  But he said something

11  negative about him and he's threatened him and he's the

12  one that you said held guns and knives and all that.

13          THE WITNESS:  Yes.  There's actually a

14  newscast on file where Jonathon -- where John was on the

15  news with a reporter.  He sought her out to make his

16  comments about Jonathon being an unfit dad and he should

17  not get custody of his daughter.  So there is a newscast

18  on that somewhere in the files.

19          THE COURT:  All right.  Thank you for coming.

20  You're excused, and if you have to catch a plane or

21  something, you can head back whenever you need to.

22          THE WITNESS:  Thank you.

23          THE DEFENDANT:  Thank you.

24          THE WITNESS:  I love you.

25          THE DEFENDANT:  Your Honor, my mother's

1    present as well.  She's -- daily contact doesn't

2    describe it.  We talk and text on the phone from sunup

3    to sundown and even throughout the night.  I will see

4    her at least two or three times during the week.  She

5    wasn't able to be here for the last bail hearing in

6    front of Judge McAuliffe because she was caring for our

7    minor daughter at that time because there was no one

8    else to do that.  My mother can also speak to the fact

9    of --

10            THE COURT:  Do you want to call her as a

11   witness?

12            THE DEFENDANT:  Yes, please, your Honor.

13            THE COURT:  All right.  Go ahead.

14            THE DEFENDANT:  Mum.

15                       NANCY MARIE HASKELL

16       having been duly sworn, testified as follows:

17            THE CLERK:  Could you state your name and

18   spell your name.

19            THE WITNESS:  Nancy Marie Haskell,

20   H-A-S-K-E-L-L.

21            THE COURT:  Go ahead.

22                       DIRECT EXAMINATION

23   BY MR. IRISH:

24       Q.   Now, I'm going to start off, there's a saying

25   in the family of, you know, between you and Leslie, I

1    couldn't get away with it.  Is it true that in my youth

2    there was points in times where I was -- I was

3    essentially all but exiled out of the family due to my

4    behaviors which, correct me if I'm wrong, were proven to

5    be because of the medication that I was being

6    prescribed?

7        A.    Yes.  You were on multitudes of medication

8    that did not work for you.  You had very odd adverse

9    reactions and people did not understand that.

10       Q.    Including yourself?

11       A.    Including myself.

12       Q.    Now, we all -- sadly enough nowadays, not a

13   lot of people get along with their stepparents,

14   different reasons, different situations.  Have you ever

15   known me to be violent or to act violently or

16   aggressively or cause harm to another individual?

17       A.    You're not physically violent.  You yell.

18       Q.    I yell, I get frustrated.  And then what

19   happens?

20       A.    We all handle things differently.  I cry, you

21   yell.

22       Q.    And then I break down and cry.

23       A.    You break down.  You apologize.

24       Q.    Now, throughout this situation, have you ever

25   known of -- has anyone threatened you or threatened

1    anyone else that you are aware of through --

2    specifically speaking since my incarceration a year and

3    two days ago?

4          A.    Can you ask that question again, please.

5          Q.    To your knowledge has yourself or anyone else,

6    whether it be my sisters, my stepfather, or my in-laws,

7    been threatened by anyone since this whole ordeal took

8    place?

9          A.    They have been threatened by the federal

10   government.

11         Q.    What about somebody -- there wasn't another

12   individual who had -- I'm sorry, it would actually be

13   before my incarceration.

14         A.    Your father, John Irish.

15         Q.    There wasn't a phone call made to you at

16   roughly 0230 in the morning?

17         A.    Yes.  The night before you were incarcerated

18   on the local charges and held by the federal custody,

19   about 3:30 in the morning I had asked a friend of yours

20   to stay with you.  I had to take your grandmother back

21   to my house and care for her because you obviously --

22   you just couldn't at that point, and a friend of yours,

23   I asked for him to stay with you.  And he promised me he

24   wouldn't leave you.  About between 3 and 3:30 in the

25   morning, I received a phone call -- two phone calls, one

1  from his phone, one from your phone, and he said I'm

2  done with this and I'm going to go slit Libby's throat.

3         Now, Libby is Stephanie Taylor, your fiancee's

4  mother.  And he said he was going to go slit her throat.

5  Your phone -- it initially came from your phone.  Then

6  your phone died and the call was reestablished through a

7  number I did not know at the time.  Eventually it was

8  determined that it was his phone.

9         THE COURT:  Wait, wait, wait, I'm lost.  Who

10  made the slit-her-throat comment?

11         THE WITNESS:  A friend, an acquaintance of

12  Jonathon's.

13         THE COURT:  When you say Jonathon, who are you

14  talking about?

15         THE WITNESS:  My son Jonathon.

16     Q.   Who made the threat?

17     A.   James Brown.

18         THE COURT:  Mr. Irish, what are you doing with

19  this stuff?  I don't understand.

20         THE DEFENDANT:  Your Honor, there's been

21  multiple times where I've been accused of being the one

22  making threatening accusations, and that may not have

23  any relevance yet.  However, it does bring up the

24  fact --

25         THE COURT:  Are you trying to show that it was

1    your friend that made the threat, not you?

2              THE DEFENDANT:  Yes, your Honor.

3              THE COURT:  So the purpose of this is to tell

4    me because you think the government is going to say keep

5    him in jail because he makes threats --

6              THE DEFENDANT:  Yes, your Honor.

7              THE COURT:  Are you going to say keep him in

8    jail because he makes threats?  I don't know.  I have no

9    idea.

10             MR. ABRAMSON:  I think that's part of the

11   calculus.

12             THE COURT:  So go ahead.  You want to try to

13   prove that this threat was made by your friend, not by

14   you.

15             THE WITNESS:  Yes, your Honor.

16        Q.   Correct or incorrect, I had no knowledge of

17   this conversation with you until when?

18        A.   Later -- I actually didn't speak to you until

19   -- that was a Thursday night, Friday morning, 3:30

20   Friday morning, and later that day I went to meet you.

21   You were filing some papers at the courthouse and I went

22   to meet you and you had been arrested so I couldn't talk

23   to you.  So it was days down the road when we finally

24   figured out that you didn't even have your phone with

25   you and that he had actually made those phone calls and

1    he was going to Maine, and he said he was going to go to

2    Maine and slit Libby's throat.

3           THE COURT:  Did this guy make threats to other

4    people?  I'm trying to figure out how does your

5    mother -- in making a threat to your mother, did you

6    report that to the police or something?

7           THE WITNESS:  At the time it was 3:30 in the

8    morning.  I had been woken up by a phone call.  I didn't

9    know this person, but I knew it wasn't my son making the

10   threat.  I had been trying to reach -- let me back up.

11   For the entire evening before, we had been trying to

12   reach Stephanie who had left their shared residence.  We

13   had kept calling, Libby, Stephanie's mother, and she

14   wouldn't answer the phone, she wouldn't answer the

15   phone, she wouldn't answer the phone, and I guess I had

16   sort of felt in my mind that he's saying this, but he's

17   not going to go to Maine.

18          We couldn't reach Libby, Mrs. Millette (ph).

19   We couldn't reach her by phone.  We really didn't have

20   any knowledge.

21          Then we discovered later on Friday that Mrs.

22   Millette had filed a restraining order against my son

23   because he threatened to kill her.

24          THE COURT:  Oh, okay.  So you want to try to

25   persuade me that any threats that they say you made to

1    Mrs. Millette were actually made by your friend, not

2    you.  Is that what you're trying to do?

3              THE DEFENDANT:  That as well, your Honor.  I

4    did not know if that was going to come up.  The reason I

5    did not want to outright ask her who made the threats to

6    Mrs. Millette, I did not want to be accused of leading

7    the witness.

8              THE COURT:  That's all right.  This isn't

9    subject to the strict Rules of Evidence.  You're not a

10   lawyer.  I'm going to give you a fair amount of latitude

11   here.  But I've got to tell you, a lot of this stuff is

12   just sort of going by me because I don't even understand

13   why -- usually hearing testimony about threatening

14   calls, threatening to slit somebody's throat being made

15   by the defendant's friend, using the defendant's phone,

16   don't usually help promote getting somebody released on

17   bail.  It usually works the other way.

18             THE DEFENDANT:  I apologize, your Honor.  Yes,

19   that's what that was for in case they bring up those

20   issues with Mrs. Millette that it was not myself and

21   that there's witnesses to that.

22             THE COURT:  So somebody was making threats,

23   but it wasn't you.

24             THE DEFENDANT:  Yes.

25        Q.   Now, during my incarceration -- the beginning

1    stages of my incarceration at Rockingham County

2    facility, were you aware that I had been given an option

3    of either stay in 23-hour lockdown and not take

4    medication for my post-traumatic stress disorder and

5    anxiety or take the medication and be moved to another

6    unit?

7        A.   I was.  I even had a conversation with the

8    nursing department over there.

9        Q.   And what was that conversation?

10            THE COURT:  Can I ask my clerk to come up and

11   help me.  Can you pull up the docket for this case?

12   I've lost it.  Go ahead.

13       A.   The conversation, it was very difficult

14   because you are over 18, but I also have a power of

15   attorney signed by you many years ago.  So I had to go

16   and present my power of attorney, and they would discuss

17   some things with me, and basically I was able to give

18   them information, and that was that over the years the

19   doctors have tried many different medications for your

20   post-traumatic stress, your ADHD, and you had adverse

21   effects.  You had very strange effects on some

22   medications that I suppose might go down in the record

23   books someday.  Things that should work on most people

24   either don't work on you or it goes overboard and it

25   gives you very adverse reactions.  And I explained that

1    to them and said I would ask that you let him try it

2    without the medication.

3         Q.    And what was their response?

4         A.    Nope.  We make the medical decisions here.  At

5    the time your family doctor made several attempts to

6    contact medical.  I believe from the conversations I had

7    with Dr. Fisher, he, in fact, did.  He even came to

8    visit you at the jail, and he tried to get them to

9    listen to him.  There was once many, many years ago when

10   you were incarcerated on a motor vehicle charge I

11   believe it was that Dr. Fisher actually wrote a note

12   with the list of medications that didn't work.  And

13   basically the jail does what they want to do.  They give

14   you what they want you to have, and if you don't take

15   it, you're going to stay locked up.

16        Q.    And you'll be punished for it.

17        A.    Correct.

18        Q.    Essentially forcing medication down your

19   throat even though it's not physically or mentally

20   healthy for the individual.

21             THE COURT:  Why am I hearing this stuff now?

22             THE DEFENDANT:  Well, your Honor, the reason I

23   bring that up -- and that will lead to the next question

24   with the witness is there are allegations of threatening

25   telephone calls.  Now, if we can hold off on that one,

1    threatening telephone calls were alleged to have

2    happened at some point at a facility.

3              THE COURT:  Are you saying that you made those

4    calls but you were on medications you didn't want to be

5    on?

6              THE DEFENDANT:  Your Honor, I don't even know

7    what calls they are talking about.

8              THE COURT:  Why don't we hear their evidence

9    before you respond.

10             THE DEFENDANT:  Well, because it's in the

11   objection, your Honor.  The thing is that there's no

12   dates or times of their allegations of the threats.

13             THE COURT:  Why don't we do this.  I'm trying

14   to find the most efficient way to get through this.

15             THE DEFENDANT:  I apologize, your Honor.

16             THE COURT:  Why don't we let the government --

17   because it seems like you want to refute evidence that

18   the government may or may not be putting on.  In a large

19   way you hurt yourself rather than help yourself.  So it

20   may be better for the government to try to explain why

21   you should be detained, and then you can try to rebut.

22   And if they don't argue that you should be retained

23   based on certain things, then you don't need to rebut

24   them.  How are you going to try to -- what do you want

25   to do to try to show that he should be detained?

1          MR. ABRAMSON:  Your Honor, as a preliminary

2    matter --

3          THE COURT:  Ma'am, why don't you do this.  Why

4    don't you step -- you don't have to go anywhere, do you?

5          THE WITNESS:  No.

6          THE COURT:  Can you stay around?  So if you

7    could just wait for us and we'll get back to you to

8    finish up.

9          MR. ABRAMSON:  Judge, I understand that you

10   were not the judge presiding over the initial bail

11   determination so I'm happy to walk through all of the

12   facts and all of the bases why the government feels that

13   detention is --

14         THE COURT:  Did you want to put on some

15   additional evidence?

16         MR. ABRAMSON:  No, and that's really my point

17   is I feel that this is actually a much narrower hearing

18   and that the standard under Rule 3142 is that once the

19   initial bail determination is made, the burden is really

20   on the defendant to show a change in circumstances.

21         THE COURT:  I recognize that.  That's why I

22   turned to him, but we're not getting that.  So I want --

23   what he seems to want to do is add to or reassess a lot

24   of the arguments that were made at the initial bail

25   hearing.

1            THE DEFENDANT:  Excuse me.  If I may, your

2  Honor, yes, physically a bail hearing was held.  And I

3  understand there's been a lot with this case and I'm --

4  obviously you have other cases as well you hear.  So I'm

5  sure you may not recall the issues of why I fired

6  Attorney Jonathan Saxe.  One of the reasons was the bail

7  hearing.  He wouldn't even stand up to disagree with

8  anything they were saying.  Therefore it was essentially

9  in layman's terms a dog and pony show.

10            THE COURT:  Do we have a transcript of the

11  bail hearing that's been prepared?

12            MR. ABRAMSON:  I do not presently have that in

13  my possession, your Honor.

14            THE COURT:  Okay.  So what I will do is I will

15  direct a transcript to be prepared.  Who was the judge?

16  Judge McAuliffe?

17            MR. ABRAMSON:  Judge McAuliffe.

18            THE COURT:  Okay.  I will direct the

19  transcript of the bail hearing to be prepared.  And your

20  arguments as to why he should be detained are we

21  demonstrated that he should be detained based on

22  arguments and facts we discussed during the bail

23  hearing.  Judge McAuliffe ruled in our favor.  The

24  standard for reconsidering a bail hearing puts the

25  burden on him to show some changed circumstance.  He

1   hasn't done that and can't do that.  Therefore, he

2   should be detained.  Right?

3          MR. ABRAMSON:  That's correct, your Honor, but

4   to the extent we do need to reassess and walk through,

5   I'm more than happy to do that.

6          THE COURT:  All right.  Why don't you give me

7   a brief overview as to what you think are the reasons

8   why he was detained initially and why I should maintain

9   that decision.  And you don't intend to put on any

10   additional evidence; is that right?

11          MR. ABRAMSON:  That's correct, your Honor.

12          THE COURT:  Okay.  Go ahead and do that and

13   then we'll recall his witness and we'll hear more about

14   what he wants to say, and then I will take it under

15   advisement.  I will get a transcript of the bail hearing

16   and I will issue a written decision on bail.

17          MR. ABRAMSON:  Sure.  So I think we start by

18   looking at the factors under 3142(g).

19          THE COURT:  Can I interrupt and ask, do I have

20   something after this?

21          THE CLERK:  You have an 11 and 11:30.

22          THE COURT:  Can you tell the people -- what do

23   I have at 2?

24          THE CLERK:  You have a hearing that I'm not

25   sure that the plaintiff is going to show up on.

```
 1              THE COURT:  Do I having anything at 1:30 or 1?
 2   Why don't you tell the 11 and 11:30 people to come back
 3   at 1:30 and I will try to do them at 1:30.  I don't want
 4   to keep them around.
 5              THE CLERK:  Okay.
 6              THE COURT:  Sorry about that, folks.  I'm just
 7   running late today.  Go ahead.
 8              MR. ABRAMSON:  Yes, your Honor.  I think we
 9   are guided by the factors as you well know under
10   3142(g), the first of which that I will address is the
11   weight of the evidence in the case.  We've pared down
12   the original indictment which contained five counts.
13   The indictment now has three counts, which include
14   aiding and abetting the straw purchase of an assault
15   rifle lower receiver, a 1001 count based on a false
16   statement to a federal agent, and a count under
17   922(g)(3) for being a regular user of marijuana in
18   possession of firearms.
19              The evidence for each of those counts is
20   overwhelming and I will limit my discussion here
21   essentially to statements made by the defendant,
22   inculpatory statements.  As to the 1001 count we will
23   have the testimony in this case of multiple law
24   enforcement witnesses --
25              THE COURT:  What was the false statement?
```

1          MR. ABRAMSON:  That he had sold all of his

2     personal firearms to a friend named Tony.  Both -- two

3     law enforcement witnesses will testify that that

4     statement was made.  Subsequently in the next few days

5     the defendant was recorded in a telephone call telling a

6     cooperating witness that he had said that to the agents

7     and that, in fact, his guns were in a location that he

8     knew.  And several days after that the defendant was

9     captured on videotape bringing those guns into the store

10    owned by the cooperating witness and essentially

11    admitting that those guns had not been sold, that they

12    had in fact been buried at his mother's campground for

13    safekeeping to avoid detection by law enforcement.

14         THE COURT:  All right.  Did you want to say

15    anything in response?  His claim is we've got

16    overwhelming evidence of your guilt with respect to that

17    charge.  You don't have to say anything.  You have a

18    right to remain silent.  Your lawyer may want to advise

19    you not to say anything.  But if you want to proffer

20    anything in response to that -- and I'm not suggesting

21    you should -- I will be happy to hear anything you want

22    to say about the government's contention that it will

23    prove your guilt of that charge very readily.

24         THE DEFENDANT:  No, your Honor.  The

25    government is actually lying and misquoting transcripts.

1   Unfortunately because Attorney Vogelman has refused to

2   give me my discovery, I'm unable to have these

3   transcripts to read verbatim to you.

4           THE COURT:  Which will be wrong?  That you

5   made the statement to the law enforcement agents or that

6   you made the statements that are recorded that they say

7   are recorded?

8           THE DEFENDANT:  The recorded statements, the

9   way he's saying that I buried them at the campground to

10  retrieve in the future.

11          THE COURT:  But they don't say the things that

12  the lawyer is telling me.

13          THE WITNESS:  I believe it says they're buried

14  but not in the sense of buried underground, your Honor,

15  and it does not say to retrieve at a future date either.

16          THE COURT:  Now, one of the things -- I

17  allowed you to represent yourself on this motion.  One

18  of the things you have to be careful about -- I can't

19  give you legal advice, but you have a constitutional

20  right to remain silent.

21          THE WITNESS:  I understand.

22          THE COURT:  You don't have to disclose

23  anything about your case.  If you choose to do that, you

24  might be giving advance warning to the prosecutor

25  about --

1    THE DEFENDANT:  Attorney Saxe and Attorney

2    Vogelman have already done that.  So there's nothing I

3    can say that won't make everything worse.

4    THE COURT:  Just so you understand, if you

5    choose to speak, they're obviously going to hear it and

6    you might be revealing things that will be helpful to

7    you to keep quiet.

8    THE DEFENDANT:  Your Honor, there is also the

9    fact that because of the negligence and ineffectiveness

10   of Attorney Saxe and Vogelman, I've had to do everything

11   verbally and the motion to compel --

12   THE COURT:  I understand, I understand.  We've

13   talked about that a lot.  Did you want to say anything

14   else about his claim that the evidence against you is

15   strong on the 1001 charge?

16   THE DEFENDANT:  Well, your Honor, the thing is

17   that, in speaking about the 1001 charge specifically,

18   I'm unsure of exactly -- because I've been told that

19   there's two different -- I've been told at least two

20   different versions of the conversation where that

21   supposedly happened.

22   Now, the conversation that they're saying that

23   happened in the plea bargain for the 15 months, the last

24   plea bargain I had before I went for the competency

25   evaluation in New York, the government is alleging that

1   that conversation -- the 1001 charge was a result of a

2   conversation that Philip Christiana was having with me

3   regarding my firearms transactions and questioning into

4   a federal investigation.  Your Honor, that conversation

5   never happened that day and I have a witness to that.

6                MR. VOGELMAN:  Judge, just so it's clear,

7   because I'm a little uncomfortable, I still technically

8   represent him.

9                THE DEFENDANT:  No, you don't.

10               THE COURT:  He does until I relieve you.

11               THE DEFENDANT:  I apologize, your Honor.

12               MR. VOGELMAN:  I just want the record to be

13  clear that if he were to listen to me, I'm advising him

14  definitely not to address the merits of the allegations

15  against him at this time.

16               THE COURT:  That would seem to be the prudent

17  thing to do unless you can demonstrate beyond doubt that

18  you're not going to be found guilty of the charge.

19  Don't reveal your defense to the other side.

20               THE DEFENDANT:  Oh, your Honor, I'm not

21  revealing the defense at all.  I'm just simply stating

22  that there is two different versions of the conversation

23  that allegedly happened.

24               THE COURT:  I understand, I understand.

25  What's the next charge and what's the evidence on the

1     next charge?

2              MR. ABRAMSON:  Yes, your Honor.  The next

3     charge is a count under 922(a)(6) for aiding and

4     abetting a straw purchase.  We have the Form 4473 from

5     September 21st, 2013, on which date the defendant's

6     girlfriend, Stephanie Taylor, purchased an assault rifle

7     lower receiver from Riley's Sport Shop in Hooksett.

8     Putting aside the fact that Ms. Taylor testified under

9     oath before a grand jury that she purchased that gun at

10    the request of the defendant with the defendant's own

11    money, we have a recorded conversation between the

12    defendant and a cooperating witness in which the

13    defendant states that he had just purchased the -- I had

14    just purchased the lower receiver from Riley's and that

15    he had sunk all of his own money into the lower receiver

16    despite the fact that it's Ms. Taylor's name on the Form

17    4473.

18             THE COURT:  Has she repudiated her testimony

19    in the grand jury?

20             MR. ABRAMSON:  To date she has not repudiated

21    it --

22             THE DEFENDANT:  Objection, your Honor, yes,

23    she has.

24             THE COURT:  Okay.  You need to calm down,

25    okay?

1          THE DEFENDANT:  I apologize.  I'm getting

2    upset with the lies.  I apologize.

3          THE COURT:  I know.  You're going to hear a

4    lot of things that are upsetting to you.

5          I want to commend you, first of all.  I know

6    how emotional this is for you.  You've done a good job

7    of working with me.  If you work with me, I will work

8    with you.

9          THE DEFENDANT:  I apologize, your Honor.

10          THE COURT:  But we've got to keep the anger

11    level down during the trial, okay?

12          THE DEFENDANT:  I apologize.

13          THE COURT:  So she has not repudiated it to

14    you.  You say she has repudiated it.  So let's disregard

15    that.  Okay?  I agree with you, let's set that aside.

16          You say you have a statement recorded saying

17    the things that you've said.

18          MR. ABRAMSON:  Yes.  We have a recorded

19    statement, your Honor, and then subsequently two weeks

20    later -- approximately two weeks later the defendant

21    sold a completed assault rifle which incorporated that

22    lower receiver to an undercover federal agent.  Ms.

23    Taylor was not present for that actual transaction.  Mr.

24    Irish sold that firearm.

25          THE COURT:  The receivers, do they have serial

1   numbers or something?

2          MR. ABRAMSON:  They do and we will be able to

3   match the serial number at trial with the firearm that

4   was purchased at Riley's.  Finally, I believe it was on

5   November 25, 2013, the date that Mr. Irish was

6   transferred to federal custody --

7          THE DEFENDANT:  November 26th.

8          MR. ABRAMSON:  -- he participated in an

9   interview, waived his Miranda rights at an interview at

10  which I was present, and stated explicitly that he had

11  had Ms. Taylor purchase that firearm for him on that

12  date in order to avoid the background check because he

13  knew that he was going to be selling that gun to what

14  would eventually be an undercover officer and was afraid

15  that the delay would put that sale in jeopardy.

16         THE COURT:  What's the other charge?

17         MR. ABRAMSON:  The final charge is the regular

18  user of marijuana in possession of firearms.  As to that

19  count, we did find drug paraphernalia at the residence

20  when a search warrant was executed in the form of a pipe

21  that there would be testimony is typically used to smoke

22  marijuana.  We have at least two and possibly three

23  individuals who will be testifying that they sold

24  marijuana to the defendant on a regular basis, typically

25  a weekly basis throughout most of 2013 when the criminal

1    conduct occurred, and we will have multiple other

2    witnesses who will testify that the defendant used

3    marijuana with them on at least a weekly if not daily

4    basis.  That will also be supported by a jail call which

5    we would seek to admit in which the defendant states

6    that he's been charged with this count and that there

7    are -- and I'm quoting loosely -- only a few individuals

8    who could testify that I used drugs with them.

9         THE COURT:  Okay.  Brief response, keeping in

10   mind what counsel said and what I have said, which is be

11   very careful that you don't disclose things that could

12   be beneficial to you.  That right to remain silent is a

13   precious right.  It gives the defendant a real

14   advantage, and if you surrender it too lightly, it can

15   be problematic for you.  Go ahead.

16        THE DEFENDANT:  I understand, your Honor.

17   Actually -- first of all, your Honor, I would like --

18   and this was one of the motions to suppress Saxe and

19   Vogelman refused to do.  I would like to request that

20   the government be forced to refer to the firearms as

21   what they are, semiautomatic carbines, not assault

22   rifles, your Honor.

23        One required element to a weapon being

24   considered an assault rifle or an assault weapon is that

25   of selective firing --

1        THE COURT:  We can wait till trial for that.

2   It doesn't really affect what's happening here.  I'm a

3   judge.  Those things don't affect me.

4        THE DEFENDANT:  I understand, your Honor.  I

5   just wanted to make that very clear.

6        Now, as far as everything else goes, I did --

7   and, again, the 4473 documents are in the discovery.  I

8   had filled out the documents for the background check

9   and the background check had been performed for the

10  lower receiver to be purchased in my name.  There was

11  the weight.

12       Now, I'm not going to get into the details of

13  the matter.  We're going to have to wait till trial on

14  this.  However, as the government denies, Stephanie has

15  refuted this and has explained things, such as the fact

16  that the FBI agent, Philip Christiana, specifically

17  asked her if she would lie on the stand for him and told

18  her it doesn't matter what you say.  You're not going to

19  get in trouble.

20       And she has told that to Attorney Saxe as well

21  as Attorney Vogelman and they refused to do anything

22  about it.  She has attempted to contact Attorney

23  Abramson, but he has not been available to speak with

24  her for whatever the reason may be.  I understand he's a

25  busy individual, especially with his job and his

1     position.

2             Now, as far as the conversation goes and the

3     statements, I had requested that that conversation on 26

4     November, that morning, be done in a recorded location,

5     and Philip Christiana refused to do that.  He said we're

6     not doing that.

7             THE COURT:  Okay.

8             THE DEFENDANT:  Now, your Honor, as well --

9             THE COURT:  Finish up because none of those

10    things really -- they don't really address the issue

11    that the lawyer's raising, which is he's going to be

12    found guilty.  All these things may be true --

13            THE DEFENDANT:  I have no issue bringing it

14    out right now, your Honor, but as you said it could

15    taint the trial.

16            THE COURT:  That's fine.  So let's go on to

17    the other arguments.  Do you have other arguments?

18            MR. ABRAMSON:  I do, your Honor.  And just to

19    address briefly with regard to Ms. Taylor --

20            THE DEFENDANT:  Oh, real quick, if we can

21    speak on Count 5, the allegations of the marijuana use.

22            THE COURT:  Yeah.

23            THE DEFENDANT:  When I was arrested on 1

24    November I requested -- because I know many deputies

25    down there.  I know many correctional officers.  I

1    requested to take a urinalysis.  They said, well, we

2    really don't have any reason to do that actually.

3            They never did one.  My entire -- between

4    November 1 to November 26th -- November 26th, mind you,

5    was my first appearance here in this court.  I have

6    requested multiple times to please be given a

7    urinalysis.  I was refused that.

8            On 26 November when I came in, the attorney

9    room out by holding, Attorney Saxe came to speak with

10   me, first time I ever met the individual.  It was before

11   the hearing, and then I believe it was after the hearing

12   they had probation come in.  I believe it's probation.

13   A woman came in.

14           THE COURT:  All right.  So your point is if

15   they had given me drug tests, I would have shown I

16   didn't test positive for marijuana.

17           THE DEFENDANT:  Yes, your Honor.

18           THE COURT:  Those are points -- I understand

19   them.  They don't really address the issue that he's

20   raising directly.  But I understand your points.  You

21   can make them at trial.  That's fine.

22           We need to move on though.  What are the other

23   arguments that you have.

24           MR. ABRAMSON:  Yes, your Honor.  Under

25   3142(g)(3), the history and characteristics of the

1    defendant, he's presently a Criminal History Category

2    III.  I do believe that understates the nature of his

3    criminal history.  There is essentially a banker's box

4    full of criminal materials related to his prior

5    convictions to police reports filed by family members,

6    members of his community, neighbors of his regarding

7    incidents during which he has made threats and in some

8    cases used his firearm in the sense of showing it in

9    order to make those threats appear to be more serious.

10           THE COURT:  Were those detailed at the prior

11   hearing?

12           MR. ABRAMSON:  They were, yes, your Honor.

13   And I'm happy to go into detail.

14           THE COURT:  No, you don't need to.  To the

15   extent you want to refute them through evidence, you can

16   do that at the appropriate time.  What else?

17           MR. ABRAMSON:  I think most importantly, your

18   Honor, for the purposes of this hearing and for the

19   prior hearing is the specific nature and seriousness of

20   the danger posed by the defendant under 3142(g)(4) and,

21   even more narrowly than that, the danger that he poses

22   to witnesses and potential witnesses at this trial.

23           There is a recorded jail call which I did not

24   provide the Court as an exhibit but I'm happy to make a

25   clip of that for you in which the defendant is

1    discussing a potential witness in this case, his belief

2    that that witness has flipped on him and is cooperating

3    against him, and makes a threat that he will cut the

4    witness's throat.  He has also made statements --

5              THE COURT:  Did you put that in the original

6    hearing?

7              MR. ABRAMSON:  I did, yes, your Honor.

8              THE COURT:  There's a transcript of that?

9              MR. ABRAMSON:  There's not a transcript of the

10   call.

11             THE COURT:  All right.  Prepare a transcript

12   and give him a copy and submit a copy to the Court.

13             THE DEFENDANT:  Your Honor, in order to argue

14   that today and to refute that, I need to know -- the

15   time of day has no bearing on it.  I need to know the

16   date of that alleged telephone call.

17             THE COURT:  That wasn't disclosed at the prior

18   hearing?

19             THE DEFENDANT:  No, your Honor, it never has

20   been.  And neither has the --

21             THE COURT:  Stop.  Disclose the date and make

22   a transcript and give it to him.  Okay?

23             MR. ABRAMSON:  Sure.

24             THE COURT:  You haven't given him all this

25   stuff already?

1          THE DEFENDANT:  No, your Honor.

2          MR. ABRAMSON:  Well, the copies of all the

3    calls have been provided to the defendant in discovery.

4          THE COURT:  And they don't say what the date

5    is of the call?  There's no way to discern the date of

6    the call?

7          MR. ABRAMSON:  Each call is dated and timed.

8          THE COURT:  Mr. Vogelman should have a copy of

9    what was made available to him, the actual call with the

10   date.

11         MR. ABRAMSON:  Yes, your Honor.  Each jail

12   call in the government's possession has been provided to

13   the defendant in discovery.

14         THE DEFENDANT:  Excuse me, your Honor.  I have

15   reviewed all the recorded jail calls on my discovery

16   when I was at Strafford County because I had access to

17   the law library and the computer.  Well, those alleged

18   calls are nowhere's in there.

19         Now, as far as the dates and times on the

20   telephone calls, I'm not sure if you are familiar with

21   computers or such, I'm rather ignorant when it comes to

22   them, but I have enough knowledge to be able to explain

23   that the only dates and times on those files for the

24   telephone calls, any of them, are the dates -- it's

25   called dates modifier.  Meaning the dates that the file

1    was modified or added to the drive.

2              THE COURT:  All right.  They will tell you

3    specifically what the date is, if they haven't already.

4    Just give him that.  If you want to file anything, give

5    it to him, get it transcribed right away, and file it

6    with the court when you've given him a copy.  And within

7    seven days of the filing, if you want to submit anything

8    in supplemental, you can.  Okay?

9              All right.  So do you need to go into much

10   more detail than that?  You say you have a transcript of

11   him threatening to -- did you say cut the head off?

12             MR. ABRAMSON:  To cut his throat, your Honor.

13             THE COURT:  Cut his throat, of a particular

14   witness.

15             MR. ABRAMSON:  Of a particular witness.

16             THE COURT:  Okay.  So he says he didn't say

17   that.  You will have a transcript and you will give him

18   a video copy or an audio copy of the call so he can

19   listen to it, see the transcript, know the date, and if

20   it says what it says, it's hard to see how he can be

21   released on bail.  I don't think we need to go further

22   than that, do we?

23             MR. ABRAMSON:  I agree, your Honor.  The rest

24   of this argument follows in that vein.  That's not the

25   only witness about whom similar statements have been

1    made.

2            THE COURT:  All right.  Do you have other

3    tapes of him doing that?

4            MR. ABRAMSON:  There are other tapes in which

5    the defendant has made specific threats as to his

6    girlfriend, Stephanie Taylor, although I believe those

7    threats have since been resolved.

8            THE COURT:  Let's just stick with what you've

9    got there, okay?

10           MR. ABRAMSON:  Sure.

11           THE DEFENDANT:  Your Honor, if I may, the

12   reason I need to know the dates and times of those

13   calls --

14           THE COURT:  You'll get them, okay?  He's going

15   to give them to you.

16           THE DEFENDANT:  I understand.  But I can

17   almost guarantee -- and I can tell you right now if it's

18   -- if it's what I think it was and the time frame I

19   think it was, it would have been when I was being forced

20   that medication that was causing this severe mental

21   state.

22           THE COURT:  I'm going to let you file

23   something where you can explain anything you get.  I

24   wasn't there, I didn't say it, I said it but I was on

25   drugs they were forcing me to take, it didn't mean what

1    they think it means, whatever.  You can provide your

2    explanation, okay?

3             THE DEFENDANT:  Now, the government spoke

4    about -- I'm not speaking verbatim, but regarding

5    threatening individuals with my firearm in the

6    community.  Your Honor, there were two situations, both

7    of which were reported to law enforcement by myself.

8    One situation was midnight at night, midnight, 12:30, my

9    wife and I are getting ready to go to bed and a vehicle

10   pulls up to the stop sign directly across the street

11   from our driveway, shuts the lights off.  I didn't know

12   what it was or who it was.  So I throw my T-shirt on and

13   I go outside.

14            Now, mind you, your Honor, it's no secret

15   amongst law enforcement, amongst the community, I always

16   legally carried my .45, my 1911, my weapon.  It was

17   always on my hip, even when I was home.  So I had -- all

18   I had been able to do was take my T-shirt off when this

19   vehicle pulls up to the stop sign and shuts its lights

20   off.  I didn't know who it was.  I didn't know what it

21   was.

22            My weapon was on my hip.  I went out to my

23   truck to turn the headlights on and my flashlight was

24   sitting on the seat of the truck.  So I take my

25   flashlight and I go inspect the vehicle.  Nobody's in

1    the vehicle.  I look in the vehicle.  There's -- it's

2    almost empty.  There's not really anything in the

3    backseat.  So I'm standing around, had my cellphone.

4    I'm putting the information into the memo pad for the

5    make and model and whatnot, and as I'm attempting to get

6    the registration number off the license plate, two

7    females come walking down the road saying is everything

8    okay?  What's going on?

9            I didn't know who they were.  All I did is I

10   saw two individuals walking down the road.  They

11   addressed me when I shined my light on them and asked

12   them who they were and asked them if it was their

13   vehicle.  They said yes, it was.  We're just playing a

14   joke on our friends.  I told them, I said, you can't

15   really do that at night around here.  People don't know

16   what's going on, don't know who you are, and you freaked

17   my wife out and drove my dogs nuts, and now my daughter

18   and my elderly grandmother is awake because of this.

19   You know, this is ridiculous.  I was about to call -- I

20   was dialing dispatch to report an abandoned vehicle

21   because I didn't know if somebody's house was getting

22   broken into.

23           So the vehicle leaves.  I called dispatch.  I

24   reported the vehicle.  That's where that situation

25   ended.

1          THE COURT:  So you didn't show them your gun?

2          THE DEFENDANT:  No, your Honor.  The weapon

3    was on my hip.  It was not covered.  It was open, plain

4    view.  It was not concealed.

5          THE COURT:  All right.  Look, here's what

6    we've got to do.  There are too many of these little

7    details where -- it's just going to get lost on me,

8    okay?  We're going to have a transcript of that hearing

9    prepared.  You can get a transcript of it.  Everything

10   in there you think is wrong or needs to be explained,

11   you can write a detailed memorandum where you explain

12   every single fact that you want to explain and submit it

13   to me, okay?  Because otherwise -- I wasn't here when

14   this hearing was held.  I don't know what the details

15   are.  Your telling me this is not going to register with

16   me.  The only way I can make this work is we'll get a

17   transcript.

18         THE DEFENDANT:  Your Honor, I understand.  The

19   main problem is, which is why I've been having to rely

20   on my wife and my mother to do this is to help me

21   because I have severe damage to my right hand, which

22   makes writing a severe issue.

23         THE COURT:  You can't have everything.  You

24   can represent yourself or you can have a lawyer, but you

25   can't tell me I can't submit things because I can't

1   write.

2           THE DEFENDANT:  I understand.  I have an issue

3   doing it and I'm doing the best I can, your Honor.  Real

4   quick.

5           THE COURT:  You just have to submit it in

6   writing.  The last comment, okay?

7           THE DEFENDANT:  Real quick.  If I may just

8   address the other alleged threat.  Now, mind you, no

9   charges have ever been brought forward or weren't able

10  to be brought forward.  The other alleged threat was

11  when an individual who had been speeding up and down the

12  road, I reported it to law enforcement.  Law enforcement

13  went up to the individual's house, which is at the top

14  of the road, at the end of the to road before it turns

15  into the off-road trail.

16          Officer clears the scene and leaves.  About

17  roughly ten minutes after the officer clears the scene,

18  individual with his roommates comes driving down the

19  road in his roommate's Camaro and parks in the middle of

20  the road right in front of my house as I'm walking from

21  my garage into my house.  He walks up to the side street

22  to see if anyone's outside or coming down the road and

23  comes running over with his hand under his shirt like

24  this, simulating a weapon.  I told him -- now, mind you,

25  he was coming -- not towards my property, onto my

1    property running at me.

2          All this happened within 30 seconds.  I

3    instructed him let me see your hands, get off my

4    property, let me see your hands, I'm armed, let me see

5    your hands or I'm going to draw my weapon.

6          THE COURT:  I've heard enough about it.  I'm

7    not going to go through the back and forth of every

8    incidence that happened in your life, okay?

9          What you need to focus on is this, Mr. Irish.

10   This is the problem that you've had with your lawyers

11   and the Court and everything else.  You're not focusing

12   on what you need to focus on, which is there are charges

13   pending against you.  You need to focus on can the

14   government prove those charges, do I have a defense to

15   those charges?  Those are the things that are going to

16   get you out of jail or result in you being in jail for a

17   long period of time.  And to the extent you want to

18   focus on child custody matters and my abusive father and

19   people who I interact with and we pull guns and threaten

20   each other, that isn't going to get you anywhere.  It's

21   a complete distraction that is going to end up hurting

22   you, and I want you to do what's best for you, and I

23   know what is best for you is to focus on the evidence

24   that the government has accumulated against you, not on

25   these threats and other stuff because that doesn't

1   influence whether you will be found guilty, about what

2   are the charges against me.

3          They say they have you on videotape and taped

4   making statements that are flatly inconsistent with

5   statements you made to the investigators.  They say they

6   have very strong evidence about this receiver.  You're

7   going --

8          THE DEFENDANT:  I can go into detail, your

9   Honor, but, again, as you said, it could taint the

10  trial.

11         Now, your Honor, the thing is is that I want

12  every one of these witnesses who said they smoked

13  marijuana with me --

14         THE COURT:  Here's how we're going to proceed,

15  okay, because we've been at this an hour and we haven't

16  made any real progress.  I'm going to direct the clerk

17  to have a transcript prepared of the bail hearing, which

18  should have been recorded.  So someone will prepare a

19  transcript of that.  A copy of that transcript will be

20  provided to the government, to the defendant, and to the

21  judge.  I will give you 14 days from the date that

22  transcript is prepared to submit a memorandum in which

23  you tell me anything you want to tell me about what I

24  should think about that transcript.  You want to make

25  factual proffers, you want to explain that doesn't

1    really mean what they say, you can do that.  Okay?

2            I'm going to direct -- did I set a time for

3    you to provide the audio and a transcript of the --

4    threatening call you said?

5            MR. ABRAMSON:  I don't believe you did, your

6    Honor.

7            THE COURT:  Okay.  So you will do that within

8    seven days.  Okay?  Within seven days thereafter.  So

9    seven days after you get this, any kind of submission

10   you want to make in response to that, you will make.

11   When I receive the transcript of the bail hearing, the

12   transcript of the call, and a copy of the audio of the

13   call, when I receive his response to that transcript and

14   the transcript of the bail hearing, the transcript of

15   the audio call, I will issue a written decision on bail,

16   and that's how I'm going to address bail.

17           Is there anything else that you need to do,

18   that you need to tell me about with respect to bail.

19           THE DEFENDANT:  Well, real quick, your Honor,

20   just a couple things.  Number one, specifically the

21   phone calls.  When Mr. Abramson spoke to Dr. Damesa

22   regarding the -- regarding the evaluation, he made

23   reference to listening to 30 hours of jail calls.

24   And -- where is it.  If I can find it, your Honor.  I

25   apologize.  He had made reference saying -- here it is.

1    AUSA Abramson noted that since he has had -- since had a

2    fair amount of contact with Mr. Irish and he listened to

3    approximately 30 hours of jail telephone calls, AUSA

4    Abramson said Mr. Irish was taking unknown psychotropic

5    medications in November and December of 2013.  He

6    explained when -- this is page 17.  He explained, when

7    he was actively taking the medication, you could tell a

8    difference as Mr. Irish was reportedly, quote, unquote,

9    more coherent on those phone calls during the time

10   period and lost his temper less frequently.

11          But no mention of these threats, just for the

12   record.

13          THE COURT:  You can put that in your response.

14   Let me just -- you really need to wrap up.

15          THE DEFENDANT:  I understand.  Real quick, the

16   last plea offer, which was given after this last hearing

17   when you had spoken to Attorney Vogelman regarding the

18   motion to dismiss for misconduct, I returned back to the

19   jail and I speak to my wife.  She says we need to get

20   ahold of Larry immediately.

21          They had an offer and the offer was as long as

22   I agree not to file the motion to dismiss based on the

23   outrageous misconduct by the government, the government

24   would agree to give me a plea deal of 12 months and

25   1 day and would release me the second or third week of

1    October.

2              Now, your Honor, if anyone wants to refute

3    that, I can get the jail calls from the facility with

4    Attorney Vogelman as well as I have the letter here from

5    Attorney Vogelman.

6              So that being said, if I was a potential

7    threat to witnesses or anyone else, it would not matter

8    whether it was post trial or pretrial.  A threat would

9    be a threat, and one with reasonable thought process

10   would think, well, a person would be more upset and more

11   likely to be violent towards a witness after they

12   were --

13             THE COURT:  I have to break.  I can't go on

14   any longer.  This has completely worn me down.

15             Let me speak to the defendant's mother just

16   briefly.  I appreciate you being here.  I hope you

17   understand something, which is truly the case.  I'm

18   going to give your son a fair trial on this matter.  I'm

19   trying to find a way for him to be able to decide to do

20   whatever he thinks is in his best interest.

21             But one of the things he completely continues

22   to overlook, and I hope maybe you can speak to him about

23   it, if you have a good relationship with him, you can

24   help him understand, he has certain very specific

25   charges against him.  Those charges contain certain

1    things that have to be proved.  If they're proved, he

2    will be found guilty.  If he's found guilty of those

3    charges, he will be sentenced, and he needs to be

4    focused on what are the charges, what is the evidence

5    the government's going to produce against me, and do I

6    have a chance of beating those charges at trial.  If I

7    do not, I need to consider other alternatives.  And

8    every time I see your son, what I worry about is he

9    wants to talk about something other than the charges.

10   He wants to talk about his wife or girlfriend.  He wants

11   to talk about his children being taken away from him.

12   He wants to talk about his abusive father.  He wants to

13   talk about how other people are lying and engaged in

14   misconduct, and he has to focus on the charges against

15   him because those other things are not going to help

16   him, whether they're true or not.  They just don't have

17   any real prospect of helping him.  He has to focus on

18   the evidence and evaluate that.  I don't know if there

19   was this deal that could get him out earlier, but if he

20   had that kind of a chance, he needs to think about those

21   things carefully if those options are available to him.

22           Again, I only want him to do what's in his

23   best interests.  You don't need to respond to me.  I

24   hope that you would -- if you have the kind of

25   relationship with him where he will listen to you, that

1   you can sit down and talk to him because these kinds of

2   hearings don't end up helping him.

3            MS. HASKELL:  Your Honor, we've had this

4   conversation.  The problem is he's not been allowed the

5   document.  I have a flash drive that was made personally

6   by me of all of the evidence that came from Attorney

7   Saxe and all of the discovery that my son's not allowed

8   to have.

9            THE COURT:  Okay.  I'm not understanding that

10  at all.  Is the government keeping him from having

11  access to the discovery?

12           MS. HASKELL:  No, the jails are.  In Strafford

13  he had no problem getting access to what he needed.

14  Attorney Vogelman -- my son was saying stuff.  I said

15  I'll try to call Attorney Vogelman.  We're greeted with,

16  "Put it in writing," and slam the phone down.

17           THE COURT:  Stop, stop, stop.  I'm going to

18  leave, I'm going to leave.  I can't go through this

19  anymore.  We need to take a break.

20           Attorney Vogelman, you will get on a thumb

21  drive every piece of evidence that you have.  Can you do

22  that?

23           THE DEFENDANT:  I can't have somebody --

24           THE COURT:  Stop, stop.  I will talk to you

25  when I'm ready.  Can you do that, Mr. Vogelman?

1          MR. VOGELMAN:  There is a thumb drive existing

2    that has all that.

3          MS. HASKELL:  He can't have it.

4          THE COURT:  Wait.  Do you have a thumb drive

5    that has all the evidence on it?

6          MR. VOGELMAN:  I have it and so does his

7    mother.

8          THE COURT:  You will contact the jail and say

9    the judge is going to order the jail to make a computer

10   available to him with a thumb drive where he can sit and

11   listen to that.  If you won't agree to it, he's going to

12   do this, all right?  And I will hold a hearing on it and

13   you're going to have to explain to me how a defendant

14   can be denied access to discovery.  Is it your position

15   that you can deny him access to discovery?

16         MR. ABRAMSON:  No, your Honor.  In fact, I've

17   had -- this issue was raised some time ago and I made a

18   call --

19         THE COURT:  If I need to I will make a

20   computer be available and a room available and every

21   document in that case will be available to him and he

22   can go in there during the day -- and where is he now?

23   What jail?

24         MR. VOGELMAN:  Middleton.

25         THE COURT:  If they don't like it at

1    Middleton, I will make you put him somewhere else, okay?

2    That's going to happen and you're going to take care of

3    it.  Do you understand?

4           MR. ABRAMSON:  Yes, your Honor.  And I did, in

5    fact, have a conversation with the jail and I told

6    them --

7           THE COURT:  It's going to be happening today.

8    You and Mr. Vogelman are going to sit down and figure

9    out how this is going to get done.  If you need me to

10   order somebody, you tell me.  But otherwise I'm going to

11   assume you are going to take care of it with the Marshal

12   Service.

13          He needs to have access to his records.  Every

14   defendant has a right to prepare for trial, and if they

15   aren't giving it to him -- now, this could all be a big

16   lie.  Maybe it is.  You can tell me if it is.  But if

17   they aren't giving him access to it, that's got to

18   change.

19          MR. ABRAMSON:  Your Honor, this is not a lie.

20   This issue was raised previously.  As soon as I found

21   out about it, I made a call to the jail and was told --

22          THE COURT:  We can't have our federal

23   prisoners being imprisoned pretrial at facilities where

24   they can't access the discovery that's available to

25   them.

1          MR. ABRAMSON:  I understand, your Honor.  And

2    during that call I was assured that the flash drive

3    would be permitted to go into the jail so that he could

4    review his documents.

5          THE COURT:  Okay.  You're personally going to

6    talk to people at the jail and the Marshal Service and

7    you're going to file something with me within seven days

8    making clear to me what you've done to resolve this

9    matter.  Okay?

10         MR. ABRAMSON:  Yes, your Honor.

11         THE COURT:  I'm not blaming you.  I'm just

12   saying, look, this is a difficult enough case for me to

13   deal with.  I don't need those kind of problems, and the

14   Marshal Service better take care of them.  Okay?

15         MR. ABRAMSON:  Yes, your Honor.

16         THE COURT:  We're going to take a break and

17   I'm going to come back after lunch and I'm going to hear

18   your argument to fire Attorney Vogelman.  Okay?  Let's

19   come back at 1:15.

20         THE DEFENDANT:  Yes, your Honor.  I apologize.

21         (Luncheon recess taken.)

22         THE CLERK:  This Court is back in session,

23   motion hearing, United States of America versus Jonathon

24   Irish.

25         THE COURT:  Mr. Irish, why do you want a new

1     lawyer?

2           THE DEFENDANT:  Yes, your Honor.  Real quick,

3     I wasn't able to go through the documents I was given at

4     the beginning of this hearing.  I didn't have the

5     adequate time.  Didn't know if it would interest you at

6     all to inform you that I actually have -- I have

7     knowledge of and it's hard for me to obtain all the

8     physical documentation and physical evidence to support

9     and substantiate my claims.  However, I do have evidence

10    which would be part of the hearing -- the motion hearing

11    we had prior to the lunch break regarding to credibility

12    of at least one of the witnesses.

13          THE COURT:  Just put it in writing, okay.

14    We've got to move on to the other motion.

15          THE DEFENDANT:  Well, your Honor, one of the

16    many issues with Attorney Vogelman, and it's been an

17    issue since the beginning, I left it alone due to

18    Attorney Vogelman's background and his reputation.  I

19    wanted to give him a chance.  However, your Honor, over

20    time he has proven that he is less than knowledgeable

21    about firearm law and firearm code, which is a very

22    large, substantial portion of this entire case.

23          Mr. Vogelman on our first meeting -- I do not

24    know the date offhand, your Honor.  It was in my notes

25    that were taken from me when I was moved from Strafford

1  County to Middleton due to assault against myself that I

2  was the victim of.  I was not allowed to bring any of my

3  legal material with me down there.

4          However, your Honor, during our first meeting

5  Attorney Vogelman looked at me and told me that, well,

6  Mr. Irish I didn't know that it was a crime to smoke pot

7  and own guns, quote, unquote.  Which is concerning, your

8  Honor, because marijuana is a controlled substance.  How

9  could a defense attorney not know that it's violation of

10  at least federal law to do so without a prescription or

11  such.  In the state of New Hampshire there is no --

12          THE COURT:  I've got to be honest with you.

13  I've been a federal judge for 22 years.  I didn't know

14  that either.  They almost never bring this charge.  It's

15  a really unusual charge.

16          THE DEFENDANT:  I understand that, your Honor.

17  From my research I found that out as well.  Now, that's

18  one of the reasons I left it on thinking, you know what?

19  Maybe it is one of those very rare blue charges that

20  doesn't come across very often.

21          So then Attorney Vogelman had called me and

22  told me he was coming up for another meeting a couple

23  weeks later.  We were speaking about Count 4, engaging

24  in the business of dealing firearms, which has since

25  been dismissed.  However, when we were discussing it, he

1   tells me, he says, well, we've got a problem because,

2   you know, even if it was a private sale of your

3   collection, which you're saying, Mr. Irish, a person can

4   only legally sell one or two -- maybe two firearms in

5   their entire lifetime without engaging in the business

6   of dealing firearms without a federal firearms license.

7           And I proceeded to show him the ATF laws and

8   regulations, including what is directly on the back

9   portion of the 4473 background check form showing him

10  that he was, in fact, wrong.  That a person could

11  legally as a hobby buy and sell firearms as well as --

12          THE COURT:  That doesn't really matter to the

13  current charges against you.

14          THE DEFENDANT:  No, I understand, your Honor.

15  That's just background on it.

16          Now, there have been issues -- you want to

17  speak about the current charges, all right, your Honor.

18  For example, since the beginning with Attorney Saxe,

19  Attorney Saxe said, oh, I've contacted Brett Newkirk, my

20  former public defender from New Hampshire for the county

21  case, the state case, which was dismissed, and I had

22  given him a document for safekeeping.  Now, this

23  document is a subpoena to testify before the grand jury,

24  which is also a subpoena for any and all electronic

25  devices in my possession upon the time of my arrest.

1              These are signed and dated by Magistrate --

2    I'm not sure what magistrate it was, your Honor.

3    However, it was signed and dated 11/4/2013, 4 November,

4    2013, which was a Monday.  Well, I have actually a copy

5    here if you would like, your Honor, for you.  I actually

6    feel rather more comfortable maintaining the original in

7    my possession.

8              THE COURT:  I'm not taking any originals from

9    you of anything.

10             THE DEFENDANT:  Now, let me back up for a

11   moment.  The reason this is so pertinent, the government

12   is mentioning the alleged text -- the text messages that

13   I allegedly sent regarding marijuana.  Now, how they

14   came about those text messages is by obtaining my

15   cellphone.

16             Now, your Honor, interestingly enough, again,

17   if you look at the date where it was signed, 11/4/2013,

18   4 November, 2013, again, a Monday, of last year, on the

19   bottom you will see where it's written in handwriting

20   11/3/13, phone released, with the initials SC, circled,

21   Stephen Church, which would be the superintendent of

22   Rockingham County correctional facility.

23             THE COURT:  What are you getting at?

24             THE DEFENDANT:  This is a rather important

25   document whereas it clearly shows that my cellphone was

1    released to the federal government, illegally obtained

2    by them and --

3              THE COURT:  I'm not understanding what you're

4    saying at all.

5              THE DEFENDANT:  Correct me if I'm wrong.  The

6    date that the --

7              THE COURT:  I don't know what this is, but I

8    don't know why it's important.  I'm asking you why it's

9    important.

10             THE DEFENDANT:  It's important because it

11   shows that my cellphone was illegally obtained by the

12   government.  It may have been only 24 hours.

13             THE COURT:  So you're saying this is a

14   potential basis for a motion to suppress, the government

15   obtained things off of my cellphone.

16             THE DEFENDANT:  Yes.

17             THE COURT:  Did the government obtain things

18   off of his cellphone?

19             MR. ABRAMSON:  Yes, your Honor.

20             THE COURT:  And how did you obtain the

21   cellphone?

22             MR. ABRAMSON:  Your Honor, I have to admit

23   this case -- I came on to the case much later than the

24   facts underlying the seizure of the cellphone.  My

25   understanding is that it was seized during the course of

1    the execution of a state warrant and then later

2    transferred to the custody of the federal government

3    after the complaint in this case.

4              THE COURT:  Okay.  And your point is you think

5    Attorney Vogelman should have filed a motion to suppress

6    the results of that cellphone search?

7              THE DEFENDANT:  Well, yes, your Honor, but the

8    thing is that I had to obtain this on my own with the

9    assistance of my wife and my mother because Attorney

10   Vogelman refused to make contact saying that this was

11   not an important document.  It had no bearing, it had no

12   weight, it was not important.  So I had my wife make

13   contact with the office and obtained the original.

14             THE COURT:  I can't even understand this.  I'm

15   not -- I don't know how I can rule in your favor.  I

16   don't understand.  What information did you obtain from

17   his cellphone?

18             MR. ABRAMSON:  Your Honor, the only

19   information from the cellphone that's really relevant to

20   this case are probably several dozen text messages sent

21   from the defendant to other individuals in which the

22   defendant talks about using marijuana and purchasing

23   marijuana.  It supports the 922(g)(3) charges.

24             THE COURT:  And you want to admit the text

25   messages?

1          MR. ABRAMSON:  That's correct.

2          THE COURT:  And you obtained them by searching

3    the cellphone?

4          MR. ABRAMSON:  That's correct.

5          THE COURT:  Did you have a search then

6    pursuant to a warrant or did you have some other theory

7    by which you acquired the cellphone?

8          MR. ABRAMSON:  Yes, your Honor, I believe

9    there was a federal warrant pursuant to which the

10   contents of the cellphone were seized and searched.

11         THE COURT:  So he says that they searched your

12   cellphone pursuant to a warrant.  Do you agree or

13   disagree?

14         THE DEFENDANT:  First of all, I was never --

15   this is the only document I was ever --

16         THE COURT:  I don't know what this is and it

17   doesn't matter.  Okay?  What I want to know is, do you

18   argue -- do you agree that they searched the cellphone

19   pursuant to a warrant?

20         THE DEFENDANT:  No, I do not, your Honor.

21         THE COURT:  So you think there was a

22   warrantless search.  Attorney Vogelman, do you know

23   anything about this?

24         MR. VOGELMAN:  Yes, your Honor.  I think what

25   Mr. Irish is claiming is that you needed a warrant to

1    physically turn the cellphone over rather than --

2              THE COURT:  From who to who?

3              MR. VOGELMAN:  Over to the federal government

4    from the state authorities, who originally seized it, as

5    opposed to needing a warrant to get into the content of

6    it.  The phone was seized legally by the state

7    government.  It was then turned over --

8              THE COURT:  Was it seized at the time of his

9    arrest?

10             MR. VOGELMAN:  Yes.  I think it was seized

11   pursuant to a search warrant of his home after his

12   arrest.

13             MR. ABRAMSON:  I think that's correct.

14             MR. VOGELMAN:  And the law is clear now, the

15   Supreme Court said that to get into the cellphone you

16   need a warrant.  And my investigation indicated that

17   although they had the cellphone, they never looked at

18   the contents until they got a federal warrant.  So I

19   didn't see a basis for a motion to suppress.

20             THE DEFENDANT:  Excuse me, your Honor.

21             THE COURT:  Your point is what?  That in order

22   for the federal government to obtain custody of the

23   cellphone from the state government, they should have

24   obtained a warrant?

25             THE DEFENDANT:  Yes, your Honor.  The state

1    government did not have possession of my cellphone.  The

2    county jail did.

3              THE COURT:  Where did they get it from?

4              THE DEFENDANT:  The county jail had possession

5    of my cellphone.

6              THE COURT:  That's the state government.

7              THE DEFENDANT:  It had nothing to do with the

8    investigation.  It was being held in safekeeping with my

9    property.

10             THE COURT:  Okay.  So what you say happened is

11   they never seized my cellphone from me.  When I went to

12   the jail, the jail took custody of all the things I had

13   in my possession when I was arrested.  Is that what

14   happened?

15             THE DEFENDANT:  Yes, your Honor.  What

16   happens, when you go in -- at least Rockingham County

17   and in Strafford County, when you are brought in and

18   booked, brought into intake, they take your possessions,

19   any jewelry other than religious items or wedding bands.

20   They take cellphones --

21             THE COURT:  Well, I can't even respond to this

22   because the lawyers don't really know -- you have a

23   completely different statement about what happened with

24   the cellphone.

25             MR. ABRAMSON:  Your Honor, the facts --

1          THE COURT:  You're going to have to find out

2     exactly what happened.  I don't know whether Attorney

3     Vogelman is not doing his job until I know what happened

4     with the cellphone.  If indeed there was never any

5     seizure of the cellphone from him, although a seizure by

6     the county would be a seizure that's justified without a

7     warrant, and when -- if what you're saying happened is

8     you were arrested, you had it on your possession when

9     you were arrested, you were brought to the jail, and the

10    things that were in your possession were inventoried and

11    taken by the jail, it's hard for me to see that

12    happening because you're booked at a police station.

13    They don't let you keep your cellphone.  But if you

14    think that's what happened -- usually when the prison

15    has something it's because you surrender it to the

16    prison and they inventory what you have at the time of

17    your surrender.  You didn't surrender to the prison.

18          THE DEFENDANT:  No.  What happened, your

19    Honor -- this was part of bail that I wasn't allowed to

20    get to.  I was contacted by the local police chief and

21    informed that there would be a warrant for my arrest,

22    and I asked him if I should be prepared to surrender my

23    weapons to him.  He said not at this point.  Where are

24    you going to be?  I said, well, I don't know where

25    Cheyenne is.  I don't know where Stephanie is.  He said

1    maybe you should go to the courthouse.

2            THE COURT:  You've got long, long stories that

3    don't have any relevance to me.  I'm sorry, I can't let

4    you go on forever.  Were you arrested by the police or

5    did you surrender yourself to the jail?

6            THE DEFENDANT:  I was at the courthouse.  I

7    went to the courthouse in a form of surrender being

8    informed that there would be a warrant for my arrest.

9    Deputy sheriffs came up and took custody of me

10   temporarily and then brought me to the county jail.

11           THE COURT:  And they let you have your

12   cellphone with you while you were in their custody?

13   They didn't take it from you?

14           THE DEFENDANT:  They took it and then returned

15   it to my custody at the jail.

16           THE COURT:  They gave you your phone back at

17   the jail?

18           THE DEFENDANT:  Yes, your Honor.  Because what

19   they do is they have you sign documents of what items

20   were taken from you -- sorry, not taken from you, but

21   what items were in your possession that are being held

22   in safekeeping in your property bag along with your

23   clothes that you have.

24           THE COURT:  Okay.  I have no idea whether

25   Attorney Vogelman has been negligent or not in not

1    addressing this issue.  So you're just going to have to

2    -- I want the government to figure out -- you've got to

3    be able to tell me what happened to the evidence that

4    you're relying on.  I mean, you're relying on evidence

5    of these text messages and you don't even know how you

6    got them?

7            MR. ABRAMSON:  I understand, your Honor.  I do

8    know that the cellphone was seized during the course of

9    the state execution of the warrant and bringing him to

10   the facility, and after that I'm happy to look back

11   through the record and determine that.

12           THE COURT:  Okay.  And your position is there

13   was a seizure of the cellphone within the meaning of the

14   Fourth Amendment.  You're not certain today whether it

15   occurred by the police at the time they arrested him or

16   at the jail.  But in either event, it was seized from

17   him by county government officials, who are agents of

18   the state.  It was then maintained by the state, and you

19   argue that that was pursuant to a warrantless seizure,

20   either a search incident -- result of a search incident

21   to arrest or an inventory search of items taken into

22   custody at the time he's being in prison.  Right?

23           MR. ABRAMSON:  Correct.

24           THE COURT:  And therefore you say either of

25   those was lawful.  Right?

1          MR. ABRAMSON:  Correct.

2          THE COURT:  And then you say the federal

3    government asked for the cellphone, and the cellphone

4    was transferred from the county government to the

5    federal government.

6          MR. ABRAMSON:  I believe that's correct.

7          THE COURT:  Was that pursuant to a subpoena?

8    I don't even know what the subpoena thing is that he's

9    talking about.

10          MR. ABRAMSON:  Yeah.  I'm not a hundred

11   percent on the underlying facts of how our office

12   obtained the phone because I was not on the case at that

13   time, but my understanding is that it was transferred to

14   federal custody pursuant to a request by the FBI and

15   some motion was filed with the state court allowing the

16   transfer of that to the federal government.

17          THE COURT:  Okay.  So if that's so, then that

18   seems like that's perfectly lawful, and then there was

19   no search of the contents of the phone until a warrant

20   was obtained.

21          MR. ABRAMSON:  I believe that's correct.

22          THE COURT:  And a magistrate of this court

23   granted a search warrant to search it?

24          MR. ABRAMSON:  I believe that's correct.

25          THE COURT:  Okay.  Do you think that's wrong?

1          THE DEFENDANT:  I've never been given a copy

2    of a warrant.  I've never seen a copy of a warrant.

3          THE COURT:  All right.  I can't say --

4          THE DEFENDANT:  I understand, your Honor.

5    Also, if it was in state custody as evidence or county

6    custody, it would have been in the custody of either the

7    Brentwood Police Department or Rockingham County

8    Sheriff's Department.  This subpoena, on the top you

9    will see it's to Rockingham County Department of

10   Corrections, attention Steve Church, who's the

11   superintendent of the facility, because --

12         THE COURT:  Did you issue this subpoena?  What

13   is this thing?  I don't know what he's talking about.

14         MR. ABRAMSON:  I'm not sure, your Honor.

15         THE COURT:  Give it to him.

16         THE DEFENDANT:  I apologize for frustrating

17   you, your Honor.

18         THE COURT:  Look, we're just completely and

19   utterly wasting time here.

20         (Pause.)

21         MR. ABRAMSON:  Yes, your Honor, it does appear

22   to be a grand jury subpoena for the cellphone to be

23   released to federal custody.

24         THE COURT:  All right.  And you think that's

25   maybe how it got into the FBI is when it was produced to

1    the grand jury?

2            MR. ABRAMSON:  Yes, that's possible, your

3    Honor.

4            THE COURT:  Why didn't they just get a warrant

5    to seize the cellphone and search its contents?  If they

6    were going to get a warrant to search its contents, why

7    are they doing it pursuant to a grand jury subpoena?

8            MR. ABRAMSON:  I would have to look back at

9    the facts as how the phone initially came into our

10   custody, your Honor.

11           THE COURT:  But in any event, nothing that

12   I've seen suggests that anything wrong was done.  I

13   don't know what was done, but nothing that's been

14   described so far suggests anything wrong was done.

15           THE DEFENDANT:  They took possession of the

16   cellphone before the subpoena was authorized.  Before

17   the seizure subpoena was authorized, the FBI took

18   possession of the phone.

19           THE COURT:  Doesn't sound wrong to me.  It

20   doesn't suggest that Attorney Vogelman did anything

21   wrong.

22           THE DEFENDANT:  Well, on top of that, your

23   Honor, I have attempted to -- while I was in New York, I

24   attempted to contact him multiple times, especially

25   after a situation where an inmate had attempted to

1   sexually assault me.  Attorney Vogelman refused to speak

2   to me, refused to contact the facility.  I attempted to

3   email him.  He replied to one email, your Honor, and

4   that was in the beginning of my stay out at Manhattan,

5   MCC or MDC, the facility where I had the evaluation.  He

6   refused to contact me.  He told my wife that he would

7   meet with me as soon as I was placed at whatever

8   facility I was placed at whenever I came back to the

9   district.  He refused to make contact with me, refused

10  to speak to me.

11          THE COURT:  All right.  Attorney Vogelman, I

12  want you to keep a log of every communication you have

13  with your client and every time he attempts to contact

14  your office.  So your secretary should be instructed, if

15  you receive any communications from him, make a note of

16  every communication you've had because it appears you're

17  going to be accused of not communicating with him, and I

18  need you to keep an absolute record of this.

19          You don't have to take every single call he

20  has, but you do have to communicate with him on a

21  regular basis, and we need to have a record of exactly

22  what attempts are made to contact you, when you do

23  contact him.  So you need to keep very detailed records

24  of all of this.

25          MR. VOGELMAN:  I have those records for my

1   contacts with him.  It's on my time sheets which are

2   always reflected on my CJA vouchers.  Otherwise --

3   there's an issue here, Judge, and maybe I can head this

4   off.  Both from Mr. Irish and his family, I was getting

5   eight to ten phone calls a week.  None of them had

6   anything to do with this case.  The calls --

7           THE COURT:  Just like everything I've been

8   hearing today, almost nothing has any relevance to what

9   we're dealing with.

10          MR. VOGELMAN:  I told Mr. Irish and I told his

11  fiancee that unless it's an emergency, call me -- they

12  were calling me at home, on weekends, on my cellphone.

13  Mr. Irish would call her.  She would then forward it to

14  me, and I said, unless it's an emergency, you can call

15  once a week.

16          Then when I had my operation, I said please

17  don't leave messages on my machine, please don't speak

18  to my secretary, put it in writing.  There's no way I

19  can keep track of the messages I'm getting, and his

20  response and his family's response was to call my

21  receptionist a bimbo, a bitch, and other words worse

22  than that, screaming and yelling at every -- at my

23  paralegal.  And I have a rule in my office.  You yell at

24  a member of my staff, you can no longer call.  You have

25  to put it in writing.  And I informed him and his family

1   that unless it was an emergency, he had to put it in

2   writing.  And that's still going to be my practice,

3   because if you call my secretary a cunt and a bitch and

4   a bimbo, you lose the right to call my office.

5           THE COURT:  Well, you're not allowed to speak

6   to them in that tone, use those words.

7           THE DEFENDANT:  I didn't, your Honor.

8           THE COURT:  Stop.  You're going to be allowed

9   to call your lawyer twice a week.  You're going to

10  schedule times, twice-a-week phone calls, and you're

11  going to talk to the defendant for up to an hour twice a

12  week and listen to whatever he has to say.  Beyond that

13  you can't call your lawyer more than twice a week.

14  Anything else has to be communicated in writing.  Okay?

15          MR. VOGELMAN:  It's not okay with me, Judge.

16  It's an illegal order.

17          THE COURT:  Well, I'm ordering you to.  You're

18  going to take those calls.  You're going to talk to him

19  twice a week for up to an hour.  You're going to listen

20  to what he has to say.  I'm ordering you to do that.

21  Why do you say that's an illegal order?

22          MR. VOGELMAN:  Because I've been threatened

23  twice with a PCC complaint and --

24          THE COURT:  What do you want me to do?  Just

25  because it's difficult for you, I need to appoint a new

1  lawyer that will do the same thing for him?  You knew

2  what you were getting into when you accepted this

3  assignment.  You knew very well what you were getting

4  into.

5          MR. VOGELMAN:  I didn't expect him to abuse my

6  staff, Judge.

7          THE COURT:  So he will then abuse another

8  person's staff.

9          MR. VOGELMAN:  That's not my problem.

10          THE COURT:  It is your problem.  You're an

11  officer of the court.  You're working for me here.

12          MR. VOGELMAN:  I understand that, Judge.

13          THE COURT:  So it is your problem.  It's not

14  acceptable.  You will -- you can record his

15  conversation.  If he makes those kind of communications,

16  you can bring them to the Court's attention.  You will

17  talk to him twice a week, no more than twice a week.  He

18  will communicate anything else he has to communicate

19  with you in writing.

20          If you abuse staff, there's going to be a

21  recording made of it, and it's going to be brought to my

22  attention and you're going to be disciplined.  Do not

23  say one nasty thing to any of his staff.  Do you

24  understand me?

25          THE DEFENDANT:  Yes, your Honor.  I understand

1    that and I have not.

2            THE COURT:  I can't believe he's lying to me

3    about this.

4            THE DEFENDANT:  Your Honor, I understand,

5    however, there's testimony as far as the fact that he's

6    referred to an alleged law student who is assisting with

7    my case supposedly and works with him in his office.

8    However, his partner has no idea on who this individual

9    is.

10           THE COURT:  I don't care.  I am not going to

11   take this from either of you.  Mr. Vogelman, you are an

12   officer of the court.  You can't simply refuse to do

13   things that I instruct you to do.

14           MR. VOGELMAN:  You didn't instruct me until

15   today, Judge.

16           THE COURT:  Well, I'm instructing you now, and

17   to tell me it's not my problem, Judge, I don't care

18   about that.  This is a difficult case and I don't want

19   to be involved with it anymore.  Well, you're an officer

20   of the court.

21           MR. VOGELMAN:  That's not what I said.  I said

22   it's not my problem if he abuses other people.  That's

23   all I said.  I didn't say this wasn't my problem.

24           THE COURT:  Well, you're not going to get out

25   of the case just because he's difficult to work with.

1    I'm sorry.  I'm not letting you out just because he's

2    difficult to work with.

3              MR. VOGELMAN:  I don't think difficult is the

4    operative word, Judge.

5              THE COURT:  So it will be just as difficult

6    for anybody else.  What do I do?  I deny him the right

7    to a lawyer and force him to go -- what will happen if I

8    do that, if I deny him counsel?

9              THE DEFENDANT:  Motion to dismiss based on

10   violation of defendant's Sixth Amendment rights.  The

11   motion's right here ready to go, your Honor.  I have a

12   copy for the Court, for the prosecution, as well as for

13   me.

14             THE COURT:  Good.

15             MR. VOGELMAN:  I'm happy to do it, Judge.

16             THE DEFENDANT:  Too late.

17             THE COURT:  You'll do what you have to do.

18             THE DEFENDANT:  He's been ineffective counsel,

19   your Honor, and the information is in the motion.  I

20   would please request that the Court review the motion

21   and hold a hearing on the matter.

22             THE COURT:  I'm denying the motion that you

23   filed to replace him as your attorney.  Are you filing a

24   new motion?

25             THE DEFENDANT:  Yes, your Honor, I am.

1          THE COURT:  You need to submit it to counsel

2    and counsel will review it and determine whether it

3    should be filed.

4          THE DEFENDANT:  I'm filing this pro se, your

5    Honor, because it's an ineffective counsel motion.

6          THE COURT:  You can't file it pro se.  You

7    have to give it to your lawyer.  He will determine

8    whether it will be filed on your behalf.

9          THE DEFENDANT:  Just like he refused to file

10   the motion to dismiss based on outrageous misconduct by

11   the government, even though he sent me a letter saying

12   he would do it.  He refused to file the motion for that

13   dismissal, your Honor, after I told him I refused to

14   take the plea bargain.  He has been increasingly

15   argumentative and increasingly --

16         THE COURT:  I can understand why given the way

17   you behaved here in this proceeding today.  You're an

18   extraordinarily difficult person to deal with.  I would

19   not want to be representing you because -- stop

20   interrupting me, please.  You're an extremely difficult

21   person to work with.  I've been trying very hard to

22   listen to you, to accommodate you, to help you do what's

23   in your interest, and I know that you are an

24   extraordinarily difficult person to deal with.

25         What he's described here is intolerable.  You

1    cannot disparage his staff, call them names.  He says

2    you did that.  You say you didn't.  I believe him.  I

3    don't believe you.  I don't believe he would make that

4    up.  Okay?

5              THE DEFENDANT:  Well, your Honor, I understand

6    that, your Honor.  I understand because he is an officer

7    of the court.

8              THE COURT:  And I believe that in large part

9    because you are an extremely volatile person who is

10   constantly doing things.  Even in court when you are

11   trying to maintain your composure, you're not able to do

12   it.  You're oftentimes crying, you're oftentimes

13   interrupting, you're oftentimes shouting out your

14   answers.  You are an extremely emotionally, volatile

15   person.

16             And so his statement that you've been saying

17   these things to his staff when you don't get what you

18   want rings true with me.  That's what -- your behavior

19   suggests that that is, in fact, how you are behaving.

20             So I believe him rather than you, and I'm

21   instructing you don't do it again, and it is an order of

22   the Court that you may not attack his staff.  You may

23   not call them names.  You may not scream and yell at

24   them.  We're going to schedule two a week phone calls

25   with him and you're going to speak to him at those

1    times, and you're not otherwise to try to contact him,

2    unless it's an emergency.  You're otherwise to

3    communicate with him in writing.  That is sufficient.

4    Two hours a week of listening to you talk about whatever

5    you want to talk about is sufficient for him to be able

6    to do his job.

7              THE DEFENDANT:  Am I supposed to pay for these

8    telephone calls, your Honor, or is he supposed to pay

9    for them?  Because he refuses to put money on the

10   collect account so that I can talk to him.

11             MR. VOGELMAN:  He's on the account, sir.

12             THE DEFENDANT:  Your Honor, it says there's no

13   money on the account and that payment must be made.

14             THE COURT:  All right.  Put him on the account

15   if he isn't already so he can have the call done.

16             MR. VOGELMAN:  As I told the Court, I made the

17   determination that that motion would be frivolous, and

18   that's what I put in the letter and that's why the

19   motion wasn't filed.  I did the research.  I saw no

20   basis for a dismissal because of outrageous government

21   misconduct.

22             THE COURT:  Okay.  That's his position.  He

23   believes your motion is frivolous.

24             THE DEFENDANT:  Well, your Honor, it seems as

25   if he already came to that conclusion before he even got

1    any of the information, obviously.

2            THE COURT:  All right.  You file your motion.

3    I will allow you to file that motion pro se.  You object

4    to that motion.  When the objection is in, I will rule

5    on it on its merits.  Okay?  So that motion will be

6    filed and resolved on the papers.  All right?

7            THE DEFENDANT:  Thank you very much, your

8    Honor.

9            And if it would please the Court, just for

10   information purposes, Agent Christiana -- and testimony

11   of this can be given by my mother as well.  Agent

12   Christiana stayed at her campground on her property

13   under a fake name this past summer.  Nobody knows why,

14   but he did it.

15           THE COURT:  That's a very good example of the

16   problem that you're having.  You're not focusing on the

17   charges that are pending against you and that if you're

18   convicted of will result in incarceration.  You need to

19   try to focus on getting your freedom back.  That's what

20   you need to do.  And these other things about whether --

21   you don't like Agent Christiana.  You think he's doing

22   bad things.  When this case is resolved, if you think

23   he's violating your constitutional rights, you can

24   pursue a lawsuit against him.

25           But this issue -- your freedom is at stake

1    here.  I don't want to see you jailed one day longer

2    than you need to be, but if you are unable to focus on

3    the issues that are relevant to your continued

4    incarceration, it's going to result in bad things for

5    you.

6              THE DEFENDANT:  I understand, your Honor, and

7    you're right, the remaining counts, Counts 1, 2, and

8    5 -- first of all, the grand jury testimony of my wife

9    was led as well as she was asked to lie on the stand.

10   That's neither here nor there -- and I don't like to

11   assume things, but I'm going to assume that I'm not

12   going to be allowed to elaborate on that any further.

13   As far as the witnesses go, they claim I'm an alleged

14   threat to the witnesses.  Your Honor, I want these

15   people to get on the stand and say the same things that

16   they said in their FBI interviews because, your Honor,

17   they will be the ones committing perjury and it will not

18   look good on the government.  The government's case is

19   equal to that of a submarine with a screen door, your

20   Honor.  It's nowhere near airtight.

21             THE COURT:  Well, that's a fancy, fun way of

22   talking about it, but the problem is they have you on

23   tape, according to the government, acknowledging that

24   you -- facts that make the false statement claim against

25   you.  They have you on tape making statements about the

1    receiver that will implicate you in the crime.  You

2    can't simply ignore -- you can't pretend like the

3    evidence against you doesn't exist.

4            THE DEFENDANT:  I'm not pretending that the

5    evidence doesn't exist, your Honor.  There is no

6    evidence of me being on tape speaking about a lower

7    receiver claim, not at all.

8            THE COURT:  I'm sorry, I misunderstood

9    something that you were saying about the receiver.

10           MR. ABRAMSON:  No, your Honor, there are

11   recorded statements in which the defendant tells a

12   cooperating witness that he has purchased the lower

13   receiver and he has put all of his own money into the

14   receiver for the subsequent -- which will end up being

15   for the subsequent resale of the completed gun to an

16   undercover officer.

17           THE DEFENDANT:  Your Honor, so here we are

18   talking about two counts right now, two separate counts.

19   We are discussing the facts of what the government is

20   claiming as facts and supposed evidence of.  The lower

21   receiver they're claiming that I put my money into for

22   the subsequent sale, that would be the lower receiver

23   I'm being accused of telling my wife to purchase for

24   Count 1, the aiding and abetting false statement in

25   connection to acquisition of a firearm.

1          THE COURT:  I've got to try a case.  When is

2    the trial set in this case?

3          MR. ABRAMSON:  It's scheduled for

4    December 2nd.

5          THE COURT:  All right.  We'll try the case on

6    December 2nd and we'll see what happens.

7          You both need to understand something.  You

8    are both officers of the court.  I recognize this

9    defendant is extraordinarily difficult to deal with.  He

10   is competent to stand trial, but he suffers from

11   significant mental illness.  He acknowledges that

12   himself.  He suffers from PTSD, among other things.  He

13   has significant mental illness.  He's an extraordinarily

14   difficult person to deal with.  He's not focusing on the

15   charges against him to his detriment.  That must be

16   extremely frustrating to you, counsel, as his lawyer.  I

17   know you want the best for him and it's very hard to

18   work with somebody that won't see the world as it is as

19   he appears to be.  That's very frustrating.  I know that

20   you think he's a dangerous person, a criminal, a bad

21   person.  He should get punished for what he did.  But he

22   has constitutional rights.  He has a right to have

23   access to the evidence that the government has against

24   him to the extent it's been produced to his lawyer.  He

25   has a right to that, and you have to ensure that he

1    receives that right.

2            He has a right to counsel.  Difficult

3    defendants have a constitutional right to counsel.  Just

4    because they're pains in the neck to deal with doesn't

5    mean they don't have the right to an attorney, and you

6    have to fulfill that right.  Just because they're

7    threatening you with professional misconduct, that's

8    routine.  You know that.  How many times has a client

9    threatened you that they will refer you to the

10   Professional Conduct Committee?  That happens all the

11   time in my courtroom.  That should be unsurprising to

12   you.

13           Now, I understand, you have to protect your

14   staff and I support that and I will support you in it,

15   and I have just issued an order to the defendant that

16   he's not to be permitted to engage in that kind of

17   conduct, and you can police it by recording his

18   communications, if necessary, to ensure that.

19           But even as a difficult person, he has a right

20   to have an attorney.  And you say it's not your problem

21   what happens to other attorneys, but it would just be

22   repeated.  I know given your experience and your

23   background, if you can't work with him, I don't know who

24   can.  And the next person will have the exact same

25   problem.  And the only answer to this I know is to get

1    this case to trial and to get it resolved.  He's

2    entitled to his day in court and I want to give him his

3    day in court.

4           I want him to have all the discovery to which

5    he's entitled.  I want him to have the assistance of

6    skilled counsel.  He doesn't have to like the attorney.

7    He doesn't have to agree with what the attorney does on

8    his behalf.  He's not entitled to 24/7 communication

9    with his attorney, but he's entitled to reasonable

10   communication with his attorney.

11          Two hours a week is more than sufficient

12   communication in a case which at this point has become a

13   rather simple case.  In the earlier phases this case was

14   unnecessarily complex based on charging decisions that

15   the government made that I don't think were wise to

16   begin with, but what you've done now is you've

17   simplified the case very dramatically.  So the case is

18   you bring in an agent who says I talked to the defendant

19   and this is what he said to me.  And then you put on

20   your evidence as to why what he said to the agent was

21   not true and can justify an inference that it was

22   knowingly untrue.

23          You put on your gun charge and you put on the

24   evidence to show that it was a straw purchase.  He can

25   call his -- are you married to her now?  I can't

 1    remember.

 2              THE DEFENDANT:  Common law wife, your Honor.

 3              THE COURT:  -- common law wife to testify and

 4    she can say I bought it and, you know, whatever

 5    explanation they have about how he ended up with the gun

 6    that she bought.  You know, that's fine.  That's a great

 7    two or three-day trial and, you know, if he has some

 8    defense, he can try to put it on.  But we're not going

 9    to be getting into what happened in a child custody

10    battle and how his father abused him and how the agents

11    are staying at his campground.  Those are not issues

12    that concern this case at all.

13              THE DEFENDANT:  Your Honor, if I may, the

14    issue with my father is going to have a slight bearing

15    at least on Count 2 specifically because, your Honor,

16    Agent Christiana that day, the first thing he said to me

17    was I need to talk to you about your father.  And he

18    starts singing the praises to the Lord about the great

19    person my father was.  And that's where that

20    conversation started and that's what that conversation

21    was about.

22              THE COURT:  To the extent you can introduce

23    evidence as to what the conversation was, that reference

24    can come in, but we're not going to have a trial about

25    whether your father was an abuser of you.  We're not

1    going to have a trial about whether your children were

2    wrongly taken from you.  We're not going to have a trial

3    about whether you threaten your common law wife or you

4    don't.  We're going to have a trial about did you make a

5    false statement to a law enforcement officer that

6    qualifies as a crime under federal law.  We're going to

7    have a trial about did you -- what's the straw purchase

8    charge?

9              MR. ABRAMSON:  Aiding and abetting.

10             THE COURT:  The aiding and abetting charge.

11   Did you aid and abet in a straw purchase, and we're

12   going to have a trial about are you a marijuana user who

13   has possession of firearms.

14             THE DEFENDANT:  Is the government going to be

15   allowed -- let me rephrase, back up.  The assented to

16   motion to dismiss Counts 3 and 4 -- and you're going to

17   look at me like I'm crazy, your Honor.  I told Attorney

18   Vogelman I objected to dismissing those two counts.

19   Because, your Honor, Count 4, I can prove beyond a

20   shadow of a doubt entrapment.  Count 3, I can prove that

21   the government's informant, my former boss at the

22   firearms store, lied to federal authorities and misled

23   the investigation.

24             THE COURT:  You don't have a right to have

25   charges brought against you.  There's no constitutional

```
 1   right to be indicted or to be tried on charges, and the
 2   government has substantial discretion to dismiss charges
 3   that it brings.  The government can even move to dismiss
 4   charges after a conviction, and the judge has very
 5   limited power to stop the government from dismissing
 6   charges that it brings.  So I don't have any real power
 7   to stop them under these circumstances.
 8            THE DEFENDANT:  No, I understand that, your
 9   Honor.  I'm just voicing my opinion that I wanted those
10   to go to trial so that I could prove --
11            THE COURT:  I understand, you want trials on
12   things that are irrelevant to the issues in front of
13   you.  That's the number one problem that you're not
14   seeing and why I am concerned about you is that you want
15   to be involved with everything other than what the
16   actual charges are against you, and it's going to end up
17   being a very bad result for you because you're not able
18   to focus on what it is that are the three charges that
19   you're going to have to face.  And if you focus on
20   those -- and this may be overly technical for you, but
21   when the government brings a charge, there are certain
22   things that the government has to prove with respect to
23   the charge.
24            THE DEFENDANT:  Elements of the case, yes,
25   your Honor.
```

1          THE COURT:  Elements of the case.  And your
2    lawyer can tell you, for each of those charges, the
3    elements are 1, 2, 3, and 4.  If they prove 1, 2, 3, and
4    4 beyond a reasonable doubt, you get found guilty unless
5    there's some kind of affirmative defense.  And that's
6    what you should be focused on.  Everything that you want
7    to do, you should be trying to figure out how does that
8    relate to my defense.
9          THE DEFENDANT:  Yes, your Honor.  I was just
10   mentioning that for informational purposes because those
11   are the two biggest charges where it was blatantly
12   obvious right in front of everyone that the government
13   was doing things they weren't supposed to do and they
14   set me up, in layman's terms.
15         THE COURT:  But entrapment as you've
16   learned -- I'm sure your research and discussion with
17   lawyers -- is not as simple as does the government set
18   me up.  The government sets up people all the time for
19   crimes and they get convicted of them.  The entrapment
20   defense is a very narrow defense that -- it doesn't look
21   like that is available to you with respect to these
22   charges.
23         THE DEFENDANT:  These three charges, no, your
24   Honor, not these three charges.  No, I apologize --
25         THE COURT:  So you won the victory on the ones

```
1   that are dismissed.  Let's focus on the ones that are
2   still in front of you.  I want to remind you, you do
3   have constitutional remedies.  If the government does
4   bad things to you, you can bring a civil suit against
5   them at some later time.  You might be able to bring a
6   Federal Tort Claims Act claim against them, some kind of
7   Bivens claim against them.  I don't know.  But they
8   aren't going to help you with your defense to these
9   criminal charges.
10          THE DEFENDANT:  Your Honor, the only reason I
11  brought that up is for informational purposes as well as
12  the fact -- they dismissed Count 4, however, they're
13  still bringing up not just elements of Count 4 but
14  specific parts of Count 4 which were the reason Count 4
15  was brought ahead, which was one of the firearms sales,
16  and they're bringing it as part of Count 1.  So Count 1
17  is part, directly sliced, half of Count 4.  So therefore
18  Count 4 is gone.  Either they have got to wipe out Count
19  1 or they have got to figure something else out, because
20  discussing Count 1, they're clearly saying how Count 1
21  and Count 4 are one and the same.
22          MR. VOGELMAN:  Judge, I can articulate because
23  he discussed this with me and I told him I disagree with
24  him.  His claim is that once you dismiss the two counts,
25  the counts that are left are fruit of the poisonous tree
```

1    and must be dismissed as well.  In my legal opinion, I

2    told him I didn't believe that was true.

3             THE DEFENDANT:  No, I misspoke on that, your

4    Honor, and I apologize.  I'm actually --

5             MR. VOGELMAN:  While he's looking, Judge, will

6    a personal visit to the jail equal one of those phone

7    calls?

8             THE COURT:  Yes.  You will either visit with

9    him or speak to him twice a week at a regularly

10   scheduled time.  Other communications need to be in

11   writing unless it's an emergency.  If his mother wants

12   to contact you, she should do so in writing.  That's the

13   way it goes.  The defendant does not have a

14   constitutional right to have his mother talk to his

15   lawyer.

16            THE DEFENDANT:  She just has pertinent

17   information about the case, your Honor, as well as my

18   wife.

19            THE COURT:  I know, but you can't have the

20   lawyer constantly being bombarded by calls, and I have

21   less control over them than I have over you.

22            THE DEFENDANT:  Yes, your Honor.  Maybe you

23   will understand how I'm trying to explain this and why

24   I'm explaining it the way I am.  This is part of the

25   draft plea bargain they sent.

1              Several months later, on September 21, 2013,

2    the defendant drove his girlfriend, hereafter referred

3    to as ST, to Riley's Sport Shop, Inc., of 1575 Hooksett

4    Road in Hooksett, New Hampshire, which is a federal

5    licensed firearms dealer.  The defendant identified a

6    firearm that he wished ST to purchase for him,

7    specifically an assault rifle lower receiver, and upon

8    arriving at Riley's, provided ST with the funds to

9    purchase the firearms, Count 1.  While the defendant

10   waited, ST filled out the requisite ATF Form 4473 to

11   purchase the Matrix Aerospace Model MA-15 assault rifle

12   lower receiver with serial number 5560179 on that Form

13   4473.  ST stated, at the defendant's request, that she

14   was the actual transferee/buyer of the firearm when in

15   fact the defendant was the actual transferee/buyer of

16   the firearm.  While the defendant was not a prohibited

17   person at the time of the purchase -- while the

18   defendant was not a prohibited person --

19              THE COURT:  Why are you reading this to me?

20              THE DEFENDANT:  Because at the end of it it

21   continues explaining that situation, and then it goes

22   and says:  At the conclusion of the transaction, ST paid

23   the money provided to her by the defendant, took

24   possession of the firearm, the lower receiver, and upon

25   exiting Riley's Store immediately handed the lower

1  receiver to the defendant who subsequently incorporated

2  the lower receiver into a complete assault rifle which

3  he had sold approximately two weeks later.

4          Now, that sale, your Honor, was to their

5  undercover agent as sale number three for Count 4 of the

6  indictment which was subsequently dismissed.

7          THE COURT:  Right.

8          THE DEFENDANT:  So, therefore, this lower

9  receiver would have never come into my possession unless

10  Count 4.  So because of Count 4's existence, Count 1

11  exists.

12         THE COURT:  Well, it came into your possession

13  because you sent your common law wife in to get it for

14  you and you then used it in a -- putting together a

15  weapon that you sold to someone else.

16         THE DEFENDANT:  Because the confidential

17  informant and his supposed customer, the undercover

18  agent, told me we will give you $1,200 front money for

19  that weapon.

20         THE COURT:  Right.  But that's not entrapment.

21  You see --

22         THE DEFENDANT:  Your Honor, that is the

23  only -- I'm sorry to cut you off.  That is the only

24  reason because I had filed in the 4473 for -- my name

25  for my lower receiver is also in the discovery.

1          THE COURT:  I think you need to have a trial

2    and the jury will hear everything you have to say and

3    the jury will decide whether you committed these crimes

4    or not.  That's what a trial is for.

5          THE DEFENDANT:  I agree, your Honor.  However,

6    I cannot do it fairly and have effective proper counsel

7    with Attorney Vogelman.  I do not feel he's going to do

8    the full amount of defense.

9          THE COURT:  No lawyer will do what you want to

10   do because what you want to do is not in the judgment of

11   any lawyer a permissible line of defense for you, and

12   I've told you in the past you can represent yourself or

13   you can have a lawyer, but you can't control what the

14   lawyer does on your behalf.

15         THE DEFENDANT:  I don't want any mention of --

16   I'm not trying to use my daughter's situation as a

17   defense, nothing about my -- the issues with my father.

18   I would rather not even think about those because of

19   what they have done to me.

20         THE COURT:  What do you want to raise that you

21   don't think Attorney Vogelman will let you raise?

22         THE DEFENDANT:  I just don't think he's going

23   to adequately fight for me and defend me.  However, your

24   Honor -- and this is why I specifically requested

25   Attorney Evan Nappen.

1          Since I was initially arrested on November 1,

2    2013, I have been in contact with Attorney Evan Nappen

3    on this matter, and because I was unable to come up with

4    the $50,000 required to obtain him, I could not hire

5    him.  However, Attorney Evan Nappen is very well

6    informed of this case.  Not only does he have knowledge

7    of this case from the beginning and knows that with the

8    proper defense -- and he's told myself and my mother and

9    my wife that Attorney Saxe and Attorney Vogelman can

10   call him at any point in time with any firearms

11   questions because he is one of the top Second Amendment

12   attorneys.

13          THE COURT:  Who is this guy?  I've never heard

14   of him.

15          THE DEFENDANT:  Attorney Evan Nappen.

16          MR. VOGELMAN:  He's a New Hampshire lawyer,

17   Judge.  I don't know whether he's admitted into this

18   court or not.

19          THE COURT:  I never heard of him.  Is he a

20   member of our bar?  Do you know?

21          THE DEFENDANT:  N-A-P-P-E-N.  I've spoken to

22   his office and Evan is more than willing.  He is onboard

23   as long as I can come up with the funds.

24          THE COURT:  We can't pay someone $50,000 to

25   represent you.  I'm sorry.  You have a right to a court-

1     appointed lawyer who will do what's necessary to defend

2     you, but you don't have a constitutional right to the

3     lawyer of your choice.  If you can't hire him -- I'm not

4     even sure he could practice in our court.  Is he a

5     member of our bar?

6                    THE CLERK:  He's a member of our bar.

7                    THE COURT:  To my knowledge I've never heard

8     of him.

9                    THE DEFENDANT:  I understand that, your Honor.

10    I understand a defendant, the Sixth Amendment guarantees

11    them a right to counsel.  They cannot cherry pick and

12    say, well, I want this one, I want that one.  However,

13    I've had issues with two separate attorneys who are not

14    very well versed in firearm law.  They do not --

15                    THE COURT:  You've had two of the most

16    experienced attorneys that we have in our court.

17    Attorney Saxe has been -- probably appeared in more

18    federal criminal trials in this district than all but

19    maybe two or three lawyers in the state.  Attorney

20    Vogelman has had a lifetime of practice as a public

21    defender, as a civil rights lawyer, as an experienced

22    member of our bar.  He's vastly experienced, vastly more

23    experienced than this other guy who I have never even

24    heard of who you like, and, you know, to say that they

25    don't know what they're doing is just wrong.  Both of

1    them are highly, highly experienced.

2            They're challenged in dealing with you because

3    you're so difficult to work with.  I understand that.

4    Attorney Saxe, I let you get rid of him even though he's

5    a highly experienced lawyer.  But I can't just keep

6    cycling you through lawyers.  My judgment is there is no

7    lawyer who I could appoint for you who you could work

8    with because no lawyer who's a member of the bar, who's

9    familiar with his obligations as an officer of the

10   court, will pursue the lines of defenses that you want

11   to pursue because they're not acceptable.  They cannot

12   lead to an acquittal.  They cannot benefit you.  And if

13   you want to pursue those lines yourself and represent

14   yourself, you can, but I can't do anything more for you

15   than that.

16           THE DEFENDANT:  No, your Honor, I understand.

17   I'm not bringing up what I'm talking about for a

18   defense.  I am not guilty of these charges as they're

19   alleged.  The thing is, your Honor, is that -- and I

20   apologize.  Attorney Saxe has a reputation as well as

21   Attorney Vogelman, and if this was a drug case or a

22   conspiracy case, I'd hop right on them for

23   representation in a heartbeat.  If I wanted a quick and

24   good deal for a plea, I'd take it in a heartbeat.

25   However, for whatever reason, when it comes to firearm

1   code and firearm law specifically, which is what this is

2   about -- let's cut down to it.  The government does not

3   want me to possess firearms.  That's what this comes

4   down to.  And Attorney Evan Nappen specializes in this,

5   in firearm law and firearm stuff.

6           THE COURT:  I can't do anything for you.  I

7   can't appoint Attorney Evan Nappen to represent you, and

8   I can't write you a check for $50,000 so you can hire

9   him.  There just isn't any basis in the law for me to do

10   that.

11           I think we've covered -- I've gone around and

12   around about as much as I can here.

13           Ma'am, just briefly, did you want to say

14   something?

15           MS. HASKELL:  Yes.  I just wanted to

16   address -- you said I could write to Attorney Vogelman?

17           THE COURT:  Yes.

18           MS. HASKELL:  I've done that.  He doesn't

19   respond.

20           THE COURT:  He doesn't represent you.  So he

21   doesn't have to contact you.

22           MS. HASKELL:  But I can tell you that I have

23   not been rude to his staff.  I am a professional.  I own

24   my own business.  I have not been rude to his staff, but

25   what I received from his staff, those people would work

1   for me for five minutes.  You don't say to somebody,

2   this man's staff speaking for Attorney Vogelman, "Put it

3   in writing," slam goes the phone.

4            THE COURT:  I'm not going to get -- this isn't

5   reality TV here, okay?  I'm done.  I've heard you on it.

6   Thank you.  Communicate with the lawyer in writing.  I'm

7   not going to get back into adjudicating what was said in

8   your phone calls with Mr. Vogelman.  I'm done.  I'm

9   done.

10           I made clear my position.  I've denied your

11  motion for new counsel.  I've instructed Mr. Vogelman as

12  to what his relationship with you is to be like.  I've

13  reminded Attorney Vogelman and the government that

14  you're officers of the Court, and it's your duty to help

15  me fulfill this defendant's constitutional rights.

16  Okay?  We've got to get him a trial, a fair trial where

17  his constitutional rights are being respected.

18           That's the only way this is going to end.  I

19  can't do it.  I need you both to do it.  And it requires

20  extra effort, and I understand that, and I wouldn't want

21  to be in your positions, but you have to do it.  That's

22  what it comes down to, okay?  Because I can't do it.

23           I've tried today to listen and try to get the

24  defendant to do what's in his interest, but I can't do

25  it.  It's up to you.

1          Do the best you can.  I recognize it's not

2    going to be a satisfying experience, but as much as you

3    are frustrated with him, I know, Attorney Vogelman, you

4    value the constitution and you recognize how important

5    it is for this defendant that he get a fair trial with a

6    vigorous advocate working on his behalf, and I am

7    confident that you can do that regardless of these

8    difficulties.

9          If you should encounter disrespectful

10   interactions with him and you need further assistance

11   from the Court, request a hearing, but come forward with

12   evidence as to what he's doing because I will at that

13   point be considering whether to hold him in contempt of

14   court because I've ordered him not to be disrespectful

15   to you and your staff.  If he can't do that, then I may

16   further limit his communications with you.  If he

17   doesn't communicate with you in a way that can be

18   productive, he may lose the right to communicate with

19   you.  All right?  We'll deal with it on an incremental

20   basis, but I will not tolerate anyone abusing your staff

21   or you.  And he can lose rights that he has, and if he

22   doesn't communicate with you effectively, he may lose

23   those rights.  But until then I want you to make every

24   effort to work with him.  All right?

25          And I want you to resolve this discovery issue

1    because I can understand the defendant's frustration.

2    If he can't see the evidence against him -- it would

3    seem to me that it would be in your strong interest to

4    actually lay out for him here are the witnesses and

5    exhibits on each of the counts, and this is the

6    evidence -- you've set it out for me very clearly.  Set

7    it out for him and give it to him so he can actually

8    look at it.

9            MR. VOGELMAN:  Just so it's clear, Judge, he

10   had everything at the beginning.  This all happened when

11   they shipped him off to New York and came back.  When he

12   was in Strafford County he had the evidence.

13           THE DEFENDANT:  What happened, your Honor,

14   after I had been forced into a cell and assaulted, I

15   contacted Attorney Vogelman who subsequently contacted

16   the Marshal Service I believe and had them transfer me.

17   I woke up that morning to the corporal and lieutenant

18   saying, Irish, pack your crap, you're out of here,

19   you're going home.

20           I packed up.  My wife was on the phone.  She

21   thought I was going home, that everything was done and

22   over with.  I said, I don't know.  They're probably

23   going to bring me to the courthouse to cut me loose from

24   there.  The judge might want to talk to me.  I don't

25   know what's going on.

1           This was 5:00 in the morning.  I go down to

2    booking.  The gentlemen who do the Strafford County

3    transport -- I believe it was these two gentlemen

4    transported me up here, and then I sat until 1330 hours

5    until finally a marshal came and spoke to me, and I said

6    what's going on?  I was told I'm going home.  He said,

7    oh, no, you're not.  You were involved in an

8    altercation.  Like I was assaulted.  I started

9    explaining.  He said, well, you're being transferred to

10   Middleton.  And he wouldn't allow me to have my thumb

11   drive, my paperwork discovery, any of it.

12           THE COURT:  I don't need to hear this.  I've

13   addressed it.  I've said you're going to get your

14   discovery.  Okay?  So I've addressed that issue.

15           If you feel people violate your constitutional

16   rights, you can pursue a civil suit against them.  If

17   you have issues with your defense, you will raise them

18   with Attorney Vogelman.  I will adjudicate your motion

19   for dismissal based on extreme prosecutorial misconduct

20   when it is fully briefed.

21           I have established a timetable for the

22   government to produce this information that I need.  I

23   will get a transcript.  I will rule on the bail hearing,

24   the request for bail, and I will rule on this extreme

25   prosecutorial misconduct motion to dismiss.

1          I've denied the motion to discharge counsel.
2    I've made clear that the defendant remains free to
3    represent himself if he chooses, but that I do not find
4    a sufficient basis to have been established to dismiss
5    Attorney Vogelman.  What else?  Yes?
6          THE DEFENDANT:  Your Honor, that's not a
7    motion to dismiss based on outrageous prosecutorial
8    misconduct by the government.  That motion was a motion
9    to dismiss based on violations of the defendant's Sixth
10   Amendment right for effective counsel.  That's what that
11   motion was.  I just wanted to clarify.
12         THE COURT:  Okay.  I thought you wanted to
13   file the extreme prosecutorial misconduct motion.
14         THE DEFENDANT:  No, your Honor, because
15   everything that I had written out was sent to Attorney
16   Vogelman and he refused to file it.
17         THE COURT:  Okay.  So this motion is to
18   dismiss --
19         THE DEFENDANT:  2255 essentially, your Honor.
20         THE COURT:  Yeah.  To the extent you're asking
21   for relief based on the fact that Attorney Vogelman is
22   not an effective attorney, that motion is denied.  I do
23   not have any power to dismiss the case against you
24   because your lawyer provides ineffective assistance.  So
25   if that's what you're asking for, it's denied.

1          THE DEFENDANT:  It's not only Attorney

2   Vogelman.  It was Attorney Saxe as well, your Honor, and

3   because of certain things that they have communicated to

4   the government, certain --

5          THE COURT:  I don't have the power to dismiss

6   your charges because your lawyers are bad.  I have the

7   power to give you a new lawyer, but you're not asking

8   for that in this motion.  I do have under limited

9   circumstances power to dismiss an indictment based on

10  extreme prosecutorial misconduct, but that's not the

11  relief that you're seeking so I don't need to grant that

12  motion.

13         THE DEFENDANT:  Well, that's really what I

14  have attempted to seek, your Honor, but Attorney

15  Vogelman --

16         THE COURT:  I will look at whatever it is you

17  filed.  I can't understand what it is.  So I will look

18  at it and do something with it.  Is there anything else

19  we need to deal with today?

20         MR. VOGELMAN:  Nothing, Judge.  Thank you.

21         THE COURT:  Okay.  Thank you.

22         THE DEFENDANT:  Also, real quick, your Honor,

23  I have also requested Attorney Vogelman to give me the

24  new Sentencing Guidelines that have been recalculated

25  after the two charges were dismissed.  He has failed to

1    do that.  He hasn't even given me my original guidelines

2    from the beginning of --

3                THE COURT:  You mean he hasn't tried to figure

4    out what your expected guideline range would be.

5                THE DEFENDANT:  He keeps telling me that he

6    has them at the office in a file.

7                THE COURT:  Attorney Vogelman, I know that you

8    can't guarantee anything with respect to a Sentencing

9    Guideline range, but sit down based on what you know now

10   about the charges and the defendant's background and

11   give him in a letter -- send him a letter in which you

12   state for him what you believe the current guideline

13   range would be if he's convicted on the charges against

14   him.

15               MR. VOGELMAN:  I will, Judge.

16               THE DEFENDANT:  And just for clarification,

17   Larry, are you going to give us any issues with the

18   credibility and the investigation into the witnesses

19   that the government's using because, just so the Court's

20   aware as well, your Honor, one of the main witnesses

21   that the government's attempting to use claiming that I

22   smoked marijuana with him is a well-known drug dealer

23   from Seabrook, New Hampshire, and it has been on the

24   local police department's radar for quite some time.

25               THE COURT:  You know, I've probably heard that

1    a thousand times in the last 20 years, and that's fine,

2    and he will do it.  I could give the line of

3    cross-examination in my sleep of the witness who

4    testifies who's the known drug dealer testifying against

5    somebody else because I've heard -- probably heard Mr.

6    Vogelman do it.  I've heard many, many, many lawyers do

7    it.  It's just routine stuff.  It can be done in the

8    ordinary course.

9                MR. VOGELMAN:  And I have that information.

10               THE COURT:  I can construct the closing

11   argument for you, too.

12               MR. VOGELMAN:  I'd appreciate it.

13               THE COURT:  Those are routine things that are

14   dealt with ordinarily in the course of trial.

15               THE DEFENDANT:  I just wanted to bring it up,

16   your Honor.

17               THE COURT:  Okay.  Thank you.  You're excused.

18               MS. HASKELL:  What is the trial date, your

19   Honor, because we're confused.  Is it for December 2nd?

20   Just so I can get it on my calendar.

21               THE COURT:  Jury draw is December 2nd.  We

22   generally will draw the jury and try the oldest criminal

23   case on my docket starting on that date.  It could start

24   anywhere between December 2nd and the next two weeks,

25   but we'll draw the jury on December 2nd.

1          MS. HASKELL:  Thank you.

2          (Adjourned at 2:30 p.m.)

1              C E R T I F I C A T E

2

3          I, Diane M. Churas, do hereby certify that the

4   foregoing transcript is a true and accurate

5   transcription of the within proceedings, to the best of

6   my knowledge, skill, ability and belief.

7

8   Submitted: 5/28/15         DIANE M. CHURAS, LCR, RPR, CRR
                               LICENSED COURT REPORTER, NO. 16
9                              STATE OF NEW HAMPSHIRE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25